**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas

MAR 0 7 2002

Michael N. Milby
Clerk of Court

| | |
|---|---|
| FINSA DEVELOPMENT CORPORATION § | |
| § | |
| Plaintiff, § | B-02-043 |
| § | |
| VS. § | CIVIL ACTION NO. _____ |
| § | |
| WALNUT GROVE L.L.C. § | |
| § | |
| Defendants. § | |

**MOTION TO DISMISS FOR IMPROPER VENUE OR**
**IN THE ALTERNATIVE, MOTION FOR STAY PENDING**
**THE OUTCOME OF THE PRIOR AND PENDING ILLINOIS SUIT**

Defendant Walnut Grove L.L.C. ("Walnut Grove") files this Motion to Dismiss For Improper

Venue, or in the Alternative, Motion for Stay Pending the Outcome of the Prior and Pending Illinois

Suit, and in support thereof would respectfully show the Court as follows:

### I. Summary of Motion

Defendant Walnut Grove seeks the dismissal of this action on account of a forum-selection

clause between the parties designating Illinois state court as the exclusive forum for resolution of the

parties' contractual dispute.   For more than nine months, the parties have already been in litigation

in Illinois state court over this controversy pursuant to the forum-selection clause.  This Texas suit

is a second suit needlessly filed and entirely duplicative of the Prior and Pending Illinois suit.   In

the alternative to dismissal of this case,  this case should be stayed pending the outcome of the Prior

and Pending Illinois suit.

## II.  Background Facts and Procedural History

In 1999 Walnut Grove contracted with plaintiff Finsa Development Corp. ("Finsa") to build a warehouse in Los Indios, Texas.  Finsa was the builder of the project.  The parties entered into a written contract to govern their relations, entitled the "Design/Build Agreement Between Owner and Contractor."  (hereinafter the "Agreement").  A true and correct copy of this Agreement is attached as Exhibit A.

The Agreement contained a choice of forum clause by which the parties agreed that any dispute would be brought for trial in the State Court of Illinois.  Section 17(a) of the Agreement is the choice of forum provision, and it reads as follows:

> The parties to this Agreement hereby consent to the jurisdiction of the State of Illinois and hereby consent and agree that any action or proceeding involving the interpretation and/or enforcement of this Agreement shall be brought in the appropriate state court in the State of Illinois covering Madison County.  Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, any objection either party may have to such venue, any defense of an inconvenience forum to the maintenance of such action or proceeding , and any rights to remove such action to federal courts.

See Exhibit A, page 18.

The warehouse building was to be completed on or before June 8, 2000.  A dispute has arisen over the completion of the warehouse.  Walnut Grove maintains that the warehouse has not been completed and full payment is not due, while Finsa maintains that the warehouse has been completed and full payment is due.

More than nine months ago, in July 2001, Walnut Grove filed a lawsuit against Finsa over this controversy in the State Court of Illinois in Madison County, Illinois in July 2001 in accordance with the forum selection clause of their Agreement.  Exhibit B is a true and correct copy of that suit.  The style of the prior and pending Illinois case is *Walnut Grove, L.L.C. v. Finsa Development Corp.*,

Cause No. 01 L 1121, in the Third Judicial Circuit Court for Madison County, Illinois (hereinafter the "Prior and Pending Illinois Suit").

More than eight months ago, in August 2001, Finsa appeared and answered the Prior and Pending Illinois Suit. Finsa is defending it there now.

More importantly, Finsa asserted counterclaims against Walnut Grove in the Prior and Pending Illinois Suit for various relief, including the monies it claims it is owed under the Agreement for the work done. A true and correct copy of the Answer and Counterclaim filed by Finsa in Illinois is attached as Exhibit C. More than three months ago, the Illinois Court entered a scheduling order for discovery and trial of the Illinois suit.

Approximately nine months after appearing, answering and counterclaiming in the Prior and Pending Illinois Suit, Finsa filed a second suit over the same warehouse and Agreement in the 404th Judicial District State Court for Cameron County, Texas. This second suit was recently removed to this federal district court.

The Prior and Pending Illinois Suit has been substantially developed. The pleadings have been fully joined with counterclaims filed by Finsa. The Illinois Court has already entered a scheduling order in the case. See Exhibit D. Substantial discovery has been taken and completed and is actively ongoing. Thousands of pages of documents have been produced. Depositions have been scheduled and are about to commence. See Exhibit E (attached Declaration).

The second suit substantially overlaps and is entirely duplicative of the Prior and Pending Illinois Suit. The subject matter of this second suit arises from substantially, if not exactly, the same building, the same controversy, the same work, the same monies in issue and the same Agreement that is already in dispute in the Prior and Pending Illinois Suit. This second suit is, for all intents and

3

purposes, a redundant and pointless suit which adds nothing to the resolution of the parties disputes being tried in the agreed forum of Illinois. Every claim asserted in the Texas suit has either already been asserted or could be asserted as a counterclaim the Illinois Suit as a compulsory counterclaim, since they arise out of the same Agreement and subject matter in controversy.

### III. Argument and Authorities

This Court should dismiss or stay this suit pending the outcome of the Illinois suit.

### A.   This Suit Should be Dismissed for Improper Venue

This second suit in Texas should be dismissed, because the parties entered into a written agreement containing a choice of forum clause which designated the Illinois state court in Madison County as the forum to hear the parties disputes, and that is presently where the Prior and Pending Illinois Suit is ongoing. Motions to dismiss based upon a forum selection clause are most properly filed as motions to dismiss for improper venue under Rule 12(b)(3). *E.g., Lipcon v. Underwriters at Lloyds of London*, 148 F.3d 1285, 1290 (11th Cir. 1998); *see Haynsworth v. The Corporation*, 121 F.3d 956, 961(5th Cir. 1997). The enforceability of a forum selection clause is a question of law. *E.g., Mitsui & Co. Inc. v. Mire M/V*, 111 F.3d 33, 35 (5th Cir. 1997).

When the agreement of the parties has a contractual choice of forum clause, the federal district courts in the Fifth Circuit dismiss the Texas suit in favor of suit in the agreed forum. *See, e.g., Kessmann and Associates, Inc. v. Barton-Aschman Associates, Inc.*, 10 F.Supp.2d 682, 693 (S.D. Tex. 1997) (dismissal in favor of suit in Nevada pursuant to Nevada choice of forum clause).[1]

---

[1] Alternatively, the Court may transfer the case to the federal court in the chosen forum. *E.g., Maley v. Design Benefits Plan, Inc.*, 125 F.Supp.2d 836, 839 (E.D.Tex. 2000) (transfer to Illinois federal district court).

4

The choice of forum clause in this case requires that Finsa's claims for payment of monies allegedly owed by Walnut Grove be brought in Illinois state court, and under the applicable law this Texas suit must be dismissed.  In pertinent part, the choice of forum clause provides: "The parties ... hereby consent and agree that any action or proceeding involving the interpretation and/or enforcement of this Agreement shall be brought in the appropriate state court in the State of Illinois covering Madison County."

A key phrase in this clause is the word "shall."  Under the controlling law in the Fifth Circuit, choice of forum clauses providing that a claim "shall" be brought in a particular forum are deemed mandatory provisions which the federal court must honor. *E.g., Kevlin Service, Inc. v. Lexinton State Bank*, 46 F.3d 13, 14 (5th Cir. 1995); *Kessman*, 10 F.Supp.2d at 692.

Another key phrase in this clause is that the clause applies to "any action or proceeding involving the interpretation and/or enforcement of this Agreement."  Under the controlling law of the Fifth Circuit, choice of forum clauses using terms like "any action or proceeding" are broadly construed to require that any dispute arising out of the parties relationship be referred to the chosen forum. *E.g., Pennzoil v. Ramco Energy Ltd.*, 139 F.3d 1061, (5th Cir. 1998); *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*, 138 F.3d 160, 164-65 (5th cir. 1998).  Under this broad clause, this Texas action is  unquestionably subject to the Illinois choice of forum clause.  Finsa's petition in the Texas suit  pleads that the fulfillment of the Agreement (which contains the choice of forum clause) as a condition precedent to recovery of the monies claimed to be owed.  The Texas suit is nothing more than an action to enforce the Agreement by lien, and entirely duplicative of the pending Illinois suit.

Based upon Fifth Circuit and other controlling federal caselaw, this action must be dismissed based upon improper venue in favor of the agreed and chosen forum of Illinois state court where the Prior and Pending Illinois Suit has been filed and ongoing for nine months. *See Haynsworth, supra; Kessman, supra; see also Pennzoil, supra (choice of arbitration forum). Nauru Phosphate, supra (choice of arbitration forum).*[2]   Alternatively, this Court should transfer this Texas action to the Southern District of Illinois, East St. Louis division, which is the district and division of the federal court that sits in Madison County, which is the location specified in the choice of forum provision in the Agreement. *Maley, supra.*

### B.    This Second Suit Should be Stayed Pending the Illinois Suit

In the alternative, Walnut Grove moves the Court to stay this Texas action pending the outcome of the Prior and Pending Illinois Suit.  The cases are virtually identical cases involving the same subject matter of monies owed and work done under the written Agreement of the parties.  The cases are identical in that each relies upon Texas state law for decision.  The Agreement expressly has a Texas choice of law provision in Section 17(a).

The Texas action adds nothing, but is entirely duplicative of the Prior and Pending Illinois Suit.  The Texas action is clearly dependent upon the outcome of the Illinois suit.  The Texas action

---

[2]The Fifth Circuit has expressly reserved the question whether a motion based upon a forum selection agreement should be categorized as one for improper venue under Rule 12(b)(3), lack of subject matter jurisdiction under Rule 12(b)(2), failure to state a claim under Rule 12(b)(6), or transfer of venue under 28 U.S.C. § 1404. *See Haynsworth, supra.*  The District Court decisions in this Circuit have considered this as motions to dismiss for improper venue.  While Walnut Grove cites improper venue in the body of the motion, Walnut Grove does not waive but expressly relies upon each of these other recognized bases as grounds for relief should the Court decide another basis is more appropriate.

seeks to enforce a lien, but the validity of the debt underlying the lien is dependent upon the outcome of the breach of contract action that has been pending in Illinois for more than nine months.

Finsa has already appeared, answered, counterclaimed, and submitted itself and its claims against Walnut Grove to the jurisdiction of the Illinois state court and suit. Finsa's claims in the Texas suit are either already pending in Illinois or are required to be heard there as compulsory counterclaims, since they derive from the same written Agreement of the parties already being litigated in Illinois. In order for Finsa to have any valid lien rights, it must first prevail on the merits of its contract claims in Illinois.

The Illinois state court was the first filed suit, and in the absence of compelling circumstances the Illinois court initially seized of the parties' controversy should be the one to hear the entire case of the parties. *E.g., Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407 (5th Cir. 1971). When two suits are substantially similar and the state court case was filed first ahead of a later suit, the federal court should dismiss or stay the later filed federal court suit pending the outcome of the earlier state court case. *E.g., Nakash v. Marciano*, 882 F.2d 1411, 1415-16 (9th Cir. 1989).

When the state court suit has progressed substantially further than the federal court suit, the federal court should stay its proceeding in favor of the more advanced state action. *E.g., Nakash*, 882 F.2d at 1415; *Telesco v. Telesco Fuel & Masons' Materials, Inc.*, 765 F.2d 356, 363 (2d Cir. 1985); *East Naples Water Systems, Inc. v. Board of County Commissioners*, 627 F.Supp. 1065, 1072 (S.D. Fl. 1986). This is particularly true in this case. The Illinois Suit has been substantially developed and is far more advanced than this Texas suit. The pleadings in the Illinois Suit have been fully joined and Finsa has already appeared and filed its counterclaims there. See Exhibit C. The Illinois court has entered a scheduling order for discovery. Thousands of pages of documents have

7

produced. Depositions have been scheduled and are about to commence. Substantial discovery has been taken.

When both cases turn upon state law (not federal law), it is particularly appropriate to defer to a state court action in which the parties have already appeared and submitted themselves. *E.g., Armco, Inc. v. Moore Exploration, Inc.*, 603 F.Supp.1, 2 (S.D. Tex. 1984). In this case, the only applicable law is Texas law, which the parties agreed in Section 17(a) of their written agreement to use in the agreed and pending forum of Illinois.

The entirety of the parties' dispute can be resolved in the Prior and Pending Illinois state action. It makes no sense to waste the resources and time of the parties and the Court in a second duplicative action. Basic justice and judicial economy and fairness all cry out for this redundant case to be stayed pending the outcome of the Illinois suit. If Walnut Grove wins the Illinois suit, this Texas action will be moot. If Finsa wins the Illinois suit, its right to payment will have been determined and the Texas suit will have been rendered essentially moot, and if not properly paid, then Finsa can proceed on its lien claims. Therefore, this case should be stayed pending the outcome of the principal pending Illinois Suit.

### Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Defendant Walnut Grove L.L.C. respectfully requests that this Court grant this motion, that the Court dismiss or stay this Texas action in favor of the agreed forum of Illinois where the Prior and Pending Illinois Suit has been ongoing for nine months, or in the alternative transfer this suit to the Southern District of Illinois, East St. Louis Division, and for such other and further relief to which it may be justly entitled to receive.

Respectfully submitted,

CLEMENTS, O'NEILL, PIERCE, WILSON & FULKERSON, L.L.P.

By: _____

Ralph A. Midkiff
State Bar No. 14025400
Federal ID No. 1564
1000 Louisiana, Suite 1800
Houston, Texas 77002-5009
Telephone: 713/654-7600
Facsimile: 713/654-7690

ATTORNEYS FOR WALNUT GROVE, L.L.C.

OF COUNSEL:

CLEMENTS, O'NEILL, PIERCE, WILSON & FULKERSON, L.L.P.
1000 Louisiana, Suite 1800
Houston, Texas 77002-5009
(713) 654-7600
(713) 654-7690 (fax)

David Oliveira
ROERIG, OLIVEIRA & FISHER, L.L.P.
855 West Price Road, Suite 9
Brownsville, Texas 78520
(956) 542-5666
(956) 542-0016 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was properly served on all known counsel of record, on this ⁶ᵗʰ day of March, 2002, addressed as follows:

William A. Faulk, Jr.
Daniel P. Whitworth
Renfro, Faulk & Blakemore, L.L.P.
185 E. Ruben Torres, Sr. Blvd.
Brownsville, TX 78520

_____
Ralph A. Midkiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **FINSA DEVELOPMENT CORPORATION** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **WALNUT GROVE L.L.C.** | § | |
| | § | |
| **Defendants.** | | |

## ORDER

On this day the Court considered Defendant Walnut Grove L.L.C.'s Motion to Dismiss For Improper Venue, or in the Alternative, Motion for Stay Pending the Outcome of the Prior and Pending Illinois Suit the Motion. The Court finds the motion is well taken and is hereby granted. It is therefore ordered that this suit is hereby dismissed for improper venue in favor of this matter being heard by the Illinois state court, which the written Agreement of the parties designated as the forum of their choice for resolution of this action and where a prior and pending action between the parties has been ongoing for many months styled *Walnut Grove, L.L.C. v. Finsa Development Corp.*, Cause No. 01 L 1121, in the Third Judicial Circuit Court for Madison County, Illinois.

 

_____

JUDGE PRESIDING

### DESIGN/BUILD AGREEMENT
### BETWEEN
### OWNER AND CONTRACTOR

This Design/Build Agreement between OWNER and CONTRACTOR (this "AGREEMENT"), is made and entered into by and between Walnut Grove, L.L.C. whose address is 1111 Sixth Street, Highland, Illinois 62249 ("OWNER") and Finsa Development Corporation ("CONTRACTOR") whose address is 973 South Minnesota, Brownsville, Texas 78521.

### RECITALS

A.    CONTRACTOR has proposed and OWNER desires to have constructed a building on its site in Los Indios, Texas (the "PROJECT").

B.    CONTRACTOR will furnish all architectural services required in connection with the PROJECT by persons lawfully licensed to practice architecture and all construction labor and material in connection with the PROJECT.

### STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants and agreements herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    PROJECT.    The "CONTRACT DOCUMENTS" consist of this AGREEMENT, and all exhibits to this AGREEMENT, the BUILDING PROJECT REQUIREMENTS attached hereto as Exhibit A (the "REQUIREMENTS"), the "CONSTRUCTION DOCUMENTS" to be prepared and furnished to the OWNER for its approval pursuant to Section 4(b) below, initialed by CONTRACTOR and OWNER's authorized representatives and any OWNER approved CHANGE ORDERS approved by OWNER and CONTRACTOR. The "PROJECT" is the total design and construction for which the CONTRACTOR is responsible, including all architectural, professional design services and all labor, materials and equipment used or incorporated in such design and construction, and all permits and authorizations required by any governmental bodies necessary to complete the PROJECT and to permit occupancy by OWNER. The "WORK" comprises the completed construction designed under the PROJECT and includes all labor necessary to produce such construction, and all material and equipment incorporated or to be incorporated into such construction.

2.    Contract Sum.

(a)    The OWNER shall pay the CONTRACTOR the CONTRACT SUM also termed BASIC COMPENSATION in current funds for the CONTRACTOR's performance of the Contract. The CONTRACT SUM shall

EXHIBIT "A"



EXHIBIT

A

be Two Million Nine Hundred Nineteen Thousand One Hundred Eleven Dollars ($2,919,111.00), which is apportioned as $1,350,000.00 for materials and $1,569,111.00 for labor and which is subject to additions and deductions as provided in the CONTRACT DOCUMENTS.

        (b)  Unit prices, if any, are as follows:  $250.00 each for 6" bollards and $200.00 each for 4" bollards, installed at OWNER's option per Exhibit A, Section 5300, item 1.

    3.  Schedule.  The Basic Services to be performed by the CONTRACTOR shall be commenced on the date of the signing of this Agreement and Completion of the PROJECT shall be achieved on the date Two Hundred Thirty (230) calendar days following the date of signing of this AGREEMENT (the "COMPLETION DATE").  If the CONTRACTOR is delayed at any time in the commencement or progress of the WORK by an act or neglect of the OWNER, or of its employee, or of a separate contractor employed by the OWNER, or by changes ordered in the WORK by way of a CHANGE ORDER which will have any time extension agreed to by both CONTRACTOR and OWNER incorporated into the CHANGE ORDER or by delay authorized by the OWNER, or if tornado or hurricane substantially damages the structural steel, roof or walls, then the COMPLETION DATE shall be extended by CHANGE ORDER for such reasonable time as the OWNER and CONTRACTOR may agree to in writing.  In the event Completion has not been achieved on or before the COMPLETION DATE as may be extended, the BASIC COMPENSATION shall be reduced at the rate of Two Thousand Dollars ($2,000.00) per day for each day after the COMPLETION DATE until Completion is achieved as liquidated damages and not as a penalty.

    4.  Contractor's Responsibilities.  The following shall constitute the "BASIC SERVICES" which the CONTRACTOR hereby agrees to perform:

        (a)  Design services shall be performed by qualified architects, engineers and other professionals selected and paid for by the CONTRACTOR.  Construction services shall be performed by qualified construction contractors and suppliers selected and paid for by the CONTRACTOR.  Nothing contained in the foregoing shall create any contractual relationship between such persons and the OWNER.  CONTRACTOR acknowledges and agrees that it shall be responsible to OWNER for the acts and omissions of its architects, the WORK of all of its design professionals shall meet every requirement of all local, state and federal laws, ordinances and regulations and any other requirements as stated in Exhibit A ("BUILDING PROJECT REQUIREMENTS").  If any BUILDING PROJECT REQUIREMENTS in Exhibit A would result in a failure to comply with any ordinance, regulation or governmental requirement during the term of the PROJECT or in existence as of the date of completion of this PROJECT, then the governmental requirement should be met.

        (b)  Based upon the Proposal, the CONTRACTOR shall submit

092799:1246D                          2



CONSTRUCTION DOCUMENTS for review and approval by the OWNER. "CONSTRUCTION DOCUMENTS" shall include technical drawings, schedules, diagrams and specifications, setting forth in detail the requirements for construction of the WORK and provide information customarily necessary including documents customarily required for issuance of permits.

(c)   The CONTRACTOR shall prepare and file all documents required and shall obtain all necessary permits or approvals of government authorities having jurisdiction over the PROJECT for construction, occupancy and related matters, and shall pay all fees and other costs thereof.

(d)   The CONTRACTOR shall provide and pay for all design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the WORK pursuant to the CONTRACT DOCUMENTS whether temporary or permanent and regardless of whether the same is incorporated or to be incorporated into the PROJECT.

(e)   The CONTRACTOR shall be responsible for and shall coordinate all construction means, methods, techniques, sequences and procedures.

(f)   The CONTRACTOR shall keep the OWNER informed of the progress and quality of the WORK and shall cooperate with OWNER's representatives.

(g)   The CONTRACTOR shall correct all WORK which does not conform to the CONTRACT DOCUMENTS, at the CONTRACTOR's expense in accordance with Section 15 below.

(h)   The CONTRACTOR warrants to the OWNER that materials and equipment incorporated into the WORK will be new unless otherwise specified, that the materials will be suitable for the purposes intended, and that work will be of good quality, performed in a good and workmanlike manner, free from fault and defects, and in conformity with the CONTRACT DOCUMENTS. WORK not conforming to those requirements shall be corrected in accordance with Section 15 below.

All warranties and guarantees of Subcontractors and Suppliers with respect to any portion of the WORK shall be obtained by the CONTRACTOR so as to extend for the benefit of and be available to be asserted in the name of the OWNER. The CONTRACTOR shall use its best efforts to obtain from all Subcontractors and Suppliers guarantees and warranties with terms and periods customarily available in the industry. During the CONTRACTOR's warranty period, the CONTRACTOR shall enforce such warranties and guarantees on behalf of the OWNER. The CONTRACTOR shall cause its Subcontractors and Suppliers to include in their subcontracts and



purchase orders the requirement that all guarantees and warranties be obtained so as to extend for the benefit of, and be available to be asserted in the name of, OWNER, which obligation shall be specifically incorporated by reference into any subcontracts, or any lower tier subcontracts or purchase orders.  To the extent that any such warranty or guarantee would be voided by reason of the CONTRACTOR's negligence or other fault in incorporating material or equipment into the WORK, the CONTRACTOR shall be responsible for correcting such defect and shall nevertheless be responsible pursuant to warranty obligations set forth herein.

(i)  The CONTRACTOR shall pay all sales, use and similar taxes and shall obtain and pay for all building and other permits (including occupancy) and governmental fees, license and inspections necessary for the proper execution and completion of the WORK.  Real estate taxes shall be paid by the OWNER.

(j)  The CONTRACTOR shall give notices and comply with all laws, ordinances, rules, regulations and orders of public authorities having jurisdiction over the PROJECT and shall provide copies of these notices to OWNER.

(k)  The CONTRACTOR shall pay all royalties and license fees and shall defend any suits or claims for infringement of copyright, patent or trademark rights and shall indemnify and hold the OWNER harmless from any loss or damage on account thereof.

(l)  The CONTRACTOR shall be responsible to the OWNER for the acts and omissions of the CONTRACTOR's employees and all subcontractors (of any tier) and their respective agents and employees.

(m)  The CONTRACTOR shall keep the premises free from waste materials or rubbish caused by the CONTRACTOR's activities on the premises.  After completion of the WORK, the CONTRACTOR shall remove from and about the PROJECT the CONTRACTOR's tools, construction equipment, machinery, surplus materials, waste materials and rubbish.

(n)  The CONTRACTOR shall prepare CHANGE ORDERS at the OWNER's predesignated representative's request and for the OWNER's approval and execution in accordance with this Agreement.  The predesignated representatives are Don Weder, Wanda Weder or Bill Straeter.  CONTRACTOR acknowledges that representatives are acting on behalf of the OWNER and agrees that neither they nor any of them shall be held personally liable for any acts or omissions. CONTRACTOR hereby releases representatives and each of them for any claims past or future.

(o)  The CONTRACTOR shall maintain in good order at the site one record copy of the drawings, specification, product data, samples, shop drawings and other modifications, marked currently to

record changes made during construction. Five (5) sets of as-built plans and Specifications, together with copies of all of the foregoing items, shall be delivered to the OWNER upon completion of the PROJECT and prior to FINAL PAYMENT.

(p)  CONTRACTOR will comply with all requirements as set forth in Exhibit A (BUILDING PROJECT REQUIREMENTS).

(q)  The CONTRACTOR shall diligently and expeditiously prosecute the WORK of the PROJECT in the most timely manner possible, and shall proceed so as to allow OWNER to occupy the building, and any portion thereof, at the earliest possible time, whereupon OWNER shall provide insurance for any damage to OWNER's property or portion of building being occupied by OWNER which may arise before FINAL COMPLETION.

(r)  OWNER exclusively shall be given the right to approve or disapprove any and all press releases regarding the PROJECT which the CONTRACTOR may wish to issue.  CONTRACTOR will not disclose any terms of this contract and CONTRACTOR will not make any press releases concerning the construction without OWNER's request and/or preapproval.

(s)  The CONTRACTOR shall ensure that all WORK performed on the PROJECT, whether by itself or by its subcontractors, shall comply with all applicable Federal, state, county and local environmental laws, statutes, and regulations.  The CONTRACTOR shall be fully responsible for the cost of all fines, penalties and remedial environmental actions required by law or regulation or directed to be performed by any Federal, state or local agency relating in any way to any of the WORK performed on the PROJECT and shall be responsible for all third party environmental claims related to the PROJECT. CONTRACTOR agrees to indemnify, defend (by counsel acceptable to OWNER) and hold OWNER harmless from and against any liens, losses, damages, judgments, administrative orders or directions, settlements, expenses or costs including attorney's fees and costs, arising out of or related to remedial environmental action and other activities related to the PROJECT.

(t)  CONTRACTOR shall ensure that all materials and workmanship complies with Section 01500 Standards, Codes and Regulations in Exhibit A (BUILDING PROJECT REQUIREMENTS) that are in effect at the date of Completion of the PROJECT and are suitable for the purposes intended.

(u)  The CONTRACTOR shall be responsible for the value of any building or construction materials, pertaining to the WORK, delivered to the site whether or not these materials have been incorporated into the PROJECT and whether or not OWNER has paid for all or any portion of these materials and shall take proper precautions to safeguard the materials.

(v) C ACTOR, when doing any ʾnting, lacquering varnishing or us⌐ ⌐ any materials that caus ⌐⌐y odors or any air or other emissions, shall ventilate the area thoroughly and comply with all environmental, health and safety laws, ordinances, rules and regulations.

(w)    The OWNER shall have unlimited rights to copy and use all Design Materials, including the right to use same on the PROJECT at no additional cost to the OWNER, regardless of degree of completion, provided that OWNER has complied with the terms of this AGREEMENT.    The CONTRACTOR agrees to and does hereby grant to the OWNER and any assignee or successor of the OWNER a royalty-free license to any such Design Materials as to which the CONTRACTOR may assert any rights under the patent or copyright laws.    The CONTRACTOR hereby assigns outright and exclusively to the OWNER all copyrights in the design appearance of the PROJECT.    The CONTRACTOR, as part of its agreements with any Subcontractor or consultant will secure such license and use rights from each such entity, and shall defend, indemnify, and hold the OWNER and any successor, or assigns harmless from any claims by such entities for copyright or patent infringement.

    5.    <u>Time</u>.

        (a)    The time limits stated herein and in the CONTRACT DOCUMENTS are of the essence of this Agreement.

        (b)    The COMPLETION DATE of the WORK shall be the date when construction is complete so that the OWNER can fully occupy and utilize the WORK for its intended use and an occupancy permit relative thereto has been issued.

        (c)    "FINAL COMPLETION" will be deemed to have occurred when Completion has been achieved and when all punch-list items have been completed and the PROJECT is in full compliance with the CONTRACT DOCUMENTS.    The CONTRACTOR shall diligently prosecute the WORK until FINAL COMPLETION is achieved.

    6.    <u>Payments</u>.

    A.    Interim Payments.

        1.    Based upon Applications for Payment as per Exhibit D submitted (by the CONTRACTOR) to a representative appointed in writing signed by the OWNER (REPRESENTATIVE) and Certificates for Payment issued by the REPRESENTATIVE, the OWNER shall make progress payments on account of the CONTRACT SUM to the CONTRACTOR as provided below and elsewhere in the CONTRACT DOCUMENTS.    In Exhibit D and Exhibit F the word "REPRESENTATIVE" shall be substituted for and replace the word "ARCHITECT."

        2.    The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

3. Provided that an Application for Payment with appropriate releases and waivers as per Exhibit G of liens is received by the REPRESENTATIVE not later than the 5th day of a month, the OWNER shall make payment to the CONTRACTOR not later than the 20th day of the same month. If an Application for Payment is received by the REPRESENTATIVE after the application date fixed above, payment shall be made by the OWNER not later than fifteen (15) days after the REPRESENTATIVE receives the Application for Payment with appropriate releases and waivers, as per Exhibit G of liens.

4. Each Application for Payment shall be based on the most recent schedule of values submitted by the CONTRACTOR in accordance with the CONTRACT DOCUMENTS. The schedule of values shall allocate the entire CONTRACT SUM among the various portions of the WORK. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the REPRESENTATIVE may require. This schedule, unless objected to by the REPRESENTATIVE, shall be used as a basis for reviewing the CONTRACTOR's Applications for Payment.

5. Applications for Payment shall indicate the percentage of completion of each portion of the WORK as of the end of the period covered by the Application for Payment.

6. Subject to other provisions of the CONTRACT DOCUMENTS, the amount of each interim payment shall be computed as follows:
(a) Take that portion of the CONTRACT SUM properly allocable to completed WORK as determined by amounts stated in releases and waivers of liens submitted with the Application for Payment allocated to that portion of the WORK in the schedule of values, less retainage of ten percent (10%). Pending final determination of cost to the OWNER of changes in the WORK, amounts not in dispute shall be included.
(b) Add that portion of the CONTRACT SUM properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the OWNER, suitably stored off the site at a location agreed upon in writing) as provided by this AGREEMENT less retainage of ten percent (10%).
(c) Subtract the aggregate of previous payments made by the OWNER; and
(d) Subtract amounts, if any, for which the



REPRESENTATIVE has withheld or nullified a Certificate for Payment as provided in Paragraph 7.E.1.

B.   FINAL PAYMENT.
1.   FINAL PAYMENT, constituting the entire unpaid balance of the CONTRACT SUM, shall be made by the OWNER to the CONTRACTOR when:
(a) The CONTRACTOR has fully performed the Contract except for the CONTRACTOR's responsibility to correct WORK, and to satisfy other requirements, if any, which extend beyond FINAL PAYMENT; and
(b) A final Certificate for Payment has been issued by the REPRESENTATIVE.
2.   The OWNER's FINAL PAYMENT to the CONTRACTOR shall be made no later than 15 days after the issuance of the REPRESENTATIVE's final Certificate for Payment.

C.   Interest on Late Payments.
Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate of twelve percent (12%) simple interest.

7.   _Payments and Completion_.
A.   The CONTRACT SUM is stated in Paragraph 2 and, including authorized adjustments, is the total amount payable by the OWNER to the CONTRACTOR for performance of the WORK under the CONTRACT DOCUMENTS.

B.   Schedule of Values.  Before the first Application for Payment, the CONTRACTOR shall submit to the REPRESENTATIVE a schedule of values allocated to various portions of the WORK, prepared in such form and supported by such data to substantiate its accuracy as the REPRESENTATIVE may require. This schedule, in the form of Exhibit F, unless objected to by the REPRESENTATIVE, shall be used as a basis for reviewing the CONTRACTOR's Applications for Payment.

C.   Applications for Payment.
1.   At least fifteen (15) days before the date established, for each interim payment, the CONTRACTOR shall submit to the REPRESENTATIVE an itemized Application for Payment for operations completed in accordance with the schedule of values. Such application shall be notarized, if required, and supported by releases of liens in the form of Exhibit G and such data substantiating the CONTRACTOR's right to payment as the OWNER or REPRESENTATIVE may require, such as copies of invoices from Subcontractors, and reflecting retainage.

(a)  As provided in subparagraph 6.A.6{a}, such

applications may include requests for payment on account of changes in the WORK which have been properly authorized by approved CHANGE ORDERs.

(b)  Such applications may not include requests for payment for portions of the WORK for which the CONTRACTOR has not paid to a Subcontractor.

2.   Unless otherwise provided in the CONTRACT DOCUMENTS, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the WORK, provided that progress payments will only be made for those materials that are anticipated to be consumed within 45 days from delivery.  Materials which are delivered that may be damaged by the elements should not be delivered more than one (1) week prior to their use and when they are delivered must be protected from the elements in a manner satisfactory to OWNER and must be protected so as not to be damaged in any way.  If approved in advance by the OWNER, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing.  Payment for materials and equipment stored on or off the site shall be conditioned upon compliance ·by the CONTRACTOR with procedures satisfactory to the OWNER to protect the OWNER's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

3.   The CONTRACTOR further warrants that upon submittal of an Application for Payment all WORK for which Certificates for Payment are issued and those that have been previously issued and payments received from the OWNER shall, to the best of the CONTRACTOR's knowledge, information and belief be free and clear of liens, claims, security interests or any other encumbrances from any and all Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment resulting to the WORK.

D.   Certificates for Payment.
1.   The REPRESENTATIVE will, within ten (10) days after receipt of the CONTRACTOR's Application for Payment, either issue to the OWNER a Certificate for Payment with a copy to the CONTRACTOR, for such amount as the REPRESENTATIVE determines is properly due, or notify the CONTRACTOR and OWNER in writing of the REPRESENTATIVE's reasons for withholding certification in whole or in part as provided in Subparagraph 7.E.1.

2.   The issuance of a Certificate for Payment will constitute a representation by the REPRESENTATIVE to the OWNER, based on the REPRESENTATIVE's evaluation of the WORK and the data comprising the Application for Payment, that the WORK has progressed to the point indicated and that, to the best of the REPRESENTATIVE's knowledge, information and belief, the quality of the WORK is in accordance with the CONTRACT DOCUMENTS.   The foregoing representations are subject to an evaluation of the WORK for conformance with the CONTRACT DOCUMENTS to results of subsequent tests and inspections, to correction of minor deviations from the CONTRACT DOCUMENTS prior to completion and to specific qualifications expressed by the REPRESENTATIVE.   The issuance of a Certificate for Payment will further constitute a representation that the CONTRACTOR is entitled to payment in the amount certified.   However, the issuance of a Certificate for Payment will not be a representation that the REPRESENTATIVE has (i) made exhaustive or continuous on-site inspections to check the quality or quantity of the WORK, (ii) reviewed construction means, methods, techniques, sequences or procedures, (iii) reviewed the releases of liens and copies of invoices received from Subcontractors and other data requested by the OWNER to substantiate the CONTRACTOR's right to payment, or (iv) made examination to ascertain how or for what purpose the CONTRACTOR has used money previously paid on account of the CONTRACT SUM, and (v) shall not be deemed to be acceptance of the WORK for all purposes and shall not relieve CONTRACTOR of its responsibility to complete the WORK in conformance with the CONTRACT DOCUMENTS.

E.   Decisions to Withhold Certification.
1.   The REPRESENTATIVE may withhold a Certificate for Payment in whole or in part, to the extent reasonably necessary to protect the OWNER, if in the REPRESENTATIVE's opinion the representations to the OWNER required by Subparagraph 7.D.2. cannot be made.   If the REPRESENTATIVE is unable to certify payment in the amount of the Application, the REPRESENTATIVE will notify the CONTRACTOR and OWNER as provided in Subparagraph 7.D.1. If the CONTRACTOR and REPRESENTATIVE cannot agree on a revised amount, the REPRESENTATIVE will promptly issue a Certificate for Payment for the amount for which the REPRESENTATIVE is able to make such representations to the OWNER.   The REPRESENTATIVE may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the whole or a part of a Certificate for Payment previously issued, to such extent as may be necessary in the REPRESENTATIVE's opinion to protect the OWNER from loss for which the CONTRACTOR is responsible, including loss resulting from

acts and omissions because of:

(a)  defective WORK not remedied;

(b)  third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the OWNER is provided by the CONTRACTOR;

(c)  failure of the CONTRACTOR to make payments properly to Subcontractors or for labor, materials or equipment;

(d)  reasonable evidence that the WORK cannot be completed for the unpaid balance of the CONTRACT SUM;

(e)  reasonable evidence that the WORK will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

(f)  material failure to carry out the WORK in accordance with the CONTRACT DOCUMENTS.

2.  When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.  Notwithstanding the above, OWNER does not waive any other rights available at law or in equity.

F.  Interim Payments.

1.  After the REPRESENTATIVE has issued a Certificate for Payment, the OWNER shall make payment in the manner and within the time provided in the CONTRACT DOCUMENTS, and shall so notify the REPRESENTATIVE.

2.  Neither the OWNER nor the REPRESENTATIVE shall have any obligation to pay or to see to the payment of money to a Subcontractor.

3.  A Certificate for Payment, an interim payment or partial or entire use or occupancy of the PROJECT by the OWNER shall not constitute acceptance of the WORK not in accordance with the CONTRACT DOCUMENTS.

G.  Failure of Payment.  If the REPRESENTATIVE does not comply with the provisions of Paragraphs 7.D. and 7.E. through no fault of the CONTRACTOR, within ten (10) days after receipt of the CONTRACTOR's Application for Payment, or if the OWNER does not pay the CONTRACTOR within the date established in the CONTRACT DOCUMENTS the amount certified by the REPRESENTATIVE, then the CONTRACTOR may, upon two (2) additional business days' written notice to the OWNER and REPRESENTATIVE, stop the WORK until payment of the amount owing has been received.  With the exception of structural steel matters, the Contract Time shall

be extended by the number of days elapsed from date of non-compliance until the date OWNER has complied with paragraphs 7D and 7E and the CONTRACT SUM shall be increased by the amount of the CONTRACTOR's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the CONTRACT DOCUMENTS. If work is stopped and the production of the structural steel by the steel manufacturer is delayed, then the number of days extended shall be a reasonable number of days necessary for the steel manufacturer to supply the steel. CONTRACTOR shall promptly resume work when OWNER has complied with the provisions of paragraphs 7D and 7E and OWNER shall not be liable for any costs or interest after the date upon which it complies with the provisions of paragraphs 7D and 7E hereof.

H.   Partial Occupancy Or Use.
     1.   The OWNER may occupy or use any completed or partially completed portion of the WORK at any stage when such portion is designated by separate agreement with the CONTRACTOR, provided such occupancy or use is consented to by CONTRACTOR's insurer and authorized by public authorities having jurisdiction over the WORK. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the OWNER and CONTRACTOR have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the WORK and insurance, and have agreed in writing concerning the period for correction of the WORK and commencement of warranties required by the CONTRACT DOCUMENTS. When the CONTRACTOR considers a portion substantially complete, the CONTRACTOR shall prepare and submit a list to the REPRESENTATIVE as provided under Subparagraph 7.G.2. Consent of the CONTRACTOR to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the WORK shall be determined by written agreement between the OWNER and CONTRACTOR or, if no agreement is reached, by decision of the REPRESENTATIVE.

     2.   Immediately prior to such partial occupancy or use, the OWNER, CONTRACTOR and REPRESENTATIVE shall jointly inspect the area to be occupied or portion of the WORK to be used in order to determine and record the condition of the WORK.

     3.   Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the WORK shall not constitute acceptance of WORK not complying with the requirements of the CONTRACT DOCUMENTS.

I.   FINAL COMPLETION and FINAL PAYMENT.
     1.   Upon receipt of written notice that the WORK is

ready for final inspection and acceptance and upon receipt of a final Application for Payment, the REPRESENTATIVE will promptly make such inspection and, when the REPRESENTATIVE finds the WORK acceptable under the CONTRACT DOCUMENTS and the Contract fully performed, the REPRESENTATIVE will promptly issue a final Certificate for Payment stating that to the best of the REPRESENTATIVE's knowledge, information and belief, and on the basis of the REPRESENTATIVE's on-site visits and inspections the WORK has been completed in accordance with terms and conditions of the CONTRACT DOCUMENTS and that the entire balance found to be due the CONTRACTOR and noted in the final Certificate is due and payable. The REPRESENTATIVE's final Certificate for Payment will constitute a further representation that conditions listed in Subparagraph 7.1.2. as precedent to the CONTRACTOR's being entitled to FINAL PAYMENT have been fulfilled.

2.    Neither FINAL PAYMENT nor any remaining retained percentage shall become due until the CONTRACTOR submits to the REPRESENTATIVE (i) a certificate evidencing that insurance, required by the CONTRACT DOCUMENTS to remain in force after FINAL PAYMENT, is currently in effect and will not be canceled or allowed to expire until at least fifteen (15) days' prior written notice has been given to the OWNER, (ii) a written statement that the CONTRACTOR knows of no substantial reason that the insurance will not be renewable to cover the period required by the CONTRACT DOCUMENTS, (iii) consent of surety, if any, to FINAL PAYMENT and (iv), if required by the OWNER, other data establishing payment or satisfaction of obligations, such as receipts, release and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the OWNER.  If a Subcontractor refuses to furnish a release or waiver required by the OWNER, the CONTRACTOR may furnish a bond satisfactory to the OWNER to indemnify the OWNER against such lien.  If such lien remains unsatisfied after payments are made, the CONTRACTOR shall indemnify and hold harmless OWNER from any claims and liabilities resulting from any such unsatisfied payments.

3.    The making of FINAL PAYMENT shall not constitute a waiver of any claims by the OWNER arising from unsettled lien claims, faulty or defective WORK or material known at the time FINAL PAYMENT is made or appearing after Completion and/or FINAL COMPLETION, failure of the WORK to comply with the requirements of the CONTRACT DOCUMENTS, terms of special warranties required by the CONTRACT DOCUMENTS and those claims previously made by



OWNER which remain unsettled. All rights of OWNER under this AGREEMENT shall survive FINAL PAYMENT or termination. Acceptance of FINAL PAYMENT shall constitute the waiver of all claims by the CONTRACTOR except those made in writing and identified by the CONTRACTOR as unsettled at the time of making its final Application for Payment.

4. Acceptance of FINAL PAYMENT by the CONTRACTOR, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

8. <u>Mechanic Lien Claims</u>. The CONTRACTOR agrees to pay all subcontractors (of any tier) and material suppliers providing labor and/or material in connection with the WORK all amounts owed to such persons when due. The CONTRACTOR hereby agrees to indemnify, defend (by counsel acceptable to the OWNER) and hold the OWNER harmless from and against any and all claims, causes of action, claims of liens, losses, damages, judgments, settlements, and expenses (including, without limitation, reasonable attorneys fees and court costs) incurred or suffered by OWNER as a result of any mechanic lien claims asserted by any person furnishing labor and/or materials in connection with the PROJECT. Such obligation shall survive the expiration or termination of this AGREEMENT and FINAL PAYMENT.

9. <u>Protection of Persons and Property</u>. The CONTRACTOR shall be responsible for maintaining and providing supervision of health and safety precautions and programs in connection with the WORK. The CONTRACTOR shall take reasonable precautions for health and safety of, and shall provide reasonable protection to prevent damage, injury or loss to employees on the WORK or other persons who may be affected thereby, the WORK and material and equipment to be incorporated therein and other property at or adjacent to the site. The CONTRACTOR shall give notices and comply with all applicable laws, ordinances, rules, regulations, and orders of public authorities bearing on the health and safety of persons and property and their protection from damage or loss. The CONTRACTOR shall be liable for all damage or any loss to property at the site including but not limited to damage caused in full or in part by the CONTRACTOR, defects in the WORK, in the materials used in or on the WORK or any of its subcontractors and their respective agents and employees and for anyone whose acts the CONTRACTOR may be liable. CONTRACTOR shall be responsible for any theft, vandalism or loss of any materials delivered on site for construction whether or not OWNER has paid CONTRACTOR for the materials.

10. <u>Insurance</u>. The CONTRACTOR shall purchase and maintain with carriers acceptable to OWNER, at all times during the WORK, the insurance described on <u>Exhibit C</u> attached hereto, in conformance with the requirements thereof, and shall maintain with





the OWNER a current certificate thereof at all times until FINAL COMPLETION. Upon request of the OWNER, the CONTRACTOR shall furnish copies of the insurance policies required to be maintained herein. All such insurance shall be written on an occurrence basis, shall name the OWNER as an additional named insured or as an additional insured as the OWNER in its sole discretion shall determine, and each current certificate shall show the same as well as show that the OWNER shall receive written notice of any material alteration, cancellation, non-renewal or expiration thereof not less than sixty (60) days before any such event. In addition to the requirements of Exhibit C, CONTRACTOR shall ensure that its architects, engineers and other design professionals carry professional errors and omissions insurance in at least the amount of One Million Dollars ($1,000,000.00) also written on an occurrence basis, endorsed to provide contractual liability coverage and showing the OWNER as additional named insured or as an additional insured as the OWNER in its sole discretion shall determine. Certificates demonstrating that this design professional insurance requirement has been met shall be provided to OWNER at the same time as the other CONTRACTOR certificates are submitted to OWNER.

11.  <u>CHANGE ORDERS</u>.

(a)  A "CHANGE ORDER" is a written order signed by the OWNER and the CONTRACTOR in the form of Exhibit H and issued after execution of this AGREEMENT, authorizing a change in the WORK, an adjustment in the BASIC COMPENSATION and/or the COMPLETION DATE. The BASIC COMPENSATION and the COMPLETION DATE may be changed only by CHANGE ORDER.

(b)  The OWNER, without invalidating this AGREEMENT, may order changes in the WORK within the general scope of the PROJECT. BASIC COMPENSATION and COMPLETION DATE shall be adjusted accordingly. Such changes in the WORK shall be authorized by CHANGE ORDER and shall be performed under applicable conditions of the CONTRACT DOCUMENTS. Each CHANGE ORDER shall be subject to all provisions of this AGREEMENT.

(c)  The increase or decrease in the BASIC COMPENSATION caused by a CHANGE ORDER shall be determined by agreement of the OWNER and the CONTRACTOR. If the parties are unable to agree upon the amount of the adjustment, the amount of the adjustment shall be in the case of an increase equal to the actual cost of performing such addition plus an amount equal to ten percent (10%) of such cost as an allowance for the CONTRACTOR's overhead and profit and in the case of a decrease the actual savings obtained from the deletion. The CONTRACTOR shall submit an itemized accounting together with appropriate supporting data to the OWNER for determining the amount of the adjustment required as a result of a CHANGE ORDER. The CONTRACTOR's actual cost shall be limited to the following: (i) cost of materials, including sales tax and delivery charges; (ii) cost of labor, including social security and other customary employee benefits; (iii) additional costs of supervision directly attributable to the change; and (iv) fees paid to

architects, engineers and other professionals. When both additions and credits covering related WORK or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the increase or decrease, if any, with respect to that change.

12.   Correction of WORK.

(a)   The CONTRACTOR shall promptly correct WORK rejected by the OWNER or known to the CONTRACTOR to be defective or failing to conform to the CONSTRUCTION DOCUMENTS, whether observed before or after substantial Completion and regardless of whether fabricated, installed, or completed.

(b)   Nothing contained in the foregoing section shall establish a period of limitation with respect to other obligations of the CONTRACTOR under this AGREEMENT or at law, it being agreed that the foregoing subparagraph relates only to the specific obligation of the CONTRACTOR to correct the WORK, and has no relation to the time within which the obligation to comply with the CONTRACT DOCUMENTS may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the CONTRACTOR's liability with respect to its obligations hereunder.

(c)   If the CONTRACTOR fails to correct defective WORK as required herein or otherwise fails to carry out the WORK in accordance with the CONTRACT DOCUMENTS, the OWNER, by written order, may order the CONTRACTOR to stop the WORK, or any portion thereof, until the cause for such order has been eliminated.

(d)   If the CONTRACTOR defaults or neglects to carry out the WORK in accordance with the CONTRACT DOCUMENTS and fails, within seven days after the receipt of written notice from the OWNER to cure such default with diligence and promptness, the OWNER may, without prejudice to any other remedies the OWNER may have, correct such deficiencies and deduct the cost thereof from payments then or thereafter due to the CONTRACTOR. If the payments then or thereafter due to the Contract are not sufficient to cover the amount of the deduction, the CONTRACTOR shall pay the difference to the OWNER. OWNER to have right to withhold any payments due on this PROJECT if there are defects on any other jobs that CONTRACTOR performs for OWNER.

13.   Subcontractors. The CONTRACTOR, as soon as practicable after the date of this AGREEMENT, shall furnish to the OWNER, in writing, the names of the persons or entities the CONTRACTOR will engage as subcontractors for the PROJECT. Nothing in this AGREEMENT or in any subcontract shall create a contractual relationship between the OWNER and any such subcontractor. The OWNER shall have the right to object to any subcontractor by giving CONTRACTOR notice in writing of OWNER's reason for objection provided that OWNER's objection shall mean that CONTRACTOR will not use that subcontractor, or that CONTRACTOR will remedy, acceptable to the OWNER, the reason for the objection.



14. **A. _Indemnity_.** To the fullest extent permitted by law, the CONTRACTOR shall indemnify, defend (by counsel acceptable to the OWNER) and hold the OWNER, its affiliates and the officers, directors, owners, managers, trustees and employees of OWNER and its affiliates harmless from and against any and all claims, causes of action, damages, losses, judgments, settlements and expenses (including, without limitation, reasonable attorney's fees and court costs) incurred or suffered by the OWNER and resulting from or arising out of the performance of the WORK, including, without limitation, claims, damages, losses or expenses attributable to bodily injury, death, destruction of personal property, and any remediation costs, losses or damages resulting from contamination or alleged contamination of air, water or soil, whether by CONTRACTOR or any of its subcontractors. Such agreement shall survive the expiration or termination of this AGREEMENT and FINAL PAYMENT.

15. _Termination_.

(a) This AGREEMENT may be terminated by the OWNER upon delivery of notice thereof to the CONTRACTOR in the event the CONTRACTOR abandons the WORK (defined as the failure of CONTRACTOR to fully man the job and diligently prosecute the work for a period of five (5) business days), and, upon such termination, the OWNER shall have no further obligation to pay any amounts to the CONTRACTOR. If the CONTRACTOR fails to carry out the WORK in accordance with the CONTRACT DOCUMENTS or otherwise fails to perform its obligations under this AGREEMENT, the OWNER may give written notice thereof to the CONTRACTOR and, if the CONTRACTOR fails to cure such failure within seven (7) days after its receipt of such notice, the OWNER may, without prejudice to any other remedy available to it at law or in equity, terminate this AGREEMENT and take possession of the site and all materials, equipment, tools and construction equipment and machinery thereon owned by the CONTRACTOR and finish the WORK by whatever method the OWNER may deem expedient. If the unpaid balance of the BASIC COMPENSATION exceeds the expense of finishing the WORK, the excess may be retained by the OWNER to compensate it for the inconvenience of finishing the PROJECT, but if the expense exceeds the unpaid balance thereof, the CONTRACTOR shall pay the difference to the OWNER.

(b) The OWNER may terminate this AGREEMENT or any portion of WORK to be performed hereunder at any time by a notice in writing from the OWNER to the CONTRACTOR for the OWNER's convenience. In such case, the OWNER shall pay to the CONTRACTOR



all funds due the CONTRACTOR for work performed up to the date of termination, any amounts due, pursuant to contract, to Subcontractors for early termination and CONTRACTOR's reasonable pro rata overhead and profit on WORK performed. All funds due hereunder, including unpaid Retainage, shall be released within thirty (30) days of termination of the AGREEMENT for convenience.

(c) In the event of termination of this AGREEMENT under Paragraph 15, all provisions of this AGREEMENT shall survive termination except Paragraph 6.

16. <u>Mediation</u>. Any Claim arising out of or related to the Contract, except Claims relating to the visual appearance of the building or the property shall be subject to dispute resolution via a minimum of at least one phone meeting between OWNER and CONTRACTOR as a condition precedent to the institution of legal proceedings by either party.

17. <u>General Provisions</u>.

(a) This <u>AGREEMENT shall be governed by and construed in accordance with the laws of the State of Texas</u>. The parties stipulate that there are significant contacts with the State of Illinois, such contacts being sufficient in significance and number to subject the parties to the jurisdiction of the state courts of Illinois. <u>The parties to this AGREEMENT hereby consent</u> to the jurisdiction of the State of Illinois and hereby consent and agree that any action or proceeding involving the interpretation and/or enforcement of this AGREEMENT shall be brought in the appropriate state court in the State of Illinois covering Madison County. Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, any objection either party may have to such venue, any defense of an inconvenient forum to the maintenance of such action or proceeding, and any rights to remove such action to federal courts. If the action cannot be brought in state court, the action shall be brought in federal court for the Southern District of Illinois, and the parties hereby waive any right to transfer or to seek transfer of any such action to any other federal court.

(b) If any provision of this AGREEMENT shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby, except as provided in 17(h).

(c) This AGREEMENT may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument, including those transmitted by facsimile. OWNER and CONTRACTOR may sign a telefaxed or machine copy or copies of this AGREEMENT and any such telefaxed or machine copy or copies shall be deemed to be an original and no objection shall be made to the introduction into evidence of any telefaxed or machine copy on the grounds related to the telefaxed or machine copy not being an original.

(d) This AGREEMENT supersedes all previous discussions, negotiations and agreements between the parties relating to the

PROJECT and constitutes the entire understanding between the parties relating to the PROJECT. This AGREEMENT may not be amended except pursuant to CHANGE ORDER or by other written instrument signed by the party to be bound thereby.

(e) This AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(f) Any notice required or permitted to be given under this AGREEMENT will be in writing and will be deemed received when sent via fax or delivered personally or deposited in the mail, certified, return receipt requested, postage prepaid and addressed to the parties at the respective addresses set forth below, unless by such notice a different person or address shall have been designated:

If to OWNER:    Donald E. Weder, President
          Walnut Grove, L.L.C.
          1111 Sixth Street
          Highland, IL 62249-0124

and to:     William F. Straeter, Executive Vice President
          Walnut Grove, L.L.C.
          1111 Sixth Street
          Highland, IL 62249-0124

and to:     Franklin J. Craig, Engineer
          Walnut Grove, L.L.C.
          1111 Sixth Street
          Highland, IL 62249-0124

and to:     David W. Harlan, Esquire
          Gallop, Johnson & Neuman, L.C.
          101 S. Hanley Road, Suite 1600
          St. Louis, MO 63105

If to CONTRACTOR:  Nicholas "Nick" Soto, Jr.
          Director of Business Development
          Finsa Development Corporation
          973 South Minnesota
          Brownsville, TX 78521

and to:     T. Mark Blakemore P 956-541-9600
          Rentfro, Faulk & Blakemore, LLP Fax 956-541-9635
          185 E. Ruben M. Torres Sr. Blvd.
          Brownsville, TX 78520-8136

(g) If any statements or provisions of this AGREEMENT conflict or can be interpreted in different ways in this AGREEMENT then the OWNER will resolve the interpretation to be used and the interpretation will be to use the statements or provisions that

092799:1246p      19

favor the OWNER.

(h)   This AGREEMENT, in writing, expresses the totality of the terms of the agreement between OWNER and CONTRACTOR hereto with respect to the subject matter covered by this AGREEMENT. Any verbal representation shall have no force or effect whatsoever. This AGREEMENT is not a part of any other agreement, does not depend for its consideration or its enforceability upon any other agreement and shall not be construed with or as a part of any other agreement past or present. OWNER and CONTRACTOR each represents and warrants that no promises, representations or inducements have been made by the other party with respect to the subject matter of this agreement, except as specifically set forth herein. This AGREEMENT may not be changed, altered, modified or amended except by an agreement in writing signed by the party against whom enforcement is sought. The foregoing notwithstanding this AGREEMENT shall at OWNER's option terminate if paragraph 17(a) describing governing law is held to be invalid and/or unenforceable; or if either party brings an action in a court other than the courts specified in this AGREEMENT.

(i)   This AGREEMENT will supersede and replace any and all prior agreements or purported agreements between OWNER and CONTRACTOR with respect to the subject matter covered by this AGREEMENT.

(j)   Waiver by OWNER or CONTRACTOR of the breach of any provision of this AGREEMENT by any party shall not operate or be construed as a waiver of any subsequent breach.

(k)   Nothing in this AGREEMENT shall be construed to make either party the legal representative or agent of the other party, except for the duties of CONTRACTOR as an independent contractor hereunder nor shall either party have the right or authority assume, create or incur any liability or any obligation of any kind, express or implied, in the name of or on behalf of the other party.

(l)   This AGREEMENT is not assignable by CONTRACTOR. OWNER has the right to assign or otherwise transfer this AGREEMENT, in whole or in part.

(m)   OWNER and/or any affiliated company from time-to-time may cause pictures (likenesses, still photographs, motion picture film and/or video and/or pictures in any other medium now know or hereafter known) to be taken of CONTRACTOR ("PICTURES"), and/or recordings of CONTRACTOR's voice alone or together with the Pictures ("RECORDINGS"). CONTRACTOR hereby irrevocably consents to and authorizes the use for any purpose whatsoever, including (but not by way of limitation) the sale, publication, display and exhibition thereof in promotion, advertising and trade and reproductions thereof by OWNER and/or any affiliated company, or anyone authorized by OWNER and/or any affiliated company, of any and all PICTURES and/or RECORDINGS, in whole or in part, and/or CONTRACTOR's name, without further compensation to CONTRACTOR. OWNER and/or any affiliated company shall own exclusively all

right, title and interest in and to the PICTURES and/or RECORDINGS, and negatives and reproductions thereof, in whole or in part, including (but not by way of limitation), the right to copyright the PICTURES and/or RECORDINGS in the name of OWNER and/or any affiliated company worldwide and all other rights of a copyright owner as set forth in Title 17 of the United States Code.

(n) This AGREEMENT shall be binding upon CONTRACTOR's heirs, assigns (if permitted), executors and administrators, or other legal representatives.

(o) OWNER and CONTRACTOR agree that the terms of this AGREEMENT were negotiated by the parties, and the provisions of this AGREEMENT shall not be construed against any party merely on the basis that such party may have drafted the particular provision or the entire AGREEMENT.

(p) Headings in this AGREEMENT are for reference purposes only and shall not be deemed a part of this AGREEMENT.

(q) This AGREEMENT is executed voluntarily by each of the parties hereto without any duress or undue influence on the part, or on behalf, of any of them. The parties hereto represent and warrant to each other that they have read and fully understand each of the provisions of this AGREEMENT and have relied on the advice and representation of competent legal counsel of their own choosing.

(r) Except as expressly provided herein, nothing in this AGREEMENT is intended or shall be construed to give any person or entity, other than the parties having rights herein and their respective assigns and subrogees, if permitted, any legal or equitable right, remedy, or claim under or in respect to this AGREEMENT or any provisions contained here; this AGREEMENT and any conditions and provisions hereof being and intended to be for the sole and exclusive benefit of the parties having rights herein and their respective assigns and subrogees, if permitted, and for the benefit of no other person or entity.

IN WITNESS WHEREOF, the undersigned have entered into this AGREEMENT and consider this AGREEMENT effective as of the date executed and consider this execution date as the Notice to Proceed.

"OWNER"

WALNUT GROVE, L.L.C.

By: _____
Printed Name: _Donald E. Wedge_
Title: _Manager_
Date: _22 Oct 99 in Highland, IL_

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT OF ILLINOIS
MADISON COUNTY, ILLINOIS

**FILED**

JUL 1 0 2001

CLERK OF CIRCUIT COURT #10
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

WALNUT GROVE L.L.C., an )
Illinois Limited Liability Company, )
)
Plaintiff, )
)
vs. )  No. 01 L1121
)
FINSA DEVELOPMENT CORPORATION, )
a Texas Corporation, )
)
Defendant. )

### C O M P L A I N T

Now comes Plaintiff, Walnut Grove L.L.C. ("Walnut Grove"), by its attorneys,

Lucco, Brown and Mudge, and for its causes of action against the Defendant, FINSA

Development Corporation ("FINSA"), alleges.

#### Count I.

1.      Walnut Grove is a limited liability company organized under the laws of

the State of Illinois, with its principal lace of business located in Highland, Illinois.

2.      Upon information and belief, FINSA is a corporation organized under the

laws of the State of Texas, with its principal place of business located in Brownsville,

Texas.

3.      This Court has jurisdiction over the parties and the subject matter in

issue.

4.      In 1999, Walnut Grove made the decision to construct a warehouse

facility in Los Indios, Texas. Walnut Grove intended that the warehouse be protected

**EXHIBIT**

B

by an Early Suppression Fast Response sprinkler system (the "ESFR System"; a state of the art fire suppression system which would (i) offer the greatest degree of protection to Walnut Grove's employees and local firefighters who might be called upon to put out a fire at the warehouse, and (ii) entitle Walnut Grove to a reduced insurance premium from its insurer, FM Global (formerly, Factory Mutual), as a Highly Protected Risk.

5.     Walnut Grove selected FINSA to oversee all aspects of the design and construction of the warehouse.    Prior to formally engaging FINSA, Walnut Grove advised FINSA of its requirements for the warehouse.   Particular emphasis was made by Walnut Grove to FINSA that the installation of the ESFR System was an important factor in its decision to proceed with construction of the warehouse facility.

6.     In selecting FINSA, Walnut Grove placed utmost faith and trust in FINSA's representations of its ability to design and construct the warehouse in accordance with both Walnut Grove's particular requirements and all local, state and federal law, ordinances and codes.

7.     Thereafter, on October 22, 1999, Walnut Grove and FINSA entered into a contract, titled "Design/Build Agreement Between Owner and Contractor" (the "Design/Build Agreement").   A true and correct copy of the Design/Build Agreement is attached as Exhibit A hereto.

8.     Venue is properly laid in this instance in Madison County, Illinois pursuant to paragraph 17(a) of the Design/Build Agreement, Exhibit A.

9.     Walnut Grove has performed or is willing to perform all of its obligations under the terms of the Design/Build Agreement.

2

10.    Under the Design/Build Agreement, FINSA was solely responsible for the total design and construction of Walnut Grove's warehouse in Los Indios, Texas.

11.    Pursuant to paragraph 3 of the Design/Build Agreement, FINSA was to complete construction of the warehouse on or before June 8, 2000 (the "Completion Date"). In the event FINSA failed to complete construction of the building by the Completion Date, Walnut Grove was entitled to reduce the compensation due and owing to FINSA at the rate of $2,000.00 per day for each day after the Completion Date, until the building has been completed in accordance with the Design/Build Agreement ("Late Completion Charges"). As of the date of the filing of this action, FINSA has not completed construction of the warehouse.

12.    Under the Design/Build Agreement, FINSA assumed the affirmative obligation to ensure that the warehouse was constructed in accordance with both the Building Project Requirements set forth in Exhibit A thereto and all local, state and federal laws, ordinances and regulations.

13.    Pursuant to Section 15025 of the Building Project Requirements of the Design/Build Agreement, FINSA agreed to install the ESFR System such that it would "meet[] or exceed [] Highly Protected Risk (HPR) standards of Factory Mutual [Walnut Grove's insurer] for the items intended to be stored [in the building] which are described in Exhibit B [to the Design/Build Agreement]."

14.    FINSA has committed a material breach of the Design/Build Agreement in that it has, *inter alia*, failed, refused and neglected to install the ESFR System.

15.    FINSA has attempted to excuse its obligation to install the ESFR System, claiming it does not comply with the Los Indios building code.

16.    Contrary to FINSA's assertion, however, the ESFR System is not simply in compliance with the applicable Los Indios building code but, in fact, significantly exceeds the requirements of the Los Indios building code.

17.    As a result of FINSA's breach of the Design/Build Agreement, construction of the warehouse was not completed on or before the Completion Date.

18.    As a direct and proximate result of FINSA's breach of the Design/Build Agreement, Walnut Grove (i) has been forced to expend substantial sums of money in payment for substitute warehouse facilities, and (ii) will be required to retain the services of another contractor to install the ESFR System.

WHEREFORE, Walnut Grove prays that it be granted a judgment against FINSA (i) for all sums which it has expended to secure substitute warehouse facilities, (ii) the cost of installing the ESFR System, (iii) allowing Walnut Grove to offset any Late Competition Charges against any sums which may be due and owing to FINSA under the Design/Build Agreement from and including June 9, 2000, until the date on which the warehouse facility is completed in accordance with the Design/Build Agreement or, if the Late Completion Charges exceed such sums, awarding Walnut Grove a judgment for such excess Late Completion Charges, (iv) an award of its costs, including a reasonable attorney's fee, and (v) such other and further relief as the Court deems just and equitable.

## Count II.

1.     Walnut Grove realleges and incorporates herein paragraphs 1 - 18 of Count I as paragraphs 1 - 18 of Count II.

19.     FINSA had a duty to advise Walnut Grove of any design and construction requirements which might prevent the warehouse from being approved or certified by the government agencies or governmental authorities having jurisdiction over construction of the warehouse for the use for which the warehouse was designed and built.  FINSA did not advise Walnut Grove of the possibility that the ESFR System would not comply with the Los Indios building code until the construction of the warehouse was well underway and substantial sums had been paid to FINSA under the Design/Build Agreement.

20.     If, as FINSA now claims, the ESFR System does not comply with the Los Indios building code or complies with such code but will not be approved by the Los Indios building inspector, FINSA had a duty to ascertain this fact prior to commencing construction of the warehouse and to so advise Walnut Grove so that the building could be redesigned or so that alternative measures could be taken.

21.     FINSA had a further duty to advise Walnut Grove of what changes, if any, could be made in the Building Project Requirements of the Design/Build Agreement so that any ESFR System which complied with the Los Indios building code could be installed in the warehouse.

22.     By failing to ascertain these facts and by failing to so advise Walnut Grove, FINSA has breached its duty to Walnut Grove.

23. As a direct and proximate result of FINSA's breach of its duties, Walnut Grove has sustained significant damages in an amount presently unknown, but believed to include at least the following (i the amount which Walnut Grove has been forced to expend in payment for substitute warehouse facilities, and (ii) the amount which Walnut Grove incur to retain the services of another contractor to install the ESFR System.

WHEREFORE, Walnut Grove prays that it be granted a judgment against FINSA for (i) the amount which Walnut Grove has been forced to expend in payment for substitute warehouse facilities, (ii) the amount which Walnut Grove incur to retain the services of another contractor to install the ESFR System, (iii) for any other and further damages which Walnut Grove has suffered as a result of FINSA's breach of the duties owed to Walnut Grove, (iv) an award of its costs, including a reasonable attorney's fee, and (v) such other and further relief as the Court deems just and equitable.

Walnut Grove L.L.C., an
Illinois Limited Liability Corporation

BY _____
J. WILLIAM LUCCO #01701835
ITS ATTORNEY

LUCCO, BROWN AND MUDGE LAW OFFICES
224 ST. LOUIS STREET
P.O. BOX 539
EDWARDSVILLE, ILLINOIS 62025
TELEPHONE: (618) 656-2321
FAX: (618) 656-2363

6

## DESIGN/BUILD AGREEMENT
## BETWEEN
## OWNER AND CONTRACTOR

This Design/Build Agreement between OWNER and CONTRACTOR (this "AGREEMENT"), is made and entered into by and between Walnut Grove, L.L.C. whose address is 1111 Sixth Street, Highland, Illinois 62249 ("OWNER") and Finsa Development Corporation ("CONTRACTOR") whose address is 973 South Minnesota, Brownsville, Texas 78521.

### RECITALS

A.    CONTRACTOR has proposed and OWNER desires to have constructed a building on its site in Los Indios, Texas (the "PROJECT").

B.    CONTRACTOR will furnish all architectural services required in connection with the PROJECT by persons lawfully licensed to practice architecture and all construction labor and material in connection with the PROJECT.

### STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the above recitals, the mutual covenants and agreements herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    PROJECT.    The "CONTRACT DOCUMENTS" consist of this AGREEMENT, and all exhibits to this AGREEMENT, the BUILDING PROJECT REQUIREMENTS attached hereto as Exhibit A (the "REQUIREMENTS"), the "CONSTRUCTION DOCUMENTS" to be prepared and furnished to the OWNER for its approval pursuant to Section 4(b) below, initialed by CONTRACTOR and OWNER's authorized representatives and any OWNER approved CHANGE ORDERS approved by OWNER and CONTRACTOR. The "PROJECT" is the total design and construction for which the CONTRACTOR is responsible, including all architectural, professional design services and all labor, materials and equipment used or incorporated in such design and construction, and all permits and authorizations required by any governmental bodies necessary to complete the PROJECT and to permit occupancy by OWNER. The "WORK" comprises the completed construction designed under the PROJECT and includes all labor necessary to produce such construction, and all material and equipment incorporated or to be incorporated into such construction.

2.    Contract Sum.

(a)    The OWNER shall pay the CONTRACTOR the CONTRACT SUM also termed BASIC COMPENSATION in current funds for the CONTRACTOR's performance of the Contract.    The CONTRACT SUM shall

EXHIBIT "A"

be Two Million Nine Hundred Nineteen Thousand One Hundred Eleven
Dollars ($2,919,111.00), which is apportioned as $1,350,000.00 for
materials and $1,569,111.00 for labor and which is subject to
additions and deductions as provided in the CONTRACT DOCUMENTS.

   (b)  Unit prices, if any, are as follows:  $250.00 each
for 6" bollards and $200.00 each for 4" bollards, installed at
OWNER's option per Exhibit A, Section 5300, item 1.

  3.  <u>Schedule</u>.  The Basic Services to be performed by the
CONTRACTOR shall be commenced on the date of the signing of this
Agreement and Completion of the PROJECT shall be achieved on the
date Two Hundred Thirty (230) calendar days following the date of
signing of this AGREEMENT (the "COMPLETION DATE").  If the
CONTRACTOR is delayed at any time in the commencement or progress
of the WORK by an act or neglect of the OWNER, or of its employee,
or of a separate contractor employed by the OWNER, or by changes
ordered in the WORK by way of a CHANGE ORDER which will have any
time extension agreed to by both CONTRACTOR and OWNER incorporated
into the CHANGE ORDER or by delay authorized by the OWNER, or if
tornado or hurricane substantially damages the structural steel,
roof or walls, then the COMPLETION DATE shall be extended by CHANGE
ORDER for such reasonable time as the OWNER and CONTRACTOR may
agree to in writing.  In the event Completion has not been achieved
on or before the COMPLETION DATE as may be extended, the BASIC
COMPENSATION shall be reduced at the rate of Two Thousand Dollars
($2,000.00) per day for each day after the COMPLETION DATE until
Completion is achieved as liquidated damages and not as a penalty.

  4.  <u>Contractor's Responsibilities</u>.  The following shall
constitute the "BASIC SERVICES" which the CONTRACTOR hereby agrees
to perform:

   (a)  Design services shall be performed by qualified
architects, engineers and other professionals selected and paid for
by the CONTRACTOR.  Construction services shall be performed by
qualified construction contractors and suppliers selected and paid
for by the CONTRACTOR.  Nothing contained in the foregoing shall
create any contractual relationship between such persons and the
OWNER.  CONTRACTOR acknowledges and agrees that it shall be
responsible to OWNER for the acts and omissions of its architects,
the WORK of all of its design professionals shall meet every
requirement of all local, state and federal laws, ordinances and
regulations and any other requirements as stated in Exhibit A
("BUILDING PROJECT REQUIREMENTS").  If any BUILDING PROJECT
REQUIREMENTS in Exhibit A would result in a failure to comply with
any ordinance, regulation or governmental requirement during the
term of the PROJECT or in existence as of the date of completion of
this PROJECT, then the governmental requirement should be met.

   (b)  Based upon the Proposal, the CONTRACTOR shall submit

CONSTRUCTION DOCUMENTS for review and approval by the OWNER. "CONSTRUCTION DOCUMENTS" shall include technical drawings, schedules, diagrams and specifications, setting forth in detail the requirements for construction of the WORK and provide information customarily necessary including documents customarily required for issuance of permits.

(c)  The CONTRACTOR shall prepare and file all documents required and shall obtain all necessary permits or approvals of government authorities having jurisdiction over the PROJECT for construction, occupancy and related matters, and shall pay all fees and other costs thereof.

(d)  The CONTRACTOR shall provide and pay for all design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the WORK pursuant to the CONTRACT DOCUMENTS whether temporary or permanent and regardless of whether the same is incorporated or to be incorporated into the PROJECT.

(e)  The CONTRACTOR shall be responsible for and shall coordinate all construction means, methods, techniques, sequences and procedures.

(f)  The CONTRACTOR shall keep the OWNER informed of the progress and quality of the WORK and shall cooperate with OWNER's representatives.

(g)  The CONTRACTOR shall correct all WORK which does not conform to the CONTRACT DOCUMENTS, at the CONTRACTOR's expense in accordance with Section 15 below.

(h)  The CONTRACTOR warrants to the OWNER that materials and equipment incorporated into the WORK will be new unless otherwise specified, that the materials will be suitable for the purposes intended, and that work will be of good quality, performed in a good and workmanlike manner, free from fault and defects, and in conformity with the CONTRACT DOCUMENTS. WORK not conforming to those requirements shall be corrected in accordance with Section 15 below.

All warranties and guarantees of Subcontractors and Suppliers with respect to any portion of the WORK shall be obtained by the CONTRACTOR so as to extend for the benefit of and be available to be asserted in the name of the OWNER. The CONTRACTOR shall use its best efforts to obtain from all Subcontractors and Suppliers guarantees and warranties with terms and periods customarily available in the industry. During the CONTRACTOR's warranty period, the CONTRACTOR shall enforce such warranties and guarantees on behalf of the OWNER. The CONTRACTOR shall cause its Subcontractors and Suppliers to include in their subcontracts and



purchase orders the requirement that all guarantees and warranties be obtained so as to extend for the benefit of, and be available to be asserted in the name of, OWNER, which obligation shall be specifically incorporated by reference into any subcontracts, or any lower tier subcontracts or purchase orders.  To the extent that any such warranty or guarantee would be voided by reason of the CONTRACTOR's negligence or other fault in incorporating material or equipment into the WORK, the CONTRACTOR shall be responsible for correcting such defect and shall nevertheless be responsible pursuant to warranty obligations set forth herein.

(i)  The CONTRACTOR shall pay all sales, use and similar taxes and shall obtain and pay for all building and other permits (including occupancy) and governmental fees, license and inspections necessary for the proper execution and completion of the WORK.  Real estate taxes shall be paid by the OWNER.

(j)  The CONTRACTOR shall give notices and comply with all laws, ordinances, rules, regulations and orders of public authorities having jurisdiction over the PROJECT and shall provide copies of these notices to OWNER.

(k)  The CONTRACTOR shall pay all royalties and license fees and shall defend any suits or claims for infringement of copyright, patent or trademark rights and shall indemnify and hold the OWNER harmless from any loss or damage on account thereof.

(l)  The CONTRACTOR shall be responsible to the OWNER for the acts and omissions of the CONTRACTOR's employees and all subcontractors (of any tier) and their respective agents and employees.

(m)  The CONTRACTOR shall keep the premises free from waste materials or rubbish caused by the CONTRACTOR's activities on the premises.  After completion of the WORK, the CONTRACTOR shall remove from and about the PROJECT the CONTRACTOR's tools, construction equipment, machinery, surplus materials, waste materials and rubbish.

(n)  The CONTRACTOR shall prepare CHANGE ORDERS at the OWNER's predesignated representative's request and for the OWNER's approval and execution in accordance with this Agreement.  The predesignated representatives are Don Weder, Wanda Weder or Bill Straeter.  CONTRACTOR acknowledges that representatives are acting on behalf of the OWNER and agrees that neither they nor any of them shall be held personally liable for any acts or omissions. CONTRACTOR hereby releases representatives and each of them for any claims past or future.

(o)  The CONTRACTOR shall maintain in good order at the site one record copy of the drawings, specification, product data, samples, shop drawings and other modifications, marked currently to

record changes made during construction. Five (5) sets of as-built plans and Specifications, together with copies of all of the foregoing items, shall be delivered to the OWNER upon completion of the PROJECT and prior to FINAL PAYMENT.

(p)  CONTRACTOR will comply with all requirements as set forth in Exhibit A (BUILDING PROJECT REQUIREMENTS).

(q)  The CONTRACTOR shall diligently and expeditiously prosecute the WORK of the PROJECT in the most timely manner possible, and shall proceed so as to allow OWNER to occupy the building, and any portion thereof, at the earliest possible time, whereupon OWNER shall provide insurance for any damage to OWNER's property or portion of building being occupied by OWNER which may arise before FINAL COMPLETION.

(r)  OWNER exclusively shall be given the right to approve or disapprove any and all press releases regarding the PROJECT which the CONTRACTOR may wish to issue.  CONTRACTOR will not disclose any terms of this contract and CONTRACTOR will not make any press releases concerning the construction without OWNER's request and/or preapproval.

(s)  The CONTRACTOR shall ensure that all WORK performed on the PROJECT, whether by itself or by its subcontractors, shall comply with all applicable Federal, state, county and local environmental laws, statutes, and regulations.  The CONTRACTOR shall be fully responsible for the cost of all fines, penalties and remedial environmental actions required by law or regulation or directed to be performed by any Federal, state or local agency relating in any way to any of the WORK performed on the PROJECT and shall be responsible for all third party environmental claims related to the PROJECT. CONTRACTOR agrees to indemnify, defend (by counsel acceptable to OWNER) and hold OWNER harmless from and against any liens, losses, damages, judgments, administrative orders or directions, settlements, expenses or costs including attorney's fees and costs, arising out of or related to remedial environmental action and other activities related to the PROJECT.

(t)  CONTRACTOR shall ensure that all materials and workmanship complies with Section 01500 Standards, Codes and Regulations in Exhibit A (BUILDING PROJECT REQUIREMENTS) that are in effect at the date of Completion of the PROJECT and are suitable for the purposes intended.

(u)  The CONTRACTOR shall be responsible for the value of any building or construction materials, pertaining to the WORK, delivered to the site whether or not these materials have been incorporated into the PROJECT and whether or not OWNER has paid for all or any portion of these materials and shall take proper precautions to safeguard the materials.

092799:1246p                    5                    Ow

(v)  C  ACTOR, when doing any    nting, lacquering varnishing or using any materials that cause  ny odors or any air or other emissions, shall ventilate the area thoroughly and comply with all environmental, health and safety laws, ordinances, rules and regulations.

(w)  The OWNER shall have unlimited rights to copy and use all Design Materials, including the right to use same on the PROJECT at no additional cost to the OWNER, regardless of degree of completion, provided that OWNER has complied with the terms of this AGREEMENT.  The CONTRACTOR agrees to and does hereby grant to the OWNER and any assignee or successor of the OWNER a royalty-free license to any such Design Materials as to which the CONTRACTOR may assert any rights under the patent or copyright laws.  The CONTRACTOR hereby assigns outright and exclusively to the OWNER all copyrights in the design appearance of the PROJECT.  The CONTRACTOR, as part of its agreements with any Subcontractor or consultant will secure such license and use rights from each such entity, and shall defend, indemnify, and hold the OWNER and any successor, or assigns harmless from any claims by such entities for copyright or patent infringement.

5.  Time.

(a)  The time limits stated herein and in the CONTRACT DOCUMENTS are of the essence of this Agreement.

(b)  The COMPLETION DATE of the WORK shall be the date when construction is complete so that the OWNER can fully occupy and utilize the WORK for its intended use and an occupancy permit relative thereto has been issued.

(c)  "FINAL COMPLETION" will be deemed to have occurred when Completion has been achieved and when all punch-list items have been completed and the PROJECT is in full compliance with the CONTRACT DOCUMENTS.  The CONTRACTOR shall diligently prosecute the WORK until FINAL COMPLETION is achieved.

6.  Payments.

A.  Interim Payments.

1.  Based upon Applications for Payment as per Exhibit D submitted (by the CONTRACTOR) to a representative appointed in writing signed by the OWNER (REPRESENTATIVE) and Certificates for Payment issued by the REPRESENTATIVE, the OWNER shall make progress payments on account of the CONTRACT SUM to the CONTRACTOR as provided below and elsewhere in the CONTRACT DOCUMENTS.  In Exhibit D and Exhibit F the word "REPRESENTATIVE" shall be substituted for and replace the word "ARCHITECT."

2.  The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

3. Provided that an Application for Payment with appropriate releases and waivers as per Exhibit G of liens is received by the REPRESENTATIVE not later than the 5th day of a month, the OWNER shall make payment to the CONTRACTOR not later than the 20th day of the same month. If an Application for Payment is received by the REPRESENTATIVE after the application date fixed above, payment shall be made by the OWNER not later than fifteen (15) days after the REPRESENTATIVE receives the Application for Payment with appropriate releases and waivers, as per Exhibit G of liens.

4. Each Application for Payment shall be based on the most recent schedule of values submitted by the CONTRACTOR in accordance with the CONTRACT DOCUMENTS. The schedule of values shall allocate the entire CONTRACT SUM among the various portions of the WORK. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the REPRESENTATIVE may require. This schedule, unless objected to by the REPRESENTATIVE, shall be used as a basis for reviewing the CONTRACTOR's Applications for Payment.

5. Applications for Payment shall indicate the percentage of completion of each portion of the WORK as of the end of the period covered by the Application for Payment.

6. Subject to other provisions of the CONTRACT DOCUMENTS, the amount of each interim payment shall be computed as follows:
(a) Take that portion of the CONTRACT SUM properly allocable to completed WORK as determined by amounts stated in releases and waivers of liens submitted with the Application for Payment allocated to that portion of the WORK in the schedule of values, less retainage of ten percent (10%). Pending final determination of cost to the OWNER of changes in the WORK, amounts not in dispute shall be included.
(b) Add that portion of the CONTRACT SUM properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the OWNER, suitably stored off the site at a location agreed upon in writing) as provided by this AGREEMENT less retainage of ten percent (10%).
(c) Subtract the aggregate of previous payments made by the OWNER; and
(d) Subtract amounts, if any, for which the

REPRESENTATIVE has withheld or nullified a Certificate for Payment as provided in Paragraph 7.E.1.

B.    FINAL PAYMENT.
1.    FINAL PAYMENT, constituting the entire unpaid balance of the CONTRACT SUM, shall be made by the OWNER to the CONTRACTOR when:
(a)   The CONTRACTOR has fully performed the Contract except for the CONTRACTOR's responsibility to correct WORK, and to satisfy other requirements, if any, which extend beyond FINAL PAYMENT; and
(b)   A final Certificate for Payment has been issued by the REPRESENTATIVE.
2.    The OWNER's FINAL PAYMENT to the CONTRACTOR shall be made no later than 15 days after the issuance of the REPRESENTATIVE's final Certificate for Payment.

C.    Interest on Late Payments.
Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate of twelve percent (12%) simple interest.

7.    Payments and Completion.
A.    The CONTRACT SUM is stated in Paragraph 2 and, including authorized adjustments, is the total amount payable by the OWNER to the CONTRACTOR for performance of the WORK under the CONTRACT DOCUMENTS.

B.    Schedule of Values.  Before the first Application for Payment, the CONTRACTOR shall submit to the REPRESENTATIVE a schedule of values allocated to various portions of the WORK, prepared in such form and supported by such data to substantiate its accuracy as the REPRESENTATIVE may require. This schedule, in the form of Exhibit F, unless objected to by the REPRESENTATIVE, shall be used as a basis for reviewing the CONTRACTOR's Applications for Payment.

C.    Applications for Payment.
1.    At least fifteen (15) days before the date established, for each interim payment, the CONTRACTOR shall submit to the REPRESENTATIVE an itemized Application for Payment for operations completed in accordance with the schedule of values.  Such application shall be notarized, if required, and supported by releases of liens in the form of Exhibit G and such data substantiating the CONTRACTOR's right to payment as the OWNER or REPRESENTATIVE may require, such as copies of invoices from Subcontractors, and reflecting retainage.

(a)   As provided in subparagraph 6.A.6(a), such



applications may include requests for payment on account of changes in the WORK which have been properly authorized by approved CHANGE ORDERs.

(b)   Such applications may not include requests for payment for portions of the WORK for which the CONTRACTOR has not paid to a Subcontractor.

2.   Unless otherwise provided in the CONTRACT DOCUMENTS, payments shall be made on account of materials and equipment delivered and suitably stored at the site for subsequent incorporation in the WORK, provided that progress payments will only be made for those materials that are anticipated to be consumed within 45 days from delivery.   Materials which are delivered that may be damaged by the elements should not be delivered more than one (1) week prior to their use and when they are delivered must be protected from the elements in a manner satisfactory to OWNER and must be protected so as not to be damaged in any way.   If approved in advance by the OWNER, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing.   Payment for materials and equipment stored on or off the site shall be conditioned upon compliance ·by the CONTRACTOR with procedures satisfactory to the OWNER to protect the OWNER's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

3.   The CONTRACTOR further warrants that upon submittal of an Application for Payment all WORK for which Certificates for Payment are issued and those that have been previously issued and payments received from the OWNER shall, to the best of the CONTRACTOR's knowledge, information and belief be free and clear of liens, claims, security interests or any other encumbrances from any and all Subcontractors, material suppliers, or other persons or entities making a claim by reason of having provided labor, materials and equipment resulting to the WORK.

D.   Certificates for Payment.
1.   The REPRESENTATIVE will, within ten (10) days after receipt of the CONTRACTOR's Application for Payment, either issue to the OWNER a Certificate for Payment with a copy to the CONTRACTOR, for such amount as the REPRESENTATIVE determines is properly due, or notify CONTRACTOR and OWNER in writing of the REPRESENTATIVE's reasons for withholding certification in whole or in part as provided in Subparagraph 7.E.1.

2.    The issuance of a Certificate for Payment will
constitute a representation by the REPRESENTATIVE to the
OWNER, based on the REPRESENTATIVE's evaluation of the
WORK and the data comprising the Application for Payment,
that the WORK has progressed to the point indicated and
that, to the best of the REPRESENTATIVE's knowledge,
information and belief, the quality of the WORK is in
accordance with the CONTRACT DOCUMENTS.  The foregoing
representations are subject to an evaluation of the WORK
for conformance with the CONTRACT DOCUMENTS to results of
subsequent tests and inspections, to correction of minor
deviations  from  the  CONTRACT  DOCUMENTS  prior  to
completion and to specific qualifications expressed by
the REPRESENTATIVE.  The issuance of a Certificate for
Payment will further constitute a representation that the
CONTRACTOR  is  entitled  to  payment  in  the  amount
certified.  However, the issuance of a Certificate for
Payment  will  not  be  a  representation  that  the
REPRESENTATIVE has (i) made exhaustive or continuous on-
site inspections to check the quality or quantity of the
WORK,  (ii)  reviewed  construction  means,  methods,
techniques, sequences or procedures, (iii) reviewed the
releases of liens and copies of invoices received from
Subcontractors and other data requested by the OWNER to
substantiate the CONTRACTOR's right to payment, or (iv)
made examination to ascertain how or for what purpose the
CONTRACTOR has used money previously paid on account of
the CONTRACT SUM, and (v) shall not be deemed to be
acceptance of the WORK for all purposes and shall not
relieve CONTRACTOR of its responsibility to complete the
WORK in conformance with the CONTRACT DOCUMENTS.

E.    Decisions to Withhold Certification.
1.    The REPRESENTATIVE may withhold a Certificate for
Payment in whole or in part, to the extent reasonably
necessary  to  protect  the  OWNER,  if  in  the
REPRESENTATIVE's opinion the representations to the OWNER
required by Subparagraph 7.D.2. cannot be made.  If the
REPRESENTATIVE is unable to certify payment in the amount
of the Application, the REPRESENTATIVE will notify the
CONTRACTOR and OWNER as provided in Subparagraph 7.D.1.
If the CONTRACTOR and REPRESENTATIVE cannot agree on a
revised amount, the REPRESENTATIVE will promptly issue a
Certificate for Payment for the amount for which the
REPRESENTATIVE is able to make such representations to
the OWNER.  The REPRESENTATIVE may also withhold a
Certificate for Payment or, because of subsequently
discovered evidence, may nullify the whole or a part of
a Certificate for Payment previously issued, to such
extent as may be necessary in the REPRESENTATIVE's
opinion to protect the OWNER from loss for which the
CONTRACTOR is responsible, including loss resulting from

acts and omissions because of:
    (a)   defective WORK not remedied;
    (b)   third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the OWNER is provided by the CONTRACTOR;
    (c)   failure of the CONTRACTOR to make payments properly to Subcontractors or for labor, materials or equipment;
    (d)   reasonable evidence that the WORK cannot be completed for the unpaid balance of the CONTRACT SUM;
    (e)   reasonable evidence that the WORK will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay;

    (f)   material failure to carry out the WORK in accordance with the CONTRACT DOCUMENTS.

2.    When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.  Notwithstanding the above, OWNER does not waive any other rights available at law or in equity.

F.   Interim Payments.
1.    After the REPRESENTATIVE has issued a Certificate for Payment, the OWNER shall make payment in the manner and within the time provided in the CONTRACT DOCUMENTS, and shall so notify the REPRESENTATIVE.

2.    Neither the OWNER nor the REPRESENTATIVE shall have any obligation to pay or to see to the payment of money to a Subcontractor.

3.    A Certificate for Payment, an interim payment or partial or entire use or occupancy of the PROJECT by the OWNER shall not constitute acceptance of the WORK not in accordance with the CONTRACT DOCUMENTS.

G.   Failure of Payment.  If the REPRESENTATIVE does not comply with the provisions of Paragraphs 7.D. and 7.E. through no fault of the CONTRACTOR, within ten (10) days after receipt of the CONTRACTOR's Application for Payment, or if the OWNER does not pay the CONTRACTOR within the date established in the CONTRACT DOCUMENTS the amount certified by the REPRESENTATIVE, then the CONTRACTOR may,upon two (2) additional business days' written notice to the OWNER and REPRESENTATIVE, stop the WORK until payment of the amount owing has been received.  With the exception of structural steel matters, the Contract Time shall

be extended by the number of days elapsed from date of non-compliance until the date OWNER has complied with paragraphs 7D and 7E and the CONTRACT SUM shall be increased by the amount of the CONTRACTOR's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the CONTRACT DOCUMENTS. If work is stopped and the production of the structural steel by the steel manufacturer is delayed, then the number of days extended shall be a reasonable number of days necessary for the steel manufacturer to supply the steel. CONTRACTOR shall promptly resume work when OWNER has complied with the provisions of paragraphs 7D and 7E and OWNER shall not be liable for any costs or interest after the date upon which it complies with the provisions of paragraphs 7D and 7E hereof.

H.    Partial Occupancy Or Use.
1.    The OWNER may occupy or use any completed or partially completed portion of the WORK at any stage when such portion is designated by separate agreement with the CONTRACTOR, provided such occupancy or use is consented to by CONTRACTOR's insurer and authorized by public authorities having jurisdiction over the WORK. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the OWNER and CONTRACTOR have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the WORK and insurance, and have agreed in writing concerning the period for correction of the WORK and commencement of warranties required by the CONTRACT DOCUMENTS. When the CONTRACTOR considers a portion substantially complete, the CONTRACTOR shall prepare and submit a list to the REPRESENTATIVE as provided under Subparagraph 7.G.2. Consent of the CONTRACTOR to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the WORK shall be determined by written agreement between the OWNER and CONTRACTOR or, if no agreement is reached, by decision of the REPRESENTATIVE.

2.    Immediately prior to such partial occupancy or use, the OWNER, CONTRACTOR and REPRESENTATIVE shall jointly inspect the area to be occupied or portion of the WORK to be used in order to determine and record the condition of the WORK.

3.    Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the WORK shall not constitute acceptance of WORK not complying with the requirements of the CONTRACT DOCUMENTS.

I.    FINAL COMPLETION and FINAL PAYMENT.
1.    Upon receipt of written notice that the WORK is

ready for final inspection and acceptance and upon receipt of a final Application for Payment, the REPRESENTATIVE will promptly make such inspection and, when the REPRESENTATIVE finds the WORK acceptable under the CONTRACT DOCUMENTS and the Contract fully performed, the REPRESENTATIVE will promptly issue a final Certificate for Payment stating that to the best of the REPRESENTATIVE's knowledge, information and belief, and on the basis of the REPRESENTATIVE's on-site visits and inspections the WORK has been completed in accordance with terms and conditions of the CONTRACT DOCUMENTS and that the entire balance found to be due the CONTRACTOR and noted in the final Certificate is due and payable. The REPRESENTATIVE's final Certificate for Payment will constitute a further representation that conditions listed in Subparagraph 7.I.2. as precedent to the CONTRACTOR's being entitled to FINAL PAYMENT have been fulfilled.

2.   Neither FINAL PAYMENT nor any remaining retained percentage shall become due until the CONTRACTOR submits to the REPRESENTATIVE (i) a certificate evidencing that insurance, required by the CONTRACT DOCUMENTS to remain in force after FINAL PAYMENT, is currently in effect and will not be canceled or allowed to expire until at least fifteen (15) days' prior written notice has been given to the OWNER, (ii) a written statement that the CONTRACTOR knows of no substantial reason that the insurance will not be renewable to cover the period required by the CONTRACT DOCUMENTS, (iii) consent of surety, if any, to FINAL PAYMENT and (iv), if required by the OWNER, other data establishing payment or satisfaction of obligations, such as receipts, release and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the OWNER.  If a Subcontractor refuses to furnish a release or waiver required by the OWNER, the CONTRACTOR may furnish a bond satisfactory to the OWNER to indemnify the OWNER against such lien.  If such lien remains unsatisfied after payments are made, the CONTRACTOR shall indemnify and hold harmless OWNER from any claims and liabilities resulting from any such unsatisfied payments.

3.   The making of FINAL PAYMENT shall not constitute a waiver of any claims by the OWNER arising from unsettled lien claims, faulty or defective WORK or material known at the time FINAL PAYMENT is made or appearing after Completion and/or FINAL COMPLETION, failure of the WORK to comply with the requirements of the CONTRACT DOCUMENTS, terms of special warranties required by the CONTRACT DOCUMENTS and those claims previously made by

OWNER which remain unsettled.  All rights of OWNER under this AGREEMENT shall survive FINAL PAYMENT or termination.  Acceptance of FINAL PAYMENT shall constitute the waiver of all claims by the CONTRACTOR except those made in writing and identified by the CONTRACTOR as unsettled at the time of making its final Application for Payment.

4.   Acceptance of FINAL PAYMENT by the CONTRACTOR, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

8.   Mechanic Lien Claims.  The CONTRACTOR agrees to pay all subcontractors (of any tier) and material suppliers providing labor and/or material in connection with the WORK all amounts owed to such persons when due.  The CONTRACTOR hereby agrees to indemnify, defend (by counsel acceptable to the OWNER) and hold the OWNER harmless from and against any and all claims, causes of action, claims of liens, losses, damages, judgments, settlements, and expenses (including, without limitation, reasonable attorneys fees and court costs) incurred or suffered by OWNER as a result of any mechanic lien claims asserted by any person furnishing labor and/or materials in connection with the PROJECT.  Such obligation shall survive the expiration or termination of this AGREEMENT and FINAL PAYMENT.

9.   Protection of Persons and Property.  The CONTRACTOR shall be responsible for maintaining and providing supervision of health and safety precautions and programs in connection with the WORK. The CONTRACTOR shall take reasonable precautions for health and safety of, and shall provide reasonable protection to prevent damage, injury or loss to employees on the WORK or other persons who may be affected thereby, the WORK and material and equipment to be incorporated therein and other property at or adjacent to the site.   The CONTRACTOR shall give notices and comply with all applicable laws, ordinances, rules, regulations, and orders of public authorities bearing on the health and safety of persons and property and their protection from damage or loss.  The CONTRACTOR shall be liable for all damage or any loss to property at the site including but not limited to damage caused in full or in part by the CONTRACTOR, defects in the WORK, in the materials used in or on the WORK or any of its subcontractors and their respective agents and employees and for anyone whose acts the CONTRACTOR may be liable.  CONTRACTOR shall be responsible for any theft, vandalism or loss of any materials delivered on site for construction whether or not OWNER has paid CONTRACTOR for the materials.

10.  Insurance.  The CONTRACTOR shall purchase and maintain with carriers acceptable to OWNER, at all times during the WORK, the insurance described on Exhibit C attached hereto, in conformance with the requirements thereof, and shall maintain with

the OWNER a current certificate thereof at all times until FINAL
COMPLETION.   Upon request of the OWNER, the CONTRACTOR shall
furnish copies of the insurance policies required to be maintained
herein.   All such insurance shall be written on an occurrence
basis, shall name the OWNER as an additional named insured or as an
additional insured as the OWNER in its sole discretion shall
determine, and each current certificate shall show the same as well
as show that the OWNER shall receive written notice of any material
alteration, cancellation, non-renewal or expiration thereof not
less than sixty (60) days before any such event.   In addition to
the requirements of Exhibit C, CONTRACTOR shall ensure that its
architects, engineers and other design professionals carry
professional errors and omissions insurance in at least the amount
of One Million Dollars ($1,000,000.00) also written on an
occurrence basis, endorsed to provide contractual liability
coverage and showing the OWNER as additional named insured or as an
additional insured as the OWNER in its sole discretion shall
determine.   Certificates demonstrating that this design
professional insurance requirement has been met shall be provided
to OWNER at the same time as the other CONTRACTOR certificates are
submitted to OWNER.

11.  <u>CHANGE ORDERS</u>.

     (a)  A "CHANGE ORDER" is a written order signed by the
OWNER and the CONTRACTOR in the form of Exhibit H and issued after
execution of this AGREEMENT, authorizing a change in the WORK, an
adjustment in the BASIC COMPENSATION and/or the COMPLETION DATE.
The BASIC COMPENSATION and the COMPLETION DATE may be changed only
by CHANGE ORDER.

     (b)  The OWNER, without invalidating this AGREEMENT, may
order changes in the WORK within the general scope of the PROJECT.
BASIC COMPENSATION and COMPLETION DATE shall be adjusted
accordingly.   Such changes in the WORK shall be authorized by
CHANGE ORDER and shall be performed under applicable conditions of
the CONTRACT DOCUMENTS.   Each CHANGE ORDER shall be subject to all
provisions of this AGREEMENT.

     (c)  The increase or decrease in the BASIC COMPENSATION
caused by a CHANGE ORDER shall be determined by agreement of the
OWNER and the CONTRACTOR.   If the parties are unable to agree upon
the amount of the adjustment, the amount of the adjustment shall be
in the case of an increase equal to the actual cost of performing
such addition plus an amount equal to ten percent (10%) of such
cost as an allowance for the CONTRACTOR's overhead and profit and
in the case of a decrease the actual savings obtained from the
deletion.   The CONTRACTOR shall submit an itemized accounting
together with appropriate supporting data to the OWNER for
determining the amount of the adjustment required as a result of a
CHANGE ORDER.   The CONTRACTOR's actual cost shall be limited to the
following: (i) cost of materials, including sales tax and delivery
charges; (ii) cost of labor, including social security and other
customary employee benefits; (iii) additional costs of supervision
directly attributable to the change; and (iv) fees paid to

architects, engineers and other professionals. When both additions and credits covering related WORK or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of the increase or decrease, if any, with respect to that change.

    12.  <u>Correction of WORK</u>.

    (a)  The CONTRACTOR shall promptly correct WORK rejected by the OWNER or known to the CONTRACTOR to be defective or failing to conform to the CONSTRUCTION DOCUMENTS, whether observed before or after substantial Completion and regardless of whether fabricated, installed, or completed.

    (b)  Nothing contained in the foregoing section shall establish a period of limitation with respect to other obligations of the CONTRACTOR under this AGREEMENT or at law, it being agreed that the foregoing subparagraph relates only to the specific obligation of the CONTRACTOR to correct the WORK, and has no relation to the time within which the obligation to comply with the CONTRACT DOCUMENTS may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the CONTRACTOR's liability with respect to its obligations hereunder.

    (c)  If the CONTRACTOR fails to correct defective WORK as required herein or otherwise fails to carry out the WORK in accordance with the CONTRACT DOCUMENTS, the OWNER, by written order, may order the CONTRACTOR to stop the WORK, or any portion thereof, until the cause for such order has been eliminated.

    (d)  If the CONTRACTOR defaults or neglects to carry out the WORK in accordance with the CONTRACT DOCUMENTS and fails, within seven days after the receipt of written notice from the OWNER to cure such default with diligence and promptness, the OWNER may, without prejudice to any other remedies the OWNER may have, correct such deficiencies and deduct the cost thereof from payments then or thereafter due to the CONTRACTOR. If the payments then or thereafter due to the Contract are not sufficient to cover the amount of the deduction, the CONTRACTOR shall pay the difference to the OWNER. OWNER to have right to withhold any payments due on this PROJECT if there are defects on any other jobs that CONTRACTOR performs for OWNER.

    13.  <u>Subcontractors</u>. The CONTRACTOR, as soon as practicable after the date of this AGREEMENT, shall furnish to the OWNER, in writing, the names of the persons or entities the CONTRACTOR will engage as subcontractors for the PROJECT. Nothing in this AGREEMENT or in any subcontract shall create a contractual relationship between the OWNER and any such subcontractor. The OWNER shall have the right to object to any subcontractor by giving CONTRACTOR notice in writing of OWNER's reason for objection provided that OWNER's objection shall mean that CONTRACTOR will not use that subcontractor, or that CONTRACTOR will remedy, acceptable to the OWNER, the reason for the objection.

14. A. Indemnity. To the fullest extent permitted by law, the CONTRACTOR shall indemnify, defend (by counsel acceptable to the OWNER) and hold the OWNER, its affiliates and the officers, directors, owners, managers, trustees and employees of OWNER and its affiliates harmless from and against any and all claims, causes of action, damages, losses, judgments, settlements and expenses (including, without limitation, reasonable attorney's fees and court costs) incurred or suffered by the OWNER and resulting from or arising out of the performance of the WORK, including, without limitation, claims, damages, losses or expenses attributable to bodily injury, death, destruction of personal property, and any remediation costs, losses or damages resulting from contamination or alleged contamination of air, water or soil, whether by CONTRACTOR or any of its subcontractors. Such agreement shall survive the expiration or termination of this AGREEMENT and FINAL PAYMENT.

15. Termination.

(a) This AGREEMENT may be terminated by the OWNER upon delivery of notice thereof to the CONTRACTOR in the event the CONTRACTOR abandons the WORK (defined as the failure of CONTRACTOR to fully man the job and diligently prosecute the work for a period of five (5) business days), and, upon such termination, the OWNER shall have no further obligation to pay any amounts to the CONTRACTOR. If the CONTRACTOR fails to carry out the WORK in accordance with the CONTRACT DOCUMENTS or otherwise fails to perform its obligations under this AGREEMENT, the OWNER may give written notice thereof to the CONTRACTOR and, if the CONTRACTOR fails to cure such failure within seven (7) days after its receipt of such notice, the OWNER may, without prejudice to any other remedy available to it at law or in equity, terminate this AGREEMENT and take possession of the site and all materials, equipment, tools and construction equipment and machinery thereon owned by the CONTRACTOR and finish the WORK by whatever method the OWNER may deem expedient. If the unpaid balance of the BASIC COMPENSATION exceeds the expense of finishing the WORK, the excess may be retained by the OWNER to compensate it for the inconvenience of finishing the PROJECT, but if the expense exceeds the unpaid balance thereof, the CONTRACTOR shall pay the difference to the OWNER.

(b) The OWNER may terminate this AGREEMENT or any portion of WORK to be performed hereunder at any time by a notice in writing from the OWNER to the CONTRACTOR for the OWNER's convenience. In such case, the OWNER shall pay to the CONTRACTOR

all funds due the CONTRACTOR for work performed up to the date of termination, any amounts due, pursuant to contract, to Subcontractors for early termination and CONTRACTOR's reasonable pro rata overhead and profit on WORK performed. All funds due hereunder, including unpaid Retainage, shall be released within thirty (30) days of termination of the AGREEMENT for convenience.

(c)   In the event of termination of this AGREEMENT under Paragraph 15, all provisions of this AGREEMENT shall survive termination except Paragraph 6.

16.   Mediation.   Any Claim arising out of or related to the Contract, except Claims relating to the visual appearance of the building or the property shall be subject to dispute resolution via a minimum of at least one phone meeting between OWNER and CONTRACTOR as a condition precedent to the institution of legal proceedings by either party.

17.   General Provisions.

(a)   This AGREEMENT shall be governed by and construed in accordance with the laws of the State of Texas.   The parties stipulate that there are significant contacts with the State of Illinois, such contacts being sufficient in significance and number to subject the parties to the jurisdiction of the state courts of Illinois.   The parties to this AGREEMENT hereby consent to the jurisdiction of the State of Illinois and hereby consent and agree that any action or proceeding involving the interpretation and/or enforcement of this AGREEMENT shall be brought in the appropriate state court in the State of Illinois covering Madison County. Each of the parties hereto hereby irrevocably waives, to the fullest extent it may effectively do so, any objection either party may have to such venue, any defense of an inconvenient forum to the maintenance of such action or proceeding, and any rights to remove such action to federal courts. If the action cannot be brought in state court, the action shall be brought in federal court for the Southern District of Illinois, and the parties hereby waive any right to transfer or to seek transfer of any such action to any other federal court.

(b)   If any provision of this AGREEMENT shall be held to be void or unenforceable for any reason, the remaining terms and provisions hereof shall not be affected thereby, except as provided in 17(h).

(c)   This AGREEMENT may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument, including those transmitted by facsimile. OWNER and CONTRACTOR may sign a telefaxed or machine copy or copies of this AGREEMENT and any such telefaxed or machine copy or copies shall be deemed to be an original and no objection shall be made to the introduction into evidence of any telefaxed or machine copy on the grounds related to the telefaxed or machine copy not being an original.

(d)   This AGREEMENT supersedes all previous discussions, negotiations and agreements between the parties relating to the

PROJECT and constitutes the entire understanding between the parties relating to the PROJECT. This AGREEMENT may not be amended except pursuant to CHANGE ORDER or by other written instrument signed by the party to be bound thereby.

(e)  This AGREEMENT shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(f)  Any notice required or permitted to be given under this AGREEMENT will be in writing and will be deemed received when sent via fax or delivered personally or deposited in the mail, certified, return receipt requested, postage prepaid and addressed to the parties at the respective addresses set forth below, unless by such notice a different person or address shall have been designated:

If to OWNER:                Donald E. Weder, President
                           Walnut Grove, L.L.C.
                           1111 Sixth Street
                           Highland, IL 62249-0124

and to:                    William F. Straeter, Executive Vice President
                           Walnut Grove, L.L.C.
                           1111 Sixth Street
                           Highland, IL 62249-0124

and to:                    Franklin J. Craig, Engineer
                           Walnut Grove, L.L.C.
                           1111 Sixth Street
                           Highland, IL 62249-0124

and to:                    David W. Harlan, Esquire
                           Gallop, Johnson & Neuman, L.C.
                           101 S. Hanley Road, Suite 1600
                           St. Louis, MO 63105

If to CONTRACTOR:          Nicholas "Nick" Soto, Jr.
                           Director of Business Development
                           Finsa Development Corporation
                           973 South Minnesota
                           Brownsville, TX 78521

and to:                    T. Mark Blakemore  P 956-541-9600
                           Rentfro, Faulk & Blakemore, LLP  Fax 956-541-3635
                           185 E. Ruben M. Torres Sr. Blvd.
                           Brownsville, TX 78520-8136

(g)  If any statements or provisions of this AGREEMENT conflict or can be interpreted in different ways in this AGREEMENT then the OWNER will resolve the interpretation to be used and the interpretation will be to use the statements or provisions that

092799:1246p                           19

favor the OWNER.

(h)  This AGREEMENT, in writing, expresses the totality of the terms of the agreement between OWNER and CONTRACTOR hereto with respect to the subject matter covered by this AGREEMENT. Any verbal representation shall have no force or effect whatsoever. This AGREEMENT is not a part of any other agreement, does not depend for its consideration or its enforceability upon any other agreement and shall not be construed with or as a part of any other agreement past or present.  OWNER and CONTRACTOR each represents and warrants that no promises, representations or inducements have been made by the other party with respect to the subject matter of this agreement, except as specifically set forth herein.  This AGREEMENT may not be changed, altered, modified or amended except by an agreement in writing signed by the party against whom enforcement is sought.  The foregoing notwithstanding this AGREEMENT shall at OWNER's option terminate if paragraph 17(a) describing governing law is held to be invalid and/or unenforceable; or if either party brings an action in a court other than the courts specified in this AGREEMENT.

(i)  This AGREEMENT will supersede and replace any and all prior agreements or purported agreements between OWNER and CONTRACTOR with respect to the subject matter covered by this AGREEMENT.

(j)  Waiver by OWNER or CONTRACTOR of the breach of any provision of this AGREEMENT by any party shall not operate or be construed as a waiver of any subsequent breach.

(k)  Nothing in this AGREEMENT shall be construed to make either party the legal representative or agent of the other party, except for the duties of CONTRACTOR as an independent contractor hereunder nor shall either party have the right or authority assume, create or incur any liability or any obligation of any kind, express or implied, in the name of or on behalf of the other party.

(l)  This AGREEMENT is not assignable by CONTRACTOR. OWNER has the right to assign or otherwise transfer this AGREEMENT, in whole or in part.

(m)  OWNER and/or any affiliated company from time-to-time may cause pictures (likenesses, still photographs, motion picture film and/or video and/or pictures in any other medium now know or hereafter known) to be taken of CONTRACTOR ("PICTURES"), and/or recordings of CONTRACTOR's voice alone or together with the Pictures ("RECORDINGS"). CONTRACTOR hereby irrevocably consents to and authorizes the use for any purpose whatsoever, including (but not by way of limitation) the sale, publication, display and exhibition thereof in promotion, advertising and trade and reproductions thereof by OWNER and/or any affiliated company, or anyone authorized by OWNER and/or any affiliated company, of any and all PICTURES and/or RECORDINGS, in whole or in part, and/or CONTRACTOR's name, without further compensation to CONTRACTOR. OWNER and/or any affiliated company shall own exclusively all

right, title and interest in and to the PICTURES and/or RECORDINGS,
and negatives and reproductions thereof, in whole or in part,
including (but not by way of limitation), the right to copyright
the PICTURES and/or RECORDINGS in the name of OWNER and/or any
affiliated company worldwide and all other rights of a copyright
owner as set forth in Title 17 of the United States Code.

(n)   This AGREEMENT shall be binding upon CONTRACTOR's
heirs, assigns (if permitted), executors and administrators, or
other legal representatives.

(o)   OWNER and CONTRACTOR agree that the terms of this
AGREEMENT were negotiated by the parties, and the provisions of
this AGREEMENT shall not be construed against any party merely on
the basis that such party may have drafted the particular provision
or the entire AGREEMENT.

(p)   Headings   in   this   AGREEMENT   are   for   reference
purposes only and shall not be deemed a part of this AGREEMENT.

(q)   This AGREEMENT is executed voluntarily by each of
the parties hereto without any duress or undue influence on the
part, or on behalf, of any of them.   The parties hereto represent
and warrant to each other that they have read and fully understand
each of the provisions of this AGREEMENT and have relied on the
advice and representation of competent legal counsel of their own
choosing.

(r)   Except as expressly provided herein, nothing in this
AGREEMENT is intended or shall be construed to give any person or
entity, other than the parties having rights herein and their
respective assigns and subrogees, if permitted, any legal or
equitable right, remedy, or claim under or in respect to this
AGREEMENT or any provisions contained here; this AGREEMENT and any
conditions and provisions hereof being and intended to be for the
sole and exclusive benefit of the parties having rights herein and
their respective assigns and subrogees, if permitted, and for the
benefit of no other person or entity.

IN WITNESS WHEREOF, the undersigned have entered into this
AGREEMENT and consider this AGREEMENT effective as of the date
executed and consider this execution date as the Notice to Proceed.

"OWNER"

WALNUT GROVE, L.L.C.

By: _____
Printed Name: _Donald E. Weder_
Title: _Manager_
Date: _22 Oct 99 in Highland IL_

"CONTRACTOR"

FINSA DEVELOPMENT CORPORATION

By: _____
    Nicholas "Nick" Soto, Jr.
    Director of Business Development

Date: _____ *10-13-99* _____

       *Effective #11  10-22-99*

1

**EXHIBIT A**
**(BUILDING PROJECT REQUIREMENTS)**

**WALNUT GROVE, L.L.C.**
**CONSTRUCTION  PROJECT REQUIREMENTS FOR**
**125,000 SQ. FT,  LOS INDIOS  FACILITY**
Nov.19, 1998---Revised September 27, 1999

## DIVISION 1 - GENERAL CONDITIONS
01000  DEFINITIONS
01500  STANDARDS, CODES AND REGULATIONS
01601  TEMPORARY OFFICE AND STORAGE
01602  TEMPORARY WATER
01603  TEMPORARY POWER
01604  TEMPORARY TELEPHONE
01605  TEMPORARY TOILETS
01606  PROVISIONS FOR OWNER'S REPRESENTATIVE
01608  OWNER USE OF PART OF FACILITY BEFORE COMPLETION
01624  HOUSEKEEPING
01628  SAFETY RAILS AND BARRICADES
01705  CONTRACT DEVELOPMENT
01710  STATEMENT OF RESPONSIBILITIES
01804  PERMITS
01940  WARRANTY
01942  DRAWINGS
01945  MANUALS
01960  ENVIRONMENTAL
01970  MATERIAL MADE OUTSIDE OF UNITED STATES

## DIVISION 2 - SITE WORK
02010  SUBSURFACE EXPLORATION
02100  CLEAR SITE
02130  EROSION CONTROL
02200  UNSUITABLE SOILS
02210  SITE GRADING
02220  FINISH GRADING
02225  FILL MATERIAL & FILL WORK
02230  ROCK EXCAVATION
02275  SOIL TESTING
02500  STORM DRAIN SYSTEMS
02520  IRRIGATION DITCH PROVISIONS

02550  SITE UTILITIES
02610  PAVING
02612  RAMP TO DRIVE THROUGH DOCK DOOR
02615  OUTSIDE LOADING DOCK APRONS ( PADS )
02618  PAVEMENT MARKING AND STRIPING
02630  WALKS, STAIRS AND RAMPS
02802  SEEDING

## DIVISION 3 - CONCRETE

03050  FLOOR SLABS
03100  FORMWORK MATERIALS
03150  CONCRETE STANDARDS
03200  REINFORCING STEEL AND ACCESSORIES
03300  CONCRETE MATERIAL
03330  CONCRETE FINISHING
03332  CURE, PROTECT AND SEAL
03399  CONCRETE TESTING
03400  DESIGN

## DIVISION 4 - MASONRY

04100  MASONRY STANDARDS AND CODES

## DIVISION 5 - METALS

05100  STRUCTURAL STEEL FRAMING
05200  METAL JOISTS
05300  PIPE BOLLARDS AND GUARDS

## DIVISION 6 - WOODS AND PLASTICS

06000  ROUGH CARPENTRY
06500  FINISH CARPENTRY

## DIVISION 7 - THERMAL AND MOISTURE PROTECTION

07110  MEMBRANE LINERS
07175  CAULKING
07212  INSULATION
## DIVISION 8 - DOORS AND WINDOWS

08100  HOLLOW METAL DOOR FRAMES
08105  HOLLOW METAL DOORS
08360  OVERHEAD DOORS
08370  ALUMINUM DOORS AND FRAMES
08400  FINISH HARDWARE
08500  WINDOW, GLASS AND GLAZING

## DIVISION 9 - FINISHES

09100 DRYWALL COMPOUNDS
09200 PAINT SPECIFICATIONS
09300 FLOOR COVERINGS

## DIVISION 10 - SPECIALTIES

10800 TOILET ACCESSORIES

## DIVISION 11 - EQUIPMENT

11100  DOCK EQUIPMENT
11200  DOCK LEVELERS
11300  DOCK SEALS AND SHELTERS

## DIVISION 12 - FURNISHINGS

NO FURNISHINGS WORK INCLUDED

## DIVISION 13 -  PREFABRICATED BUILDING

13100 ROOF AND FRAME  LOAD DESIGN
13200 WIND LOAD DESIGN
13300 EARTHQUAKE DESIGN
13640 PREFABRICATED BUILDING
13650 ROOF
13653 SKYLIGHTS AND WALL-LIGHTS
13660 GUTTERS, DOWNSPOUTS AND FLASHING

## DIVISION 14 - INTERIOR  OFFICES AND STRUCTURES

14050  GENERAL DESCRIPTION

14100  MAIN OFFICE, GENERAL DESCRIPTION
14120  PLANT SHIPPING, RECEIVING AND TRUCK DRIVER ROOMS
14131  IN-PLANT REST ROOMS
14133  PLANT REST ROOMS IN MAIN OFFICE
14135  MAIN OFFICE REST ROOMS
14136  RECREATION ROOM, BATHROOM JACUZZI/SHOWER AND SAUNA ROOM
14180  STRUCTURAL SYSTEMS
14250  MAIN OFFICE FINISH
14300  DOORS AND WINDOWS
14350  OFFICE  PLUMBING
14400  OFFICE  ELECTRICAL
14500  TELEPHONE LINES

## DIVISION 15 - MECHANICAL

15010  PLUMBING AND RELATED EQUIPMENT
15015  FLOOR DRAINS
15020  PLUMBING FIXTURES AND ACCESSORIES
15025  SPRINKLER SYSTEM
15055  VENTILATION ( ROOF VENTS )
15060  HEATING, VENTILATION AND AIR CONDITIONING

## DIVISION 16 - ELECTRICAL

16020  CONDUIT
16030  ENTRANCE
16040  SERVICE EQUIPMENT
16050  WIRING
16060  PUBLIC ADDRESS SYSTEM
16600  UTILITIES CONNECTIONS
16700  PERMITS

## DIVISION 17 -FENCING

17001  FENCE

5

## DIVISION 1 - GENERAL CONDITIONS

SECTION 01000  DEFINITIONS

1.  Wherever the term " or equal" is used herein it is to be understood that a substitution may only be made if approved by OWNER in writing.

SECTION 01500  STANDARDS, CODES AND REGULATIONS

1. Unless otherwise stated herein  all designs, materials, equipment and WORK are to comply with all of the following authorities.  In the event of a conflict the more demanding requirement shall prevail.

Authorities;  All  U.S. Federal  laws and regulations including but not limited to those of the State, County and City having jurisdiction, the Environmental  Protection  Agency (EPA), the Occupational Safety and Health Agency ( OSHA ) and the American disabilities Act ( ADA ); All codes and requirements  stipulated  by  the Southern Building Code Congress International, Standard Building  Code ( SBC ) for the Cameron County, Texas area,  the Texas Catastrophe Property Insurance Association (T.C.P.I.A.) now called the Texas Windstorm  Insurance Association (T.W.I.A.), the  National Electrical Code ( NEC ), the American Concrete Institute   ( ACI ), also according to American Society of Civil Engineers 7-95 (ASCE7-95) and Factory Mutual Research Corp. (FMRC or FM) for the highly protected risk rating.  The CONTRACTOR shall have total responsibility to comply with the  latest editions of the above codes and regulations. CONTRACTOR must submit a certified letter certifying that building does in fact meet all above stated codes and regulations.

SECTION 01601 TEMPORARY OFFICE AND STORAGE

1.  The CONTRACTOR shall provide secure and weather tight, temporary storage  trailers or structures for storage of  construction material as is  necessary  to prevent  damage or loss of materials.

2.  The CONTRACTOR will be solely  responsible for safeguarding and protecting all material, WORK in progress and finished WORK until the building and all on site WORK is complete. Any loss during this time will be replaced,reworked and/or repaired (to the OWNER's satisfaction by the CONTRACTOR at the CONTRACTOR's expense.

6

SECTION 01602 TEMPORARY WATER
1. The CONTRACTOR shall provide water for his use during construction.

SECTION 01603 TEMPORARY POWER

1. The CONTRACTOR shall provide temporary power and lights as necessary during construction. Any costs for connections or generators shall be the responsibility of the CONTRACTOR.

SECTION 01604 TEMPORARY TELEPHONE

1. The CONTRACTOR shall provide for their use a temporary telephone and pay all costs for installation and billings.

SECTION 01605 TEMPORARY TOILETS

1. The CONTRACTOR shall provide and maintain sanitary chemical toilet facilities for the use of all workmen employed on the PROJECT.

SECTION 01606 PROVISION FOR OWNER'S REPRESENTATIVE

1. The CONTRACTOR shall provide, at no extra charge to OWNER, electricity and water (when available) and the use of toilet facilities for the use of the OWNER's on-site REPRESENTATIVE.

2. The CONTRACTOR will provide equipment and qualified personnel that CONTRACTOR may be using in the normal construction of the building PROJECT to assist the OWNER's REPRESENTATIVE to test or inspect WORK or material throughout duration of the PROJECT whenever requested.

SECTION 01608 OWNER USE OF PART OF FACILITY BEFORE COMPLETION

1. In the event that the OWNER desires to use some part of the building prior to completion of the building or PROJECT, for purposes consistent with the OWNERs normal operations, the CONTRACTOR will permit this use and help to make this use practical to the extent that this help does not cause the CONTRACTOR to incur appreciable delays or expenses. If OWNER occupies a portion of the building prior to completion, OWNER will be required to carry the insurance on OWNER's property stored in the building only; however, OWNER does not waive any warranties or indemnifications as provided herein.

SECTION 01624 HOUSEKEEPING

1. The CONTRACTOR shall keep dust, resulting from the construction process, to a minimum by whatever means is necessary.

2. The CONTRACTOR shall keep the job site clear of debris, water, paper, miscellaneous construction materials and keep the job site in a clean, orderly manner for the duration of the PROJECT. No wood or debris is is to be buried, burned or disposed of on site.

3. The CONTRACTOR must inform the OWNER promptly if a spill of oil or other pollutants occurs and CONTRACTOR must clean-up said spill along with any soil which was contaminated and dispose of both off site in a lawful manner.

SECTION 01628 SAFETY RAILS AND BARRICADES

1. The CONTRACTOR shall provide and maintain all fences, barricades and other protective structures or devices necessary for the safety of workmen, equipment, the public and property as required by Federal, State and local laws and regulations.

2. The CONTRACTOR shall provide closing and locking (with temporary locks) of the building at the earliest time possible. Permanent door locking hardware for man doors only is to be furnished by OWNER and installed by the CONTRACTOR.

3. The CONTRACTOR shall protect all door, window and roof openings with temporary covers as required to prevent damage, accidents and /or to secure building.

SECTION 01705 CONTRACT DEVELOPMENT

1. The CONTRACT DOCUMENTS shall consist of the Design/Build AGREEMENT between OWNER and CONTRACTOR and exhibits and modifications thereto. A modification is either a written amendment signed by both parties or a CHANGE ORDER signed by both parties.

2. The CONTRACTOR shall maintain, at the site, for OWNER, one copy of all drawings, specifications, approved shop drawings, CHANGE ORDERs and other modifications.

3. The CONTRACTOR shall prepare a complete set of civil, mechanical, electrical, and plumbing engineering drawings. The CONTRACTOR shall utilize a registered professional engineer experienced in the design of industrial manufacturing facilities to be approved by OWNER however the OWNER in no way assumes any responsibilities for correctness of design and/or drawings. All drawings shall bear the PE (professional engineer) Stamp.

4. Unconditional affidavits of Waiver of Lien will be required by OWNER prior to all

payment distributions from OWNER. The affidavit forms will be specified by OWNER

5.  The OWNER will make  no down payment to the CONTRACTOR.  Progress payments will be made as follows.  On or about the first of each  month the CONTRACTOR  will submit  an itemized  Application for Payment with an invoice  requesting payment for the previous months WORK and material received and kept on the site and other allowed costs incurred by CONTRACTOR the preceding month.

If the invoice is acceptable to OWNER and all other requirements are met, it will be paid within ten (10) days of invoice receipt or by the tenth of the month, whichever is later.

6.  With each invoice the CONTRACTOR will submit a sworn statement, in a form acceptable to OWNER, which subdivides the PROJECT WORK and material costs and all other costs into line items, the total of which will be the total amount to be paid the CONTRACTOR by the OWNER for the entire PROJECT.  The sworn statement is to set forth the names of the subcontractors and material suppliers that have been paid or are to be paid, together with the amounts previously paid and due, the amounts to be paid on the current Application for Payment, and the total contract amount which will be due to each.

7.  A 10% retention will be withheld, by OWNER, from all requested payments and paid as part of the FINAL PAYMENT.  The FINAL PAYMENT will be paid after PROJECT is completed and everything is to the satisfaction of the OWNER.

8-A.  This building PROJECT is to be completed in it's entirety no later than 230 days from the date of contract signing by both parties.

8-B.  The Contract BASIC COMPENSATION amount  will be reduced  $2,000.00 per calendar day for each day the completion extends beyond the COMPLETION DATE.   If entire PROJECT is not complete 60 days after COMPLETION DATE as specified in 8-A above then OWNER has sole discretion to continue with CONTRACTOR and deducting the $2,000. per day beyond the COMPLETION DATE or to take over the PROJECT and have CONTRACTOR taken off the PROJECT and thereafter owe no further monies or payments regardless of what money is currently owed at time of discontinuation.

9. The  CONTRACTOR  will not disclose the terms of the  contract  and  any press releases made concerning the construction will be made by Walnut Grove, LLC, herein known as OWNER,
or with OWNER prior approval and no press releases  will be made unless OWNER so requests or approves in writing.

SECTION 01710  STATEMENT OF RESPONSIBILITIES

The format and wording in the PROJECT Requirements, outside of this section, is not intended to assign responsibilities to any third party. Except where it is stated that the OWNER will furnish or do something or it is stated in this Section 01710 that a third party will do something it is the sole responsibility of the CONTRACTOR signing this AGREEMENT to provide all material and WORK needed to build or install all of the items specified herein. Where a statement in another Section of this PROJECT Requirements conflicts with this Section this Section 01710 will govern

Nothing in this document is to be construed as a contract or AGREEMENT between the OWNER and any subcontractor or anyone other than the CONTRACTOR. In those instances where OWNER approval is required (for eg. approval of outside consulting/testing firms) in no case will\ OWNER's approval transfer any responsibility to OWNER. CONTRACTOR retains complete and full responsibility to make sure building is properly constructed in accordance with all applicable codes and all requirements as set forth in these specifications.

SECTION 01804 PERMITS

1. The CONTRACTOR shall secure and pay for all permits, governmental fees and licenses necessary for the proper execution and completion of the WORK. It is the responsibility of the CONTRACTOR to make certain that all drawings, specifications (regardless of origin), all WORK and the finished parts of as well as the whole of the PROJECT are in accordance with all applicable laws, statutes, building codes and regulations.

SECTION 01940 WARRANTY

1. All WORK shall be to the OWNER's satisfaction.

2. The CONTRACTOR will provide qualified personnel-to perform a complete check , demonstration and training of all systems with the OWNER.

3. All WORK specified herein shall be warranted for one year after FINAL PAYMENT, for the correction of defective material and workmanship.

4. The warranty shall include all labor and material necessary to make the repair.

5. The CONTRACTOR shall arrange for all equipment and component warranties of more than one year to be warranted to, or transferred to the OWNER.

SECTION 01942 DRAWINGS

1. The CONTRACTOR will supply Engineering drawings detailing all fabrication and construction. All WORK is to conform to these drawings or approved changes. The CONTRACTOR will furnish to OWNER, five ( 5 ) sets of all drawings ( one set to be furnished as soon as they are available ) including but not limited to, the prefabricated building, finished grade elevations, all concrete WORK, dimensional gas, water and sewer systems drawings, all underground gas, hydraulic and electric systems drawings which must be dimensional, and Electric and light drawings. All the above must be done to the OWNERs satisfaction. OWNER will have 5 business days to review and provide comments on the drawings presented.

SECTION 01945 MANUALS

1. The CONTRACTOR shall require mechanical equipment suppliers to furnish Installation, Operating, and Maintenance (including wiring diagrams ) manuals and Parts Lists in both English and Spanish. All equipment and fixture manuals received by CONTRACTOR shall be given to OWNER when no longer needed by CONTRACTOR but in no instance later than the date on which FINAL PAYMENT is made.

SECTION  01960 ENVIRONMENTAL

1.  Any soil that is brought onto the PROJECT site or the Walnut Grove, LLC property for fill or other purposes will require laboratory analyses at the CONTRACTOR's expense. The CONTRACTOR is to have the soil, including caliche, at the excavation sites (source) tested and analyzed, by a reputable testing firm approved by OWNER, for suitability, priority pollutants and hazardous constituents to assure that the soil is free of such contamination. Copies of these analyses and all subsequent analyses shall be supplied to OWNER. All samples must be placed in laboratory supplied containers and preservation techniques must be followed. If these "source" tests indicate the soil is not acceptable, as defined in the later part of this section the soil is not to be brought onto the OWNER's property. Regardless of the outcome of the " source " tests, if subsequent tests indicate the soil to be not acceptable after it is on the OWNER's property, the CONTRACTOR must remove all the soil or caliche from the sampled area and OWNER's property and disposed of it in accordance with all local, State and Federal regulations solely at the CONTRACTORs expense.

Select soil and caliche samples will be taken at the construction site by a soil analysis laboratory paid for by the CONTRACTOR. The laboratory will keep the soil samples in their possession at all times. The compacted fill will be divided into two (2) equal areas and eighteen (18) test holes will be made in each area to sample the selected soil. The OWNER will locate all test holes and depths on the construction site. At each hole a sample will be collected between the surface and 1 ½ feet of depth. Another sample will be taken from each

hole between 1 ½ and 3 feet of depth.  All samples from each area shall be composited into one sample for that area, but  samples from each area must be kept separate from the samples collected from the other area.

The caliche samples will be taken in the same way as the select soil  except the area need not be divided and only one sample is to be taken from each of the 18 caliche test holes. Altogether 3 analyses are to be conducted, 1 for each select soil area and 1 for the caliche paving.

The testing laboratory to be used must be certified by the U. S. EPA and approved by OWNER.  The lab will perform the  analyses listed below and the soil will be judged not acceptable if the analysis indicates concentrations at or above detectable levels.

> Analysis to be performed:
> Priority pollutants using United States Environmental Protection Agency (U.S. EPA)
> SW-846   test methods.

2.  The CONTRACTOR shall require all suppliers to furnish Material Safety Data Sheets in English and  Spanish and supply the OWNER with copies.

SECTION 01970 MATERIAL MADE OUTSIDE OF U.S.
1.  If material, equipment or parts are used which are made outside of the United States, they must be equal in quality to U.S. made.


DIVISION 2

SECTION 02010 SUB-SURFACE EXPLORATION

1.  The CONTRACTOR shall perform sub-surface soil investigation prior to performing any site WORK and have the results made available to the OWNER.

2.  The CONTRACTOR shall base their foundation design on theirs sub-surface exploration and analysis.

3.  CONTRACTOR is entirely responsible for doing his own subsurface soil investigation and is solely  responsible for making sure the structure complies with everything as set forth in the specifications.

SECTION 02100 CLEAR SITE

12

1. The CONTRACTOR shall remove all rubble, trash, etc. from the area affected by the contract WORK.

2. The CONTRACTOR shall remove from the area, affected by the contract WORK, all brush, shrubs, and stumps.

3. The CONTRACTOR shall dispose of rubbish, resulting from these operations, off the OWNER's property in accordance with all applicable laws, regulations ordinances, or on site, with the approval of the OWNER.

4. No trees shall be removed or damaged except those that have been selected and marked (on the tree) by Don Weder, Wanda Weder or Bill Straeter.

SECTION 02130 EROSION CONTROL

1. The CONTRACTOR shall prepare drawings and secure permits and install and maintain all erosion control devices required by Federal, State and local governing authorities for the duration of the PROJECT.

2. The CONTRACTOR shall provide any surety or bond which may be required for erosion control by Federal, state and local governing authorities.

SECTION 02200 UNSUITABLE SOILS

1. All undercutting and back filling beyond that which is normally expected must be approved by OWNER, in writing, prior to beginning such work.

SECTION 02210 SITE GRADING

1. The CONTRACTOR shall strip at least 8" of topsoil within the construction area and stockpile the soil on site. The CONTRACTOR shall then test the exposed surface and near-surface soil for organic matter and strip additional soil as required.

2. After topsoil is removed the CONTRACTOR must have an independent engineering testing firm test the remaining subgrade and also test the compacted soil during filling and after filling is complete. The engineering firm must be approved by OWNER. The CONTRACTOR will comply with the recommendations of the engineering firm concerning suitability of the soil for the intended purpose and treatment required. The OWNER is to be supplied with copies of all testing reports.

3. The CONTRACTOR shall replace topsoil in areas where needed, from the stockpile and

spread any excess around the perimeter of the site or as directed by OWNER in a location acceptable to OWNER.

## SECTION 02220  FINISH GRADING

1.  The maximum surface slope any place on site is to be 30 % except at stairs.

2.  The finish grade must slope so as to drain away all surface water. No surface depressions which will not drain-off water naturally are to be present.

3.  All pavement and grade within 20 feet of the building shall slope down and away a minimum of 1% grade.

4.  The finish grade is to be smoothly contoured without unnecessary bumps, ridges, swales or gulleys.

## SECTION 02225  FILL MATERIAL AND FILL WORK

1.  The fill material needed to achieve the finished floor elevation required will be Select Soil with caliche on top of Select Soil if necessary, both from off site, supplied by CONTRACTOR.  ( see Section 01960 & 02275 Environmental and Soil Testing ).

2.  All fill material is to be placed in layers not to exceed 6" and compacted to 95% using standard Proctor testing.

## SECTION 02230 ROCK EXCAVATION

1.  It is assumed that rock will not be encountered during the site work that cannot be removed with conventional grading equipment.  If rock that cannot be removed with conventional grading equipment is encountered, it will be considered extra WORK and require a CHANGE ORDER.

## SECTION 02275 SOIL TESTING

1.  Quality control testing of a filling operation must be performed.  Such tests will be arranged and paid for by the CONTRACTOR and results of tests submitted to OWNER.  The testing firm is to be approved by OWNER prior to beginning WORK.

2.  Before any rock base for concrete or pavement is placed, the sub-grade must be proof rolled, to the OWNERs approval at the CONTRACTOR's expense.  The OWNER may also test and if the test fails,  the CONTRACTOR will bear the expense of subsequent tests

specified by the OWNER.

3.   ( also see Sections 01960 Environment )

SECTION 02500 STORM DRAINAGE SYSTEMS

1.  The drainage of rainwater shall be accomplished by permanent slopes, swells and ditches incorporated in the site and in compliance with Federal, State, local and highway regulations and standards. The finished surface of drives, parking lots and truck aprons are to be at least 4" higher than the surrounding grade.

2.  The CONTRACTOR shall provide concrete culverts under drive, parking lots and walks as required to handle all run off water.

SECTION  02520   IRRIGATION DITCH PROVISIONS

1.    Provide a 12" diameter X 36 ft. long concrete culvert under the entry road approximately 65 ft. from the center of U.S. 281 for an existing irrigation watercourse.  The road surface elevation is to accommodate said culvert.

2.    Finish grade an  irrigation ditch from the culvert to 500 ft. East of the  culvert paralleling the highway.  The bottom of the ditch is to be at or below the bottom of the culvert. slope the sides of the ditch to a  grade of 5 to 8%.

SECTION 02550 SITE UTILITIES

1. The CONTRACTOR shall provide all , electrical, water and sewer extensions  and connections  to service the building.

2. The CONTRACTOR shall provide underground entrance conduit, through concrete, into building for telephone cables, electric entrance, sewer lines and  water lines.
3. The CONTRACTOR is to include  the cost of taping into the sewer and water mains and electric lines  along Highway 281,  South of the building.

SECTION 02610 PAVING

1. All rock surfaced road or parking areas are to be built of  compacted stone  or caliche, at least 8" thick.   All other pavement is to be constructed of steel reinforced concrete.  Base all pavement designs on sub grade tests with truck use pavement  to be  8" thick,  4000 PSI concrete and car only pavement  to be 8", 4000 PSI concrete.

2. Unless otherwise specified herein, all designs, materials, mixes, equipment and methods shall conform to the Texas State highway department specifications.

3. CONTRACTOR will provide entrance drive and pavement construction as per OWNER's Entrance Drawing and Site Drawing . Extend drive and other pavement as required to transition match grade elevations to street.

4. The surface of all pavement is to be no lower than the present grade ( before grading ) except within 10 feet of the highway right of way.

5. All pavement shall be crowned or sloped to drain-off water. At no point on pavement is there to be a depression which will hold water 1/8" or more in depth. No water shall drain toward the building.

SECTION 02612 RAMPS TO DRIVE THROUGH DOORS.

1. Build a 12 ft. wide ramp from the drive, up to the 14 ft. drive through overhead door opening. The slope is to be a maximum of 6.5%. Transition both ends of ramp from slope to flat. The ramp pavement is to be rock or Caliche, 8" thick.

SECTION 02615 OUTSIDE LOADING DOCK APRONS ( PADS )

1. The finished floor surface of the building is to be Four feet (4') + or - 1" above the surface of the truck aprons, at the shared edges.

2. CONTRACTOR shall provide steel reinforced, 8" thick, 4,000 PSI concrete truck Aprons, adjacent to the 25 docks on the West side of the building Also on the West side of the building the CONTRACTOR shall provide steel reinforced, 8" thick, 4,000 PSI concrete car parking and 4 ft. wide landing pads for parked trailers. The above to be as shown on OWNER's Warehouse Site drawing. Design of the Aprons, pads and car parking shall be based on the sub grade tests.

3. Two chain eyelets shall be anchored in the pad concrete flush with the surface, between each truck height dock door opening, for the purposes of securing wheel chocks. Eyelets to be          minimum of 3/8 rod diameter, zinc plated steel or stainless steel. Locate 5' from building and      center between dock door openings.

SECTION 02618 PAVEMENT MARKING AND STRIPPING

1. The CONTRACTOR shall provide all parking and handicapped identifying devices and/or marking as required by applicable codes and laws.

2.   CONTRACTOR shall paint stripping for 30 car parking spaces.

## 02630 WALKS, STAIRS AND RAMPS

1.  The CONTRACTOR shall provide stairs with a top landing in front of all exterior personnel doors, adjacent to the truck and car aprons.

2.  The CONTRACTOR shall provide concrete walks from doors to pavement at the western-most personnel doors on the north end and south end of the building.

3.  The CONTRACTOR shall provide a wheel chair ramp to the front door, if stairs are required.

4.  The  CONTRACTOR shall provide a slanted ladder/stairway from the 2nd floor of the office to a roof opening, and provide a Roof Hatch for maintenance access to roof with location as per CONTRACTOR preference.

## SECTION 02802 SEEDING

1.  Seeding shall consist of grass and ground cover as required to accomplish soil erosion control over all areas affected by the site WORK.

2.  Any area where the slope and the volume of run-off will not allow cover to grow and stop erosion shall have a stabilizing fabric ground cover along with the seeding.

## DIVISION 3 - CONCRETE

## SECTION 03050  FLOOR SLABS

1.   The  building floor slab surface is to be level and in the same plane  within 1/2" everywhere  and all points in any 10 ft. continuous distance  must be within 1/8" of level with any other point horizontally within 10 ft..  All points in any 4 ft. continuous distance  must be within 1/16" of level with any other point horizontally within 4 ft.

2.   The CONTRACTOR shall pay for any necessary drying of soil and shall maintain concrete in an above freezing temperature environment during the entire construction period and up to the time finished building PROJECT is completed as described in this contract.

## SECTION 03100 FORMWORK

1.   Forms for exposed concrete shall consist of large exterior grade plywood sections or commercial forms in good condition.   Joints shall be regularly spaced, tight and with smooth even edges.

2.  All exposed edges of concrete shall have a 3/4" chamfer or radius.

3.  Forms shall be built true to lines, grades and dimensions indicated on drawings.  They shall be constructed to prevent concrete leakage.

4.  Forms shall be properly braced and tied together in order to maintain position and shape when concrete is being placed.

SECTION 03150 CONCRETE STANDARDS

1.  ACI Standards as well as any other applicable standard shall be conformed to for all concrete WORK, material and testing.

SECTION 03200 REINFORCING STEEL AND ACCESSORIES

1.  Bars:  Reinforcing bars shall be grade 60 cut and cold bent in the sizes and to the shapes indicated by final plans.

2. As a minimum all concrete slabs are to have  2 layers of 6 x 6, W2.9 x  W2.9 welded wire fabric ( WWF ) on wire chairs held in the  center of the slabs per ACI Standards.  The WWF shall be tie wired together so that the  openings in the two layers coincide with each other and held in center of the slabs with wire or concrete chairs spaced no more than three (3) feet apart.

SECTION 03300 CONCRETE MATERIAL

1.   The 28 day compression strength shall not be less than 4,000 pounds per square inch (PSI) for slabs on grade and 3,000 PSI for footings, grade beams, walls, walks and landings on grade.

2.  Order concrete for all slabs on grade with a slump of less than 3-1/2"

3.  When concrete is delivered for all slabs on grade the Slump is not to exceed 3-1/2".  No water is to be added but  superplasticizer may be added on site to obtain slumps above 3-1/2" but no more than 5-1/2".

4. Concrete is to be free of  cracks except in control joints.

## SECTION 03330 CONCRETE FINISHING

1.  The floor slab, truck dock apron, car apron, and truck drive slab shall be a minimum of 8" thick.

2.  All concrete floor slabs shall receive machine troweling adequate for a smooth finish, but not so much as to cause surface spider web cracking.

3.  All exterior concrete shall be troweled and then a light broom finish applied.

4.  Concrete is not to be vibrated long enough to cause aggregate separation.

5.  Control joints shall be cut at a time and depth (not to exceed 1/3 of slab thickness) which will prevent random cracking of concrete.

6.  All finished concrete shall be free of cracks that affect the structural strength or durability of the concrete. Any cracks that do not affect the structural strength or durability of the concrete shall be repaired by the CONTRACTOR if OWNER requests. Control joints are not to be considered as cracks.

## SECTION 03332 CURE, PROTECT AND SEAL

1.  Concrete slabs shall be protected against loss of moisture, rapid drying, temperature changes, mechanical injury or injury from rain, freezing or flowing water.

2. Fresh concrete slabs must be protected from evaporation the same day as poured if possible but no later than 24 hours after pour in any case. A Cure and Seal containing at least 30% solids may be used if placed on the concrete before any part of the surface becomes dry. Concrete may be water cured including edges for at least 7 days. Polyethylene, 6 mil. may be used if placed on the concrete before any part of the surface becomes dry and wetted thereafter to prevent any part of the surface from becoming dry. All edges and overlaps must be kept sealed to prevent evaporation. Clean burlap ( at least 2 layers of 9-ounce ) or mats of cotton, sisal or jute equal to the 2 burlap layers may be used if kept wet everywhere night and day.

3.  The slab shall be protected to prevent cement and other abrasive or chemicals, oils etc. from destroying or discoloring the surface.

4. All control and expansion joints are to be sealed with joint sealer.

## SECTION 03399 CONCRETE TESTING

1. The CONTRACTOR shall perform quality control testing of all concrete in accordance with ACI Standards. Seven day and 28 day break tests are to be performed with test results submitted to OWNER.

## SECTION 03400 DESIGN

1. Foundation and floor designs shall be performed by a registered engineer experienced in foundations. As a minimum all concrete designs are to be to ACI standards

2. CONTRACTOR shall base all floor slab and pavement designs on sub grade tests but the minimum for truck use pavement and floor slab is to be 8" thick, 4000 PSI (28 day Test) concrete and 8", 4000 PSI concrete for car pavement. Floor slab in main building shall be designed for 30,000 lb., hard wheeled, fork truck use.

3. As a minimum all concrete slabs are to have as a minimum, 2 layers of 6 x 6, W2.9 x W2.9 welded wire fabric ( WWF ) on wire chairs held in the center of the slabs per ACI Standards. The WWF shall be tie wired together so that the openings in the two layers coincide with each other.

4. The CONTRACTOR shall supply the OWNER with drawings of the prefabricated building and column reactions calculations stamped by a licensed professional Engineer ( P.E. ).


## DIVISION 4 - MASONRY

SECTION 04100 MASONRY STANDARDS AND CODES

1. All masonry material and WORK is to be in accordance with U. S. Building Code Requirements for Masonry Structures which will include but not be limited to ACI 530/Asce 5/TMS 402 and Specifications for Masonry Structures ACI 530.1/ASCE 6/TMS 602, and all other applicable laws, standards and codes.

2. All load bearing concrete block walls shall be of U.S. made block.

3. Provide expansion joints ( filled with elastic joint filler ) adequate to prevent random cracking.


## DIVISION 5 - METALS

SECTION 05100 STRUCTURAL STEEL FRAMING

1. All shapes, plates and bars are to conform to AISC specifications.

2. All electrodes and procedures for welding shall conform to the requirements as specified by the American Welding Society.

3. All connections shall be bolted type with A325 fasteners, unless other connections are specifically approved by the OWNER.

4. Paint shall be "Themes" #99 primer for structural steel, "Rust-Oleum" #1069 or equivalent.

SECTION 05200 METAL JOISTS

1. Steel joists shall be designed and fabricated in accordance with the "Standard Specifications And Load Tables For Open Web Steel Joists/Long Span Steel Joists" by the Steel Joist Institute.

2. Paint shall be "Themes" #99 primer "Rust-Oleum" #1069 or equivalent.

05300 BOLLARDS ( PIPE BUMPERS ) AND GUARDS

1.     Steel pipe bollards, 5 ft. long, are to be installed at all overhead doors, sprinkler risers, distribution electric panels, transformers and gas piping if located on or near plant floor. Steel pipe bollards, 5 ft. long shall be installed at all structural columns that are not to be surrounded by racks, but OWNER will advise CONTRACTOR which structural columns will require bollards after OWNER has determined rack layout and the cost for these bollards will be an additional $250.00 for each 6" bollard and $200.000 for each 4" bollard.

2.     Six inch (6") bollards shall be installed by CONTRACTOR to guard Main Electric Panels if panel is not enclosed in a special room.

3.     CONTRACTOR shall install 6" bollards outside to protect A/C units and Electric equipment if these are located near parking or drives.

4.     All Shipping and Receiving Dock door openings ( 25 ) are to have 6" bollards on the inside of each jamb.

5.     The 14 ft. drive through overhead door opening is to have 6" bollards, two on each side of the door (4 per door).

6.     Other overhead door openings (if any) are to have 2 each, 4" bollards on inside of

each jamb.

7.    All other bollards are to be 4". Columns away from walls shall be protected by CONTRACTOR with four (4) bollards each and CONTRACTOR shall protect columns at walls with two (2) bollards each and shall be installed on those columns specified by OWNER.

8.    All bollards are to be perpendicular within +/- 1/4" at the bollard top and the same height within +/- 1". Bollards are to be capped and painted yellow. CONTRACTOR will submit drawing of bollard location for OWNER approval.

9.    All bollards are to be hand removable.

10.   6" bollards shall be 6" outside diameter X 1/4" wall X 5 ft. long (4' above floor).

11.   The 4" bollards are to be 4" outside diameter X 1/4" wall x 5 ft. long (4' above floor).

12.   Bollard holes may be core drilled in 8" thick concrete or steel sleeves may be set in the concrete floor or pavement or in concrete filled holes. In either case the bollards must be hand removable from the holes or sleeves. The concrete must be reinforced with "u" shaped Re-Bar to prevent concrete cracking if bollards are within 1 ft. of a slab edge or expansion joint.


## DIVISION 6 - WOODS AND PLASTICS

SECTION 06000 ROUGH CARPENTRY

1. Wood blocking used for support of toilet accessories, door stops etc. shall be #2 grade yellow pine pressure treated.

SECTION 06500 FINISH CARPENTRY

1.    (See Division 14)


## DIVISION 7 - THERMAL AND MOISTURE PROTECTION

SECTION 07110 MEMBRANE LINERS

1. Under all concrete floor and pavement a 6 mil. polyethylene vapor barrier shall be placed over the compacted subgrade.

SECTION 07175 CAULKING

1. Exterior caulking shall be Sonneborn NP-1 or equivalent.

2. Hollow metal frames shall be caulked on the interior with latex caulking and on the exterior with Sonneborn NP-1 or equivalent.

SECTION 07212 INSULATION

1. Wall insulation for the exterior walls of the building is to be a Radiant Barrier system only as per the attached Building Wall Insulation drawing. The wall Radiant Barrier material is to be "Super R Plus" from Innovative Insulation Inc., (817-446-6222) or equal.

2. Roof insulation is to be a Radiant Barrier system only as per the attached Building Roof Insulation drawing. The roof Radiant Barrier material is to be "Super R Plus" from Innovative Insulation Inc., (817-446-6222) or equal. The roof Radiant Barrier is to be installed under the entire roof area except where there are skylights or vents.

3. The perimeter office wall (1st and 2nd floor) adjacent to the West exterior wall of the building is to be completely sealed and insulated with "Double Bubble" Reflective Insulation from Innovative Insulation Inc., (817-446-6222) or equal. The installation is to be per attached Office Insulation drawing.

4. The perimeter office walls (1st and 2nd story) adjacent to the warehouse areas (East, North, and South perimeter walls of the office) as well as dividing wall in first story separating the 86' x 37' room from other offices are to be insulated with "Super R Premium" from Innovative Insulation, Inc., (817-446-6222) or equal. The installation is to be as per the attached Office Insulation drawing.

5. The area above the 2nd floor ceiling is to be completely sealed and insulated with "Double Bubble" Reflective Insulation from Innovative Insulation Inc., or equal. The installation is to be as per the attached Office Insulation drawing. All HVAC ducting in this area is to be under this insulation and is not to be in direct contact with the Reflective Insulation foil surface.

6. The area above the 1st floor ceiling but below the 2nd story floor is to be completely sealed and insulated with "Double Bubble" Reflective Insulation from Innovative Insulation Inc., or equal. The installation is to be as per the attached Office Insulation drawing. All HVAC ducting for the 1st floor offices in this area is to be below this insulation and is not to be in direct contact with the Reflective Insulation foil surface.

## DIVISION - 8 DOORS AND WINDOWS
SECTION 08100 HOLLOW METAL DOOR FRAMES

1.  Welded frames shall be factory assembled construction for perimeter exterior doors only. Interior doors can be metal frames assembled on site.

2.  Frames shall not be less than 14 gauge for exterior and 16 gauge for interior (US Standard GA) doors.

3.  Frames shall be constructed of hot-rolled annealed or cold rolled carbon steel with mitred corners and rubber slam cushion buttons.

4.  Frames shall be extra heavy duty and shall be connected and braced to the building frame to give two times the supporting strength as compared to standard industrial construction.

SECTION 08105 HOLLOW METAL DOORS

1.  The hollow metal doors specified below are to be 3 ft. wide, 81 inch high doors with 3 hinges.

2.  On the North, South and West walls, there shall be at least eight (8) personnel doors in the building perimeter walls, opening outward, not including the Main Office store front door.  On the East wall there shall be 10 personnel doors that are to be positioned per OWNER's instructions after OWNER has been able to determine rack layout.

3  All doors exiting the Main Office, and the plant lunch room into the plant area are to be hollow metal doors with a steel wire reinforced glass window approximately 2 ft. x 2 ft.

4.  All doors, except overhead dock doors, are to accept Sargent brand lock sets to be supplied by OWNER.

5.  Hollow metal doors shall be full-flush type, 1 3/4" thick, made of two face plates of steel, rigidly connected and reinforced inside with continuous interlocking members (space not over 6" on center).

6.  Doors shall be sound-deadened with inorganic filler material placed between reinforcements, filling void spaces.

7.  Door face plates shall be constructed with seamless cold-rolled stretcher-leveled furniture steel using at least U.S. standard #16 ga., for exterior doors and U.S. standard #18 ga. for interior doors.

SECTION 08360 OVERHEAD SECTIONAL DOORS WITH VERTICAL LIFT

1.   The CONTRACTOR is to furnish and install  28 overhead sectional dock doors doors with vertical lift with all manual operating devices.

2.   There are to be 25 Shipping and Receiving Dock openings which are to have  9 ft. wide x 10 high  overhead  doors, manually operated. CONTRACTOR shall number dock doors with 12" tall numbers with one placed outside above the door and one placed inside the center of the door.

3.   There shall be 2 (two) 9 ft. wide x 10 high section dock doors, manually operated  doors installed on the South wall.

4.  There shall be one (1) 14 ft. wide X 14 ft. high  overhead door  installed  at the drive through opening  which is to be manually chain operated.

SECTION 08370 ALUMINUM DOORS AND FRAMES

1. Front entrance frame shall be extruded aluminum sections with a bronze anodized finish. This door is to be an extra heavy duty industrial/commercial quality door designed for frequent use.

2.  All exterior caulking of these frames shall be neoprene type and a color to match frame.

3.  All interior caulking of these frames shall be latex type.

SECTION 08380 WOOD DOORS

1.  Office doors are  to be 1-3/4" solid core, Birch Leaf with metal frames that will accept Sargent brand lock sets.

SECTION 08400 FINISH HARDWARE

1.   All lockets, AA striker plates and latch sets shall be supplied by OWNER and installed by CONTRACTOR.

2.   The front entrance door, all plant rest room doors, all doors exiting the main office  and all exterior doors on the South and East walls of the building shall be provided with closers.

3.  All closers shall be Yale and Towne or Equal.  All doors are to have door stops.  All doors

shall be capable of being opened at least 160 degrees.

4. All door stops in the office area shall be Yale and Towne 487-RP high-profile cast aluminum or equal.

## SECTION 08500 WINDOW, GLASS AND GLAZING

1.   All 13 exterior glass windows shall be 5/8" thick, opening, non tinted, polished plate, double pane insulation type glass sealed to prevent dust and moisture between panes. Windows to be welded, anodized aluminum with Thermal Block, . The windows are to be approximately 4' wide by 4' high. Windows to be "Quaker" or equivalent and contain screens.

2.   All glass non-opening interior wall windows that view out into warehouse, are to be 5 ft. wide X 3 ft. high, steel framed, double glass pane.   Non-opening interior windows shall be 5/8" thick, non tinted, polished plate, double pane insulation type glass sealed to prevent dust and moisture between panes  All non-opening interior windows that are between offices shall be (5/8") thick, non tinted, polished plate single pane glass.

3.   OWNER approved mini blinds are to be provided on all exterior windows and  on all wall-lights in Main Offices.

## DIVISION 9 - FINISHES

SECTION 09100 DRYWALL COMPOUND

1.  Use M100 Hypo Allergenic drywall compound by Murco.  (Call Murco, 615-363-5851, Ginger).

SECTION 09200 PAINT SPECIFICATIONS

1.  Use Benjamin Moore Impervo Enamel and primer for same.

2.  Wood stain shall be Quickdry Antique Spice from Lockwood Flooring in white oak light color (800-325-9608).

3.  Wood varnish to be Crystal Aire clear finish from Nigra Enterprises (818-889-6877).

SECTION 09300 FLOOR COVERINGS
 ( See Floors, in Section 14250 )

## DIVISION 10 - SPECIALTIES

SECTION 10800 TOILET ACCESSORIES

1. Each Water Closet shall contain a Toilet Tissue Holder and each lavatory is to have one liquid soap dispenser.

## DIVISION 11 - EQUIPMENT

SECTION 11100 DOCK EQUIPMENT

1. The building is to contain 25 truck high docks that will allow trailer doors to be opened when trailers on either side are parked in dock doors that are parked up to as much as one foot off center from the middle of the dock door. Center to center of dock doors must be a minimum 14 feet.

SECTION 11200 DOCK LEVELERS

1. CONTRACTOR shall provide and install two ( 2 ) each pit type dock levelers at 2 of the dock openings. Pit levelers are to be 7 ft. wide x 8 ft. long, model RH1087 by RITE HITE complete with dock bumper stops, or equal. Leveler capacity is to be designed for a 12,000 lb. gross weight load, 35,000 lb. dynamic capacity and static capacity of 52,500 lbs.

2. The CONTRACTOR shall provide nineteen (19 ) and install 21 adjustable, 20,000 lb. capacity, Edge Of Dock levelers, 78" leveler width.   Each dock leveler shall meet or exceed U.S. O. S. H. A. requirements. The 19 Edge of Dock levelers are to be "Genquip" Edge of Dock levelers, complete with dock bumper stops, model AD78 or equal. The CONTRACTOR will locate levelers per OWNER.  CONTRACTOR shall install 2 edge of dock levelers that will supplied by OWNER which OWNER intends to remove from an existing warehouse.

3. The CONTRACTOR shall provide and install two ( 2 ) adjustable, 30,000 pound capacity, Edge Of Dock levelers, 78" leveler width, at 2 of the dock openings. Each dock leveler shall meet or exceed U.S. O. S. H. A. requirements. These 2 Edge of Dock levelers are to be "Genquip" Edge of Dock levelers, complete with dock bumper stops, model AD78 or equal.

Summary:
   The docks shall contain:

21 each 20,000 lb. capacity Edge of dock levelers (19 supplied by CONTRACTOR, 2 supplied by       OWNER).
2 each  30,000 lb. capacity Edge of Dock levelers.
2 each  Pit leveler.
  Locate all per OWNER.

## SECTION 11300  DOCK SEALS AND SHELTERS

1.   The CONTRACTOR shall build onto the side of the building a roof shelter to protect from rain all 25 Shipping and receiving dock door openings. The lowest point of this shelter is to 14 ft. above the truck apron and extend it at least 4 ft. out from the building and 8 ft. beyond the last  dock door openings.  The Shelter roof panels are to be 26 gage (minimum) galvalume decking and the structure designed for the greater of 110 MPH wind, TCPIA, T.W.I.A requirements or Seismic Zone 0 or Factory Mutual's Class I-90.


## DIVISION 13 - PREFABRICATED BUILDINGS

## SECTION 13100 ROOF AND FRAME LOADING DESIGN

1.  The main frame and  roof  load design is to be 20 pounds per square foot (PSF) for both (no tributary reductions allowed) plus dead load and plus 3 PSF auxiliary load.

## SECTION 13200 WIND LOAD DESIGN

1. The building Wind Load Design is to be for the greater of 110 MPH sustained winds or T.C.P.I.A., T.W.I.A. requirements, or any earthquake, seismic other requirement stated in section 01500, or Factory Mutual's Class I-90.

## SECTION 13300 EARTHQUAKE DESIGN

1.  Earthquake Seismic Design is to comply with Seismic requirements of all codes stipulated in section 01500.

## SECTION 13640 PREFABRICATED BUILDINGS

1.   The side walls of the building shall be 26 gage steel.  Steel color to be an off white and approved by OWNER.

2.  The main  building  structure shall be 200 ft.  wide by 625 ft. long with a  30 ft. eave height and have a roof slope of 1" in 12".

3. The primary framing system shall consist of tapered sidewall columns with 25 ft. and 30 ft. spacing and intermediate columns with 66.7 ft. spacing.

4. Twenty-seven (27) overhead door openings are to be sized for 9 ft. wide x 10 ft. high overhead doors.

5. There shall be one (1) each 14 ft. X 14 ft. overhead door drive through opening.

6. All steel surfaces to be painted, primed or plated.

SECTION 13650 ROOF

1. The roof system shall be a screwed down metal roof. Roof Deck panels are to be aluminum- zinc alloy coated steel, 26 gage minimum, meeting the herein stated wind load, roof load, bar joist spacing, FM requirements and all other herein stated OWNER requirements. Roof slope is to be 1" in 12". The roof system shall have a 20 year prorated material guarantee. Roof system to have a 36 month non-prorated weather tightness warranty by the CONTRACTOR. A copy of the guarantee is to be supplied to OWNER prior to contract signing. CONTRACTOR will provide a letter from roof metal supplier acceptable to OWNER verifying that roof system was properly installed according to roof metal supplier's specifications.

2. Roof insulation is to be a Radiant Barrier System, see Section 07212.

SECTION 13653 SKYLIGHTS AND WALL-LIGHTS

 NOTE:  All roof skylights are to have OSHA compliant guarding to prevent man fall-through.   All Fiberglass Reinforced Plastic (FRP) skylights and wall-lights must be accepted by FMRC in writing and said approval submitted to OWNER before purchasing same. If these skylights are not acceptable to FMRC, CONTRACTOR shall supply skylights acceptable to FMRC.

1. The roof shall contain a minimum of 2000 square feet of approximately 3' X 10' single panel translucent skylights located per OWNER's Roof Skylights future drawing. The roof skylights are to be Sequentia High Strength FRP or equal.

2. In the walls of the building shall be a minimum of 6,500 square feet of single panel, approximately 3 ft. X 12 ft., translucent wall-lights (skylights in walls). Wall-lights are to be Sequentia Standard panels or equal. The locations of these wall-lights shall be designated by the OWNER.

29

3. The combined total area of roof and wall skylights is to be 8,500 square feet.

SECTION 13660 GUTTERS, DOWNSPOUTS AND FLASHING

1. The CONTRACTOR shall install gutters and downspouts, roof to wall flashing, cap flashing and concrete splash plates or buried storm pipe. The outside top edge ( overflow ) edge of all gutters is to be below the low end of the roof surface. The spacing between downspouts shall be one half ( 1/2 ) code requirements or alternatively stated downspouts are to be twice the code requirement size.

## DIVISION 14 - INTERIOR OFFICES AND OTHER INTERIOR STRUCTURES

SECTION 14050 GENERAL DESCRIPTION

1. The PROJECT will include a two story main office with four (4) office rest rooms on second floor. The First (1st) floor is to contain 2 plant personal rest rooms and a lunch room. Also included in this division is a Truck Driver room and a Truck Driver rest room in the office structure. All structures in Division 14 are to be considered a part of the main structure and must therefore comply with the requirements stated in all other applicable parts of this complete document. Diagrams of the finished electrical, duct WORK and plumbing are to be provided by CONTRACTOR for OWNER after WORK is completed.

2. The foundations for all structures in Division 14 shall be reinforced concrete elements. Footing design is to be based on soil tests, the weight of the structures, point load bearings and a second floor loading of 150 PSF. Minimum cover for reinforcing steel in the foundation is to be 3". CONTRACTOR must provide foundation calculations with all requirements for the structures.

3. The first floor slab in the Main Office is to be a minimum of 5" thickness. All other floor slabs on grade shall be 8" thick.

4. All second (2nd ) story and mezzanines are to have a steel joist floor system with a minimum 3" thick reinforced concrete floor ( 4,000 psi) over plastic membrane on a galvanized 24 gauge minimum metal deck screwed down to steel joists.

SECTION 14100 MAIN OFFICE, GENERAL DESCRIPTION

1. CONTRACTOR shall build a two story structure for the main office located in the main building.



30

The main office will be a two story structure with each floor 6,327 sq. ft. with an inside stairway, with handrails and another stairway with hand rails at the North end of the offices (outside office). The First Floor shall contain seven (7) private offices, an open WORK area, a 294 sq. ft. Lunch Room, plant personnel rest rooms and a Truck Driver Room and Truck Driver Room Rest Room.

The Second Floor shall contain eight (8) private offices, a kitchen, a recreation room, a shower and Jacuzzi room, a sauna room that includes a toilet fixture, four (4) Rest rooms and two (2) conference rooms. First and second floors to be approximately per attached offices drawing, CONTRACTOR to do a detailed layout and obtain OWNER's approval prior to construction. Jacuzzi and sauna fixtures and Tanning Table will be supplied by OWNER.

2. The height of the 2nd story floor top surface is to be 12 ft.

3. The office perimeter walls shall be fire rated per code and F.M. recommendations and extend to the building ceiling. The perimeter walls shall be painted white.

4. The perimeter fire rated wall shall contain, on the first (1st) floor, 13 each 3' X 5' steel framed, double pane, non opening windows, as per the attached 1st floor drawing to allow viewing of the plant floor from the office rooms. The Second (2nd) floor perimeter fire rated wall shall contain 18 each 40" x 72" steel framed, double pane, non opening windows.

5. Main office to have single pane windows between offices.

6. The Main Office shall contain 35 each exterior windows (see Section 08500). Locate per OWNER.
SECTION 14120 TRUCK DRIVER ROOM

1. CONTRACTOR shall build a Truck Driver room inside the 1st floor office with ceiling height the same as the office per the following:

2. The Truck Driver room, 11' X 8,' is to be built as shown on attached Main Office 1st floor drawing on the first floor with a door to the Main Office and a door to the adjacent 8' X 6' rest room. The Truck Driver room is to contain a small 8' X 6' rest room with door per the attached drawing. The walls separating the room and the office shall be Gypsum board on steel studs.

SECTION 14131 TRUCK DRIVER REST ROOM

1. Truck Driver rest room shall contain one water closet, one mirror, one lavatory and one electric hand dryer.



## SECTION 14133 FIRST FLOOR OFFICE PLANT REST ROOMS IN MAIN OFFICE

1. CONTRACTOR shall build into the Main Offices (for warehouse personnel use) a set of Rest Rooms as follows and per OWNER.

2. Women's room shall contain 3 water closets, 2 lavatories, 2 mirrors and 2 electric hand dryers and one emergency shower. All water closets are to be enclosed in partitions with doors.

3. Mens rooms shall contain 2 water closets, two (2) urinals, 2 lavatories, 2 mirrors and 2 electric hand dryers and one emergency shower. All water closets are to be enclosed in partitions with doors.

4. Provide one handicap stall in each rest room.

## SECTION 14135  SECOND FLOOR  MAIN OFFICE REST ROOM

1. The second floor shall contain 4 rest rooms in addition to facilities in the recreation room.

2. Each of the four Second floor unisex rest rooms shall contain one water closet, one lavatory, one mirror, one electric hand dryer and hook up for washer and dryer, also one closet with shelves one shower stall, Towel Racks, and Hook-ups for Washer and Dryer .

## SECTION 14136 RECREATION ROOM, BATH ROOM JACUZZI/SHOWER & SAUNA ROOM

1. Build on the second floor a recreation room, bath room Jacuzzi/shower room and a sauna room, all to be installed as per the attached drawing. The sauna, hot tub & shower room floor is to be ceramic tile. Recreation room floor is to be ceramic tile. Sauna and hot tub fixtures and the tanning table will be supplied by OWNER and installed by CONTRACTOR.

## SECTION 14180 - STRUCTURAL SYSTEMS

The Structural Systems for the Main Office shall be columns and beams. and are to meet Seismic Zone 0 requirements or higher seismic requirements. All Main Office structural steel elements shall be treated with anti-rust primer.

The construction of the second story floors will meet all Steel Joist Institute and ACI specifications and requirements. All elements, components, connections, fasteners and joints



PLAN VIEW, WEST WALLS

WALL STUDS

2 SIDED THICK TAPE

DOUBLE BUBBLE REFLECTIVE INSULATION

DRY WALL

WEST

PLAN, VIEW, NORTH, SOUTH & EAST OFFICE WALLS

.75" MIN. AT MID-POINT

WALL STUDS

2 SIDED THICK TAPE

DOUBLE BUBBLE REFLECTIVE INSULATION

DRY WALL

2nd STORY CIELING

AIR DUCT

DOUBLE BUBBLE REFLECTIVE INSULATION

2nd STORY FLOOR

AIR DUCT

DOUBLE BUBBLE REFLECTIVE INSULATION

FIRST FLOOR CIELING

OFFICE INSULATION DRAWING
MSI INC. 7/12/99   F. CRAIG



BUILDING WALL INSULATION
DRAWING          SIDE VIEW

MSI INC.

7/112/99      F. CRAIG



THERMAL BLOCK, 1/2″ (MIN.) THICK

roof panel

2 SIDED THICK TAPE

PURLIN

RADIANT BARRIER

BUILDING ROOF INSULATION
DRAWING          SIDE VIEW

MSI INC.

7/112/99    F. CRAIG

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ACI | American Concrete Institute |
| ADA | American Disabilities Act |
| A.F.F. | Above Finished Floor (electrical) |
| ANSI | American national Standards Institute |
| ASA | American Standards Association |
| AISC | American Institute of Steel Construction |
| AWG | American Wire Gauge (electrical) |
| B.B. | Battery Backup (electrical) |
| CKT | Circuit (electrical) |
| C.S. now ANSI | Commercial Standards |
| EMT | Electrical Metallic Tube (electrical) |
| EPA | Environmental Protection Agency |
| ESFR | Early Suppression Fast Response |
| F. | Fahrenheit |
| FC | Foot-Candles (measurement of light) |
| FM or FMRC | Factory Mutual Research Corp. |
| FRP | Fiberglass Reinforced Panel |
| GFI | Ground Fault Interrupter (electrical) |
| G.R.C. | Galvanized Rigid Conduit (electrical) |
| HVAC | Heating, Ventilation and Air Conditioning |
| KVA | Kilo Volt-Amp (1,000 Volt Amps) (electrical) |
| MPH | Miles Per Hour |
| NEC | National Electrical Code |
| OSHA | Occupational Safety and Health Agency |
| PSF | Pounds per Square Foot |
| PSI | Pounds per Square Inch |
| PVC | Polyvinylchloride |
| SEER | Standard Energy Efficiency Ratio |
| SPB or SBCCI | Southern Building Code Congress International, Standard Building Code |
| THHN | Electric wire type (electrical) |
| U.S. | United States |
| UG | Underground (electrical) |
| WWF | Welded Wire Fabric |

EXHIBIT B
LIST OF ITEMS TO BE STORED IN BUILDING

(i)     Bulk and finished foil rolls painted or unpainted, laminated or not laminated;

(ii)    Bulk and finished paper rolls painted or unpainted, laminated or not laminated;

(iii)   Bulk and finished plastic type rolls painted or unpainted, laminated or not laminated;

(iv)    All finished goods and all raw and in-process materials needed to manufacture products in Highland Supply's catalog dated 1998.

(v)     Speed Cover® Plant Covers & Sheets. Standard, printed, Prestige Plus, Brite, Due, Mini Dot, Earth Cover, Basketweave, Satin.

        Bags. Clear, Corsage, Gift-It, Grass

        Easter/Shredded Products. Standard Easter Grass, Beauty Grass, Iridescent Shred, Paper shred, SizzlePak Shred, Decorative Grass

        Dazzle Wrap & Sheets

        Florist Foil. Plastifoil Seconds.

        Bulk Paper Rolls. SizzlePak.

        Film (Raw). Clear (Laminate), Metallic, White Opaque, Beauty Board.

        Inks/Dyes. Pigments (HM&S Extrusion Dye). Water-based Inks (Flexiverse Red, Lithol Rubine, Phthalo Blue, Sunsperse Yellow, Diarylide Yellow, Y/S Red, Carbon Black). Lacquer for Speed Cover® Film (Renaissance, Mini Dot, Duet, Standard).

        Chemicals/Adhesives. Morstick, Joncryl, Surfynol, Defoamer BYK, Liquitron, Raybo, Citrus D-Limonene, Lucidene, Acrysol, Aqua Ammonia, Foam Blast, Lox Wash. Glues for Speed Cover® Film (Standard, Mini Dot, Duet, Brite).

        Corrugated Boxes. Speed Covers®, Corsage Bags, Easter Grass.

        Resin. Polypropylene (In Bags & Plastic Gaylords)

        Miscellaneous. 4" and 6" Flower Pots, Labels, Machine Parts, Wickets (with or without rubbers).

EXHIBIT C

Without limiting its liability under this Contract, the CONTRACTOR shall, for the protection and benefit of the Indemnitees which includes but is not limited to The Generation Trust (a parent of Walnut Grove, L.L.C.) and Automation Management Corporation (a subsidiary of Walnut Grove, L.L.C.) and the OWNER and the agents, employees, subsidiaries, successors, assigns, affiliates, officers, directors, OWNER's managers and trustees of all of the above-mentioned, the CONTRACTOR and as part of the CONTRACTOR's efforts to satisfy the obligations set forth in the AGREEMENT, procure, pay for and maintain in full force and effect, and shall require each Subcontractor and all sub-subcontractors to procure, and maintain, at all times during the performance of the WORK until final acceptance of the WORK or for such duration as required, policies of insurance issued by a responsible carrier or carriers acceptable to the OWNER, and in form and substance reasonably satisfactory to the OWNER, which afford the coverages set forth below:

(A)    Workmen's compensation insurance in full compliance with the Workmen's Compensation Act of the State of Texas with Waiver of Subrogation in favor of OWNER, All States Endorsement, and Employer's Liability coverage in the amount of $1,000,000 per occurrence per Walnut Grove, L.L.C. PROJECT.

(B)    Comprehensive General Liability bodily injury, including death $1,000,000 per occurrence per Walnut Grove, L.L.C. PROJECT. $1,000,000 per aggregate per Walnut Grove, L.L.C. PROJECT.

Property Damage (Broad Form): $500,000 per occurrence per Walnut Grove, L.L.C. PROJECT. $1,000,000 per aggregate per Walnut Grove, L.L.C. PROJECT.

(C)    Comprehensive Automobile liability bodily injury, including death (Owned, leased, or hired, and non-owned motor vehicle): $1,000,000 per person per Walnut Grove, L.L.C. PROJECT. $1,000,000 per occurrence per Walnut Grove, L.L.C. PROJECT. Property Damage: $500,000 per aggregate per Walnut Grove, L.L.C. PROJECT.

(D)    Contractual Liability:

Bodily Injury: $1,000,000/$1,000,000 per Walnut Grove, L.L.C. PROJECT. Property Damage: $1,000,000/$1,000,000 per Walnut Grove, L.L.C. PROJECT.

Liability insurance shall also include, but not be limited to:

1.    Premises - Operations.
2.    Products - Completed Operations beyond 2-3 years of project coverage.

3.    Independent Contractors.
4.    XCU Coverage.
5.    Contractual Liability (oral and written).
6.    Personal Injury (libel, slander, defamation of character, discrimination).
7.    Incidental Medical Malpractice.

(E)   Pollution liability policy with $5,000,000 per occurrence limit with OWNER as an additional insured or as an additional named insured as directed by OWNER in its sole discretion after examination of policy.  Pollution liability policy must be written on an occurrence basis and must be written with a carrier who has an AM Best rating of A++.

(F)   Commercial umbrella insurance in excess of above primary limits:

For fire protection, plumbing, mechanical, and electrical subcontractors     $5,000,000 per Walnut Grove, L.L.C. PROJECT

For all other subcontractors     $5,000,000 per Walnut Grove, L.L.C. PROJECT

For Sections A, B, C, D and E
                     $5,000,000 per Walnut Grove, L.L.C. PROJECT

(G)   Sixty (60) days prior written notice required for coverage cancellation or reduction.

(H)   The OWNER will be covered as an additional insured or as an additional named insured as directed by OWNER in its sole discretion after examination of the insurance policies (or specimens thereof) procured, or to be procured by contract or pursuant to Exhibit C.

(I)   All insurance to be written on an occurrence basis and to be written with carriers having a minimum AM Best's rating of A. The Additional Insured - OWNER endorsement ISO form #GG20101185 should be attached to the CONTRACTOR's insurance policies.

(J)   Builder's Risk insurance must be provided to cover the PROJECT during the course of construction per the following requirements.

a)    Coverage is written to provide protection against "All Risks" of physical loss or damage to the property, including flood, collapse, earthquake, and seepage, pollution, and contamination resulting from a covered peril or causing a covered peril.

b)    Coverage for hot and cold testing, boiler explosion,

C-2

machinery breakdown, and electrical injury is provided.

c)   Coverage for soft costs, business interruption, extra expense, loss of rental income (if appropriate), expediting expenses, and claim preparation expenses.

d)   Damages covered include fees for design professionals.

e)   There is no prohibitions or restrictions on adding additional interests or against subrogation waivers.

f)   Additional coverages include debris removal; property in temporary, off-site storage or in transit; and sue and labor charges.

(K)   CONTRACTOR to provide insurance coverage in excess of the One Million Dollars ($1,000,000.00) to be provided by architects, engineers and other design professionals as per Item 13 and provide up to Three Million Dollars ($3,000,000.00) to insure for the provisions as described in Item 13 and the DESIGN/BUILD AGREEMENT for the architects, engineers and design professionals.

CONTRACTOR shall forward a certificate of insurance outlining points A through K above at least seven (7) days before beginning WORK to OWNER.

CONTRACTOR shall also require each Subcontractor to indemnify and hold harmless the OWNER, and its affiliated and related entities, due to such Subcontractor's negligence with respect to this PROJECT, in form and substance acceptable to OWNER, and substantially similar to CONTRACTOR's indemnification herein.

The CONTRACTOR hereby agrees to deliver to the OWNER, within ten (10) days of the date of the AGREEMENT and prior to any equipment being delivered to the site, certified copies of all insurance policies procured by the CONTRACTOR under or pursuant to this AGREEMENT or, with consent of the OWNER, Certificates of Insurance in form and substance satisfactory to the OWNER evidencing the required coverages with limits not less than those specified above. The coverage afforded under any insurance policy obtained under or pursuant to this AGREEMENT shall be primary to any valid and collectible insurance carried separately by the CONTRACTOR or any of its subcontractors. Further, all policies and Certificates of Insurance shall expressly provide that no less than sixty (60) days prior written notice shall be given the OWNER in the event of material alteration, cancellation, non-renewal or expiration of the coverage contained in such policy or evidenced by such certified copy or Certificate of Insurance.

In no event shall any failure of the OWNER to receive certified copies or certificates of policies required hereunder or to demand receipt of such certified copies or certificates prior to the

CONTRACTOR commencing the WORK be construed as a waiver by the OWNER of the CONTRACTOR's obligations to obtain insurance pursuant to this AGREEMENT.  The obligation to procure and maintain any insurance required by this AGREEMENT is a separate responsibility of the CONTRACTOR and independent of the duty to furnish a certified copy or certificate of such insurance policies.

If the CONTRACTOR fails to purchase and maintain, or require to be purchased and maintained, any insurance required under this AGREEMENT, OWNER may, but shall not be obligated to, upon five (5) days' written notice to the CONTRACTOR, purchase such insurance on behalf of the CONTRACTOR and shall be entitled to be reimbursed by the CONTRACTOR upon demand or, in OWNER's sole discretion, OWNER may set-off the purchase cost against any amount owed CONTRACTOR under this AGREEMENT.

When any required insurance, due to the attainment of a normal expiration date or renewal date shall expire, the CONTRACTOR shall supply the OWNER with Certificates of Insurance and amendatory riders or endorsements that clearly evidence the continuation of all coverage in the same manner, limits of protection, and scope of coverage as was provided by the previous policy.  In the event any renewal or replacement policy, for whatever reason obtained or required, is written by a carrier other than that with whom the coverage was previously placed, or the subsequent policy differs in any way from the previous policy, the CONTRACTOR shall also furnish the OWNER with a certified copy of the renewal or replacement policy unless the OWNER provides the CONTRACTOR with prior written consent to submit only a Certificate of Insurance for any such policy.  All renewal and replacement policies shall be in form and substance satisfactory to the OWNER and written by carriers acceptable to the OWNER.

Any aggregate limit under the CONTRACTOR's liability insurance shall, by endorsement, apply to this PROJECT separately.

The additional insured endorsement included on the Subcontractor's comprehensive general liability policy shall state that coverage is afforded the additional insureds with respect to claims arising out of operations performed by or on behalf of the CONTRACTOR.  If the additional insureds have other insurance which is applicable to the loss, such other insurance shall be on an excess or contingency basis.  The amount of the insurer's liability under this insurance policy shall not be reduced by the existence of such other insurance.

# CONTINUATION SHEET

## AIA DOCUMENT G703 (Instructions on reverse side)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

PAGE    OF    PAGES

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C – G) | RETAINAGE (IF VARIABLE RATE) |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |

AIA DOCUMENT G703 • CONTINUATION SHEET FOR G702 • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

G703-1992

CAUTION: You should use an original AIA document which has this c⋯ on printed in red. An original assures that chang⋯ ⋯ill not be obscured as may occur when documents are reproduced.

F -1

# INSTRUCTION SHEET
## FOR AIA DOCUMENT G703

### A.  GENERAL INFORMATION

**1. Purpose and Related Documents**

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed for use on Projects where the Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

**2. Use of Current Documents**

The user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

**3. Limited License for Reproduction**

AIA Document G703 is a copyrighted work and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The document is intended to be used as a consumable—that is, the original document purchased by the user is intended to be consumed in the course of being used. There is no implied permission to reproduce this document, nor does membership in The American Institute of Architects confer any further rights to reproduce G703. A limited license is hereby granted to retail purchasers to reproduce a maximum of ten copies of a completed or executed G703, but only for use in connection with a particular Project. Further reproductions are prohibited without the express written permission of the AIA.

### B.  COMPLETING THE G703 FORM:

**Heading:** This information should be completed in a manner consistent with similar information on AIA Document G702, Application and Certificate for Payment.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled values consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed Work covered by the previous application (columns D & E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated in the project that were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column must be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed—This Period.)

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702 form.

Construction Change Directives: Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201.

*The following is an example of a Continuation Sheet for work in progress. Please note that dollar amounts shown below are for illustrative purposes only, and are not intended to reflect actual construction costs.*

| A | B | C | D | | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| ITEM NO | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | % (G ÷ C) | | |
| 1 | MOBILIZATION | 5,000 | 5,000 | 0 | 0 | 5,000 | 100 | 0 | |
| 2 | STUMP REMOVAL | 5,000 | 5,000 | 0 | 0 | 5,000 | 100 | 0 | |
| 3 | EARTH WORK | 15,000 | 10,000 | 5,000 | 0 | 15,000 | 100 | 0 | NOT APPLICABLE TO CONSTANT RATE RETAINAGE |
| 4 | LOWER RETAING WALL | 10,000 | 0 | 5,000 | 0 | 5,000 | 50 | 5,000 | |
| 5 | CURBS & MISC. CONC. | 5,000 | 0 | 0 | 0 | 0 | 0 | 5,000 | |
| 6 | PAVING, UPPER DRIVE | 20,000 | 0 | 0 | 0 | 0 | 0 | 20,000 | |
| 7 | PAVING, LOWER DRIVE | 20,000 | 0 | 0 | 0 | 0 | 0 | 20,000 | |
| 8 | PAVERS | 10,000 | 0 | 0 | 10,000 | 10,000 | 50 | 10,000 | |
| 9 | BRICK WORK | 5,000 | 0 | 0 | 0 | 0 | 0 | 5,000 | |
| | | 105,000 | 10,000 | 10,000 | 10,000 | 40,000 | | 65,000 | |

*Instruction Sheet revised 4/94 without procedural change.*



# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702 (Instructions on reverse side) PAGE ONE OF    PAGES

| | |
|---|---|
| TO OWNER: | PROJECT: | APPLICATION NO.: | Distribution to: |
| | | | ☐ OWNER |
| | | PERIOD TO: | ☐ ARCHITECT |
| | | PROJECT NOS.: | ☐ CONTRACTOR |
| FROM CONTRACTOR: | VIA ARCHITECT: | | ☐ |
| | | CONTRACT DATE: | ☐ |
| | | | ☐ |
| CONTRACT FOR: | | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

**1. ORIGINAL CONTRACT SUM** ........... $

**2. Net change by Change Orders** .........

**3. CONTRACT SUM TO DATE (Line 1 ± 2)** ........ $

**4. TOTAL COMPLETED & STORED TO DATE** .......
(Column G on G703)

**5. RETAINAGE:**
  a. _____ % of Completed Work $
    (Columns D + E on G703)
  b. _____ % of Stored Material $
    (Column F on G703)
  Total Retainage (Line 5a + 5b or
  Total in Column 1 of G703) ...........

**6. TOTAL EARNED LESS RETAINAGE** ....... $
(Line 4 less Line 5 Total)

**7. LESS PREVIOUS CERTIFICATES FOR PAYMENT**
(Line 6 from prior Certificate)

**8. CURRENT PAYMENT DUE** ........... $

**9. BALANCE TO FINISH, INCLUDING RETAINAGE**
(Line 3 less Line 6) $

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____ Date: _____

State of:
County of:
Subscribed and sworn to before
me this                   day of
Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** ...........
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)
ARCHITECT:
By: _____ Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

G702-1992

D-1

# INSTRUCTION SHEET
## FOR AIA DOCUMENT G702

### A. GENERAL INFORMATION

#### 1. Purpose and Related Documents

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

#### 2. Use of Current Documents

Prior to using any AIA document, the user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

#### 3. Limited License for Reproduction

AIA Document G702 is a copyrighted work and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The document is intended to be used as a consumable—that is, the original document purchased by the user is intended to be consumed in the course of being used. There is no implied permission to reproduce this document, nor does membership in The American Institute of Architects confer any further rights to reproduce G702. A limited license is hereby granted to retail purchasers to reproduce a maximum of ten copies of a completed or executed G702, but only for use in connection with a particular project. Further reproductions are prohibited without the express written permission of the AIA.

### B. COMPLETING THE G702 FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702, Application and Certificate for Payment.

The Contractor should sign G702, have it notarized, and submit it, together with G703, to the Architect.

The Architect should review G702 and G703 and, if they are acceptable, complete the Architect's Certificate for Payment on G702. The Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201. The Architect should then initial all figures on G702 and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702 and G703 should be forwarded to the Owner.

*The following is an example of an Application for Payment for work in progress. Please note that dollar amounts shown below are for illustrative purposes only, and are not intended to reflect actual construction costs.*

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract. Continuation Sheet, AIA Document G703, is attached.

| | |
|---|---|
| 1 ORIGINAL CONTRACT SUM | $ 100,000.00 |
| 2 Net change by Change Orders | $ 5,000.00 |
| 3 CONTRACT SUM TO DATE (Line 1 ± 2) | $ 105,000.00 |
| 4 TOTAL COMPLETED & STORED TO DATE (Column G on G703) | $ 40,000.00 |
| 5 RETAINAGE: | |
| a. ___% of Completed Work (Columns D + E on G703) | $ 5,000.00 |
| b. ___% of Stored Material (Column F on G703) | $ 500.00 |
| Total Retainage (Line 5a + 5b or Total in Column I of G703) | $ 3,500.00 |
| 6 TOTAL EARNED LESS RETAINAGE (Line 4 less Line 5 Total) | $ 36,500.00 |
| 7 LESS PREVIOUS CERTIFICATES FOR PAYMENT (Line 6 from prior Certificate) | $ 18,000.00 |
| 8 CURRENT PAYMENT DUE | $ 18,500.00 |
| 9 BALANCE TO FINISH, INCLUDING RETAINAGE (Line 3 less Line 6) | $ 68,500.00 |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | 10,000.00 | 5,000.00 |
| TOTALS | 10,000.00 | 5,000.00 |
| NET CHANGES by Change Order | 5,000.00 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR: *Robert Apple*

By *ROBERT APPLE, PRESIDENT*   Date: *AUGUST 1, 1992*

State of: VIRGINIA
County of: FAIRFAX

Subscribed and sworn to before me this FIRST day of AUGUST 1992

Notary Public
My Commission expires: DEC. 31, 1995

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . . . . $
*(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)*

ARCHITECT:

By . . . . . . . . . . . . . . . . . . . . . . . Date: . . . . . . . .

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

### C. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Architect on AIA Document G702, Application and Certificate for Payment. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702.

### D. EXECUTION OF THE DOCUMENT

Each person executing the Agreement should indicate the capacity in which they are acting (i.e., president, secretary, partner, etc.) and the authority under which they are executing the Agreement. Where appropriate, a copy of the resolution authorizing the individual to act on behalf of the firm or entity should be attached.



*Instruction sheet revised 6/94 without procedural change*   D-2

# CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

See instructions on reverse side.

APPLICATION NO.:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

PAGE　OF　PAGES

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G÷C) | BALANCE TO FINISH (C-G) | RETAINAGE (IF VARIABLE RATE) |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 1. | GENERAL CONDITIONS | | | | | | | | |
| 2. | CONCRETE FOUNDATION | | | | | | | | |
| 3. | PRE-ENGINEERED BLDG. | | | | | | | | |
| 4. | BUILDING ERECTION | | | | | | | | |
| 5. | HANGER DOOR | | | | | | | | |
| 6. | DOOR ERECTION | | | | | | | | |
| 7. | MASONRY WALL | | | | | | | | |
| 8. | EXTERIOR WINDOWS | | | | | | | | |
| 10. | STOREFRONT/ENTRANCE | | | | | | | | |
| 11. | OVERHEAD DOOR | | | | | | | | |
| | SUBTOTAL | | | | | | | | |
| 12. | OVERHEAD & PROFIT | | | | | | | | |

*Sample* (handwritten)

F-3

1092

# CONTINUATION SHEET

See Instructions on reverse side.

APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

PAGE    OF    PAGES

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| | | | FROM PREVIOUS APPLICATION (D+E) | THIS PERIOD | | | | | |
| 13. | ARCHITECTURAL & ENGIN. | | | | | | | | |
| | TOTAL | | | | | | | | |
| 14. | CHANGE ORDER #1 ELECTRICAL ROUGH IN | | | | | | | | |
| | PLUMBING ROUGH IN | | | | | | | | |
| 15. | CHANGE ORDER #2 METAL BLDG XTRAS | | | | | | | | |
| 16. | CHANGE ORDER #3 FOUNDATION XTRAS | | | | | | | | |
| 17. | CHANGE ORDER #4 POWER, LIGHTING, SERVICE UNDERGRND SERVICE | | | | | | | | |
| 10. | CHANGE ORDER #5 MASONRY WALL | | | | | | | | |
| | TOTAL | | | | | | | | |

F-4

# CONTINUATION SHEET

APPLICATION AND CERTIFICATION FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

See Instructions on reverse side.

APPLICATION NO.:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

PAGE   OF   PAGES

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 19. | CHANGE ORDER #6 ELECTRICAL TRIM OUT | | | | | | | | |
| 20. | CHANGE ORDER #7 PLUMBING FIXTURES & SUPPLY | | | | | | | | |
| | TOTAL | | | | | | | | |

Sample

EXHIBIT G

SUBCONTRACTOR'S LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS          )
                            )    KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____  )

BEFORE ME, the undersigned authority personally appeared _____ of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

"PURSUANT to an Agreement made by and between Affiant and FINSA DEVELOPMENT CORPORATION (hereinafter referred to as "GENERAL CONTRACTOR") whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

"For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

EXECUTED this _____ day of _____, 1999.

_____
AFFIANT

G-1

```
THE STATE OF TEXAS            )
                              )
COUNTY OF _____)
```

BEFORE ME, the undersigned authority on this day personally appeared _____, and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


_____
NOTARY PUBLIC, STATE OF TEXAS

_____
(print notary name above)


MY COMMISSION EXPIRES:

G-2

## SUBCONTRACTOR'S PARTIAL LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS )
              )   KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____)

   BEFORE ME, the undersigned authority personally appeared _____ of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

   "PURSUANT to an Agreement made by and between Affiant and FINSA DEVELOPMENT CORPORATION (hereinafter referred to as "GENERAL CONTRACTOR") whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

   "For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant through the date of his or its latest request for payment, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

   EXECUTED this _____ day of _____, 1999.


_____
AFFIANT

THE STATE OF TEXAS                    )
                                      )
COUNTY OF _____)

     BEFORE ME, the undersigned authority on this day personally appeared _____, and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


                              _____

                              NOTARY PUBLIC, STATE OF TEXAS

                              _____

                              (print notary name above)


MY COMMISSION EXPIRES:

G-4

CONTRACTOR'S LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS          )
                            )   KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____   )

BEFORE ME, the undersigned authority personally appeared _____ of FINSA DEVELOPMENT CORPORATION of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

"PURSUANT to an Agreement made by and between Affiant and WALNUT GROVE, L.L.C. whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

"For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are owed by Affiant or payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

EXECUTED this _____ day of _____, 1999.


_____
AFFIANT

```
THE STATE OF TEXAS              )
                                )
COUNTY OF _____ )
```

BEFORE ME, the undersigned authority on this day personally appeared _____ , and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


_____
NOTARY PUBLIC, STATE OF TEXAS

_____
(print notary name above)


MY COMMISSION EXPIRES:

G-6

## CONTRACTOR'S PARTIAL LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS          )
                            )  KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____  )

    BEFORE ME, the undersigned authority personally appeared _____ of FINSA DEVELOPMENT CORPORATION of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

    "PURSUANT to an Agreement made by and between Affiant and WALNUT GROVE, L.L.C. whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

    "For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant through the date of his or its latest request for payment, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are owed by Affiant or payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

    EXECUTED this _____ day of _____, 1999.


_____
AFFIANT


G-7

```
THE STATE OF TEXAS              )
                                )
COUNTY OF _____ )
```

BEFORE ME, the undersigned authority on this day personally appeared _____, and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


_____
NOTARY PUBLIC, STATE OF TEXAS

_____
(print notary name above)


MY COMMISSION EXPIRES:

G-8

EXHIBIT H

CHANGE ORDER TO THE DESIGN/BUILD AGREEMENT BETWEEN
FINSA DEVELOPMENT CORPORATION AND WALNUT GROVE, L.L.C.
DATED _____

Walnut Grove, L.L.C. (OWNER)        Finsa Development Corporation
1111 Sixth Street                   (CONTRACTOR)
Highland IL 62249                   973 South Minnesota
                                    Brownsville TX 78521

CHANGE ORDER # _____
CHANGE ORDER INITIATION DATE: _____
PROJECT: Los Indios Building for Walnut Grove
CONTRACT FOR: 125,000 Square Foot Building
CONTRACT DATE: _____

You are directed to make the following changes in this CONTRACT:

_____

_____

_____

_____

_____

NOTE: All terms and conditions of the DESIGN/BUILD AGREEMENT between OWNER and
      CONTRACTOR shall apply to this CHANGE ORDER.

THE TOTAL SUM OF THIS CHANGE ORDER: _____

Not valid until signed by the OWNER and CONTRACTOR. Signature of the CONTRACTOR
indicates his AGREEMENT herewith, including any adjustment in the CONTRACT SUM
or CONTRACT TIME.

The original CONTRACT SUM was:                     $_____
Net change by previously authorized CHANGE ORDERS: $_____
The CONTRACT SUM prior to this CHANGE ORDER was:   $_____
The CONTRACT SUM will be increased by
      this CHANGE ORDER:                           $_____
The new CONTRACT SUM including this
      CHANGE ORDER will be:                        $_____

Authorized by:

Walnut Grove, L.L.C. (OWNER)        Finsa Development Corporation
1111 Sixth Street                   (CONTRACTOR)
Highland IL 62249                   973 South Minnesota
                                    Brownsville TX 78521

By:_____        _____

Date: _____         Date: _____

will meet or exceed American Institute of Steel Construction standards. CONTRACTOR must provide structural calculations to OWNER. All live loads must be increased by a minimum of 20% above the applicable code requirements for office areas. Reinforcing steel shall be grade 60.

SECTION 14200 -MAIN OFFICES DIVIDING WALLS AND CEILINGS

1. Dividing walls shall be galvanized steel 25 gauge frame on 16" centers. Horizontal channels shall be at a minimum spacing of 48 inches.

2. The drywall shall be 5/8" thick gypsum. The 5/8" gypsum drywall will be screwed to the metal studs, taped and floated with a minimum of two coats of M100 Hypo Allergic Drywall Compound by Murco. The finished drywall surface will be smooth and free of ridges, bumps or indentations. All wall lines must be squared and vertically plumed. Ceilings will be painted drywall panels with insulation on the top of the 2nd story ceiling..

3. Color of walls to be off white and approved by OWNER prior to painting.

SECTION 14250 - MAIN OFFICE FINISH

1. Floors: The 1st floor office space and bathroom floors will be 12" x 12" heavy traffic vinyl tile. The bathroom floors will be installed on concrete leveling floor adhesive and 1/8" thick caulking. The entire 2nd floor including aisles, Sauna, Hot Tub and Shower rooms are to be 8" X 8" ceramic tile. Floor color options are to be presented to OWNER for approval prior to installation.

2. Base: The base will be 3" vinyl on floors with vinyl and 3" ceramic tile on ceramic floors.

3. Office Walls: Walls will be finished with one coat of Benjamin Moore primer and two coats of Benjamin Moore Impervo Enamel.

4. Ceilings, Offices: *The 1st floor* ceiling will be painted drywall panels suspended exposed grid 2' x 2' at a 10' maximum height and 8' minimum height using galvanized wire hangers 24" b.w. reinforced in lamps location. Appropriate space should be allowed for electrical wiring, ducting, lights, sprinklers and plumbing.

SECTION 14300 - DOORS AND WINDOWS

1.   All interior Main Office doors will be solid core 1- 3/4" birch leaf with industrial quality metal frames and 3 each 3 ½" x 3 ½" bronze finished hinges. All lock set ASA striker plates and latch sets shall be supplied by OWNER and will be installed by CONTRACTOR. OWNER will provide one lock set  with back set and cutout specifications.  Additional lock sets will be supplied after doors are installed.  All  doors between plant and office areas shall be provided with closers made by Yale manufacturing or equal. All doors stops in office area shall be Yale high profile cast aluminum or equal..  All exterior caulking shall be neoprene type and  interior caulking shall be latex type.

2.   All exterior glass shall be  5/8" thick, non  tinted,  polished plate, double pane insulation type  glass  sealed to  prevent  dust and moisture between panes.  Windows to  be  welded, anodized aluminum with Thermal Block, single  hung.   Glass section of windows shall be 4' wide by 4' high. Windows  are to be Quaker aluminum windows with double sealed panes or equivalent and contain screens.

3.   OWNER approved mini blinds are to be provided on all exterior office windows and all windows between offices and offices overlooking warehouse interior.

SECTION 14350 - OFFICE PLUMBING

1.   See Section 14134

2.   All PVC sewage lines shall be schedule 40 joined with primer and PVC cement.  All PVC lines must be tested with a minimum 10 foot height  water column.

SECTION 14400 - OFFICE  ELECTRICAL

1.  All electrical WORK will comply with the latest edition of the National Electrical Code ( NEC ) and all Federal, state and local regulations.

2.  Main breaker and distribution panel will be provided  for lights, receptacles, and regulated power for computer.

3. All wiring will be in EMT type conduit with compression fittings in concealed wall space..

4.  One isolation transformer shielded 6 KVA 120/240v will be provided for computers and one computer panel will be provided with 30 amp 1 PH, 3 wire, 12 circuits, with isolated neutral bar.

5.   All connections to be made with compression connectors insulate with 7 SCOTCH filled and SCOTCH 88. Do not use wire caps any where.

6.   All receptacles to be LEVITON, or equal, double receptacle type.

7.   Provide office lighting sufficient to give 80 candle power at floor level..

8.   All switches to be LEVITON or equal.

9.   All wire used will be THHN type.

10.   Provide exit and emergency lighting as required by NEC, OSHA, building codes and all other Federal, state and local codes.

11.   Number of office receptacles to be the greater of a minimum of 1 every 8 linear feet of wall or according to applicable building codes.

## SECTION 14500 - TELEPHONE LINES

1.   PVC conduit for incoming telephone and computer lines as per Southwestern Bell specifications will be run to a demarcation point in the building.

2.   All telephone wiring from telephone and computer equipment room to office jacks will be home runs and a dual jack will be mounted at each location. One computer and one telephone jack is to be installed adjacent to each office receptacle. The phone and computer lines should be run over a category 5 wire and a dual category 5 jack, and all capable and connectors must fully comply with all EIA/TIA-568A Category 5 requirements. The jack will have one port which will operate data and the other port will operate the phone for each office. The installation should be performed by a qualified technician familiar with the category 5 requirements. When roughing-in category 5, there can be no splices on cable runs, there should not be more than 25 pounds of pulling tension used when installing, cables cannot be run in parallel with power wiring, the cable cannot be bent sharply, etc.

3.   All splices will be done on cross connect blocks. All wiring, cross connect blocks, jacks and installation will comply with all specifications for category 5 telephone wiring and connective equipment.

4.   Telephone and phone line equipment room to be located in the 86' x 37' unfinished room underneath the stairs or close to center wall as CONTRACTOR and OWNER may agree upon.

## DIVISION 15 - MECHANICAL

SECTION 15010 PLUMBING AND RELATED EQUIPMENT

1.  CONTRACTOR to provide waste-water drain system.

2.  All PVC sewage lines shall be schedule 40 joined with primer and PVC cement.  All PVC lines must be tested with a minimum 10 foot height  water column.

3.  All water pressure pipe is to be copper.

4.  All copper piping shall be "L" above grade and "K" below grade. All copper to be soldered with lead free solder.  All copper piping must be tested at 100 psi for 24 hours and any leaks repaired.

5.  All above grade water pressure piping shall be insulated.

SECTION 15015 FLOOR DRAINS

1.  The CONTRACTOR shall provide at least one floor drain in each rest room.   No point on any rest room floor will be further than 12 feet from a floor drain.  The floor shall be constructed so as to drain toward the floor drain.

SECTION 15020 PLUMBING, FIXTURES AND ACCESSORIES

1.  The CONTRACTOR shall provide one (1) 30 gallon electric water heater and one (1 ) 50 gallon electric water heater by State, model #PRV or equal.

2.  CONTRACTOR shall supply and install metal partitions for rest  rooms with baked enamel and all hardware included.  Rest rooms are to be equipped with hand air dryers made by Nova International, exhaust ventilator fans, soap dispensers, mirrors, and toilet paper dispensers.

3.  All water closets will be American Standard brand open front  plastic seat with infrared electronic flush valve on each water closet with inside diameter from front to back a minimum of 15 inches and with the ability to handle high solids.

4.  All lavatories will be American Standard brand with infrared electronic shout off  valve faucets.

5.  All urinals will be American Standard brand with infrared electronic shut off flush

the OWNER. The vent must meet Factory Mutual standards for HPR rates.

## SECTION 15060   AIR CONDITIONING

1.  Provide two (2) split air conditioning systems with electric heaters which will heat and cool the offices and Drivers room and hold the temperature within, when in full use, at 70 degrees f. when the outside temperature is 20 degrees f. or 115 degrees f.

2.  The air conditioners are to have scroll pumps with a minimum SEER rating of 12 and air handlers to match.

3.  All air delivery ducts for A/C system except return air ducts shall be wrapped with Double Bubble Reflective Insulation from Innovative Insulation, Inc. or equal. No ducts shall contain any fiberglass insulation. All duct WORK shall be galvanized steel ducting. CONTRACTOR does not warrant that duct WORK will not sweat.

## DIVISION 16 - ELECTRICAL

SECTION 16020 CONDUIT

1.  The CONTRACTOR shall provide EMT type conduit with compression fittings in concealed wall space and 10' A. F. F. All conduit below 10' A. F. F. to be G. R. C.

2.  All conduit 2" and larger to be G. R. C. in all locations.

3.  Provide four (4) electrical conduits, through the floor, to the outside for future lamp post lighting, (one at each side of building).

SECTION 16030 ENTRANCE

1.  The CONTRACTOR shall provide and install a concrete transformer pad outside the building and underground conduit encased in concrete  and wire to bring electric power into the building.

SECTION 16040 SERVICE  EQUIPMENT

1.  The CONTRACTOR shall provide switch gear and panels to be 3 phase 480 volt as follows:

<div align="center">SWITCH GEAR</div>

CONTRACTOR shall size the main to supply all power required for CONTRACTOR installed circuits plus 400 amps and at least 2 empty breaker spaces for future use.

Panel is to have main breaker, 3 phase-4 wire 480/277Y volt with GFI and anti-single phasing protection, I-Line type panel. Verify short circuit current available and provide proper bus bracing.

Provide breakers with proper short circuit interrupting ratings for all CONTRACTOR installed circuits.

Provide panel and breakers for all warehouse and outside lighting with switching for these to be near office.

Provide main breaker and distribution panel, warehouse and office light panels with breakers, warehouse and office receptacle panels with breakers, power panels as required for building (including one at office wall for office HVAC and computers), transformers as required for building (including office), 20 duplex outlets on columns and posts in warehouse, all warehouse exit lights with B. B. and emergency heads, 16 each 250 watt wall packs outside) and 110 volt wiring to all overhead doors to allow plugging in of lights (supplied by OWNER) shining into trailers and emergency lights. Lights are to be located by OWNER.

CONTRACTOR shall provide an over the door, outside light at all exterior doors.

CONTRACTOR shall provide four (4) exterior 110 volt receptacles outside, two (2) of which will be located near the first docks north and south of office and the other two (2) which will be located at the northmost and southmost docks.

Provide circuits, panel and breakers or disconnects for 8 OWNER supplied chargers for electric 5,000 lb. Fork Trucks

Provide at office wall one isolation transformer-shielded 6KVA 120/240 V for computers and one computer panel (CP) 30 AMP-MB-1 phase-3 wire-12CKT with isolated neutral bar.

Provide 6 breakers for computers.

SECTION 16050 WIRING

1. All electrical WORK shall comply with the latest edition of the NEC.

2. CONTRACTOR shall arrange with electric company to provide the service and pad mounted transformer adjacent to building.

3.  All UG conduit is to be PVC encased in concrete.  All conduit is to be exposed except for the service entrance which is to be buried and brought in through the floor..

4.  CONTRACTOR shall provide a 3/0 bare copper ground conductor 3' below grade around the building and cadweld perimeter to columns or structure and to a 10' X 5/8" ground rod driven at 50' intervals.

5.  All conductors should be stranded copper.

6.  All conductors AWG 2 and larger are to be RHH-RHW-USE.  All conductors smaller than AWG 2 to be THHN-THWN.

7.  All connections are to be made with compression connectors, insulate with Scotch-fil and Scotch 88.  Do not use wire caps.

8.  Feeder conductor--No splices are to be made in the feeder conductor except under Terminal Block connectors in boxes with removable covers.

9.  All switch gear and distribution equipment is to be SQ. D, Westinghouse or General Electric.  Verify short circuit current available to determine rating.

10.  Unless otherwise noted all lighting fixtures are to be 277V 1 phase.

11.  All plant lighting is to be 400 watt metal halide-Hi-Bay type.  CONTRACTOR shall provide for a foot candle (FC) level of 35 at floor with space being unoccupied.

12 . All office lighting fixtures are to be high efficiency lay-in  2' X 4'  with electronic ballast.

13. CONTRACTOR shall provide exterior lighting around perimeter of the building.

14. CONTRACTOR shall provide exit and emergency lighting as required by the NEC, Building Code, OSHA and all other local and state codes.  OWNER, at his option, may supply up to ten (10) of the exit lights it has previously removed from another building.  For any signs that OWNER supplies OWNER will receive a deduction per sign that is the same amount as CONTRACTOR is paying for the other emergency exit signs or $100.00, whichever is less.

15. CONTRACTOR shall use a minimum of AWG #12 copper conductor sizes for all lighting and receptacle circuits.

SECTION 16060 PUBLIC ADDRESS SYSTEM

1.  The CONTRACTOR is to provide a public address system with 12 Bogen speakers # SPT-15A mounted near the ceiling throughout the warehouse. The PA system should interface with the phone system and shall connect the PA system to the phone system.

2.  CONTRACTOR shall provide one Bogen Amplifier #TPU-100B

3.  CONTRACTOR shall provide one Voice Operated #VAR-1.

4.  CONTRACTOR shall provide and install speaker wire Bogen #9497 or equal.

5.  CONTRACTOR shall install speaker wire no closer than 2 ft. of any lights or other electric equipment.  Do not parallel when within 2 Ft. of other electric wires.

SECTION 16600 UTILITIES CONNECTIONS

CONTRACTOR shall provide all utilities connections and hookups for water, sewer and electrical.

SECTION 16700 PERMITS
(See Section 01804)

CONTRACTOR shall obtain any and all permits required to complete the PROJECT.


**DIVISION 17  FENCING**

SECTION 17001 FENCE

1.  CONTRACTOR shall provide and install  approx. 2,800 ft. of 7.5 ft. high, 12 gage, galvanized chain link fence with 3 strands of barbed wire on top, 3 each 8 ft. wide and one each 25 ft, wide gates.

41



WALNUT GROVE, LLC
LOS INDIOS, TEXAS

WAREHOUSE SITE
MAY 5, 1999
F. CRAIG

DRAINAGE DITCH

IRRIGATION
EASEMENT

CALICHA

GRASS          30'

12', TYP.

N

135'

70'

12'

78'

50'

8" CONCRETE

12 DOCKS

150'

OFFICE

BUILDING
200' X
625'

RAMP

CAR
PORK

550

171'

84'

156'     25'

13 DOCKS

48'

4'

6'   130'

176'       24'

30'

30'

80'

C.L.,   U.S. 281 & RIGHT OF WAY



EW = Exterior Window 4'x4' (Qty 11)
NOW = 3'x5' non opening window (Single Pain (Qty 9)
NOW(OP) 3'x5' non opening window Double Pane (Qty 13)

Main Office
1st Floor

N
W — E
S

37'

171'

85'

13'x16.5' offices

13'x16.5' offices
('for conference' room if desire)

16.5'    NOW(OP)    NOW(OP)    16.5'

NOW(OP)    13'    4' Aisle    13'    NOW(OP)

NOW    NOW

NOW    NOW

NOW    4.5' Aisle    NEW

18'    13.5'    Main Entrance

18'    13.5'    Truck Driver Room    Truck Driver RR

13.5'x18' Men's Restroom
2 Toilets, 2 Urinals
1 Emergency Shower
2 Lavoratories
3 mirrors
2 Electric Hand Dryers

21'    16'    Office

14'x21' Inside Stairs to Lunch Room

13.5'x18' Women's Restroom
3 Toilets, 2 Lavoratories
1 Emergency Shower
2 mirrors
2 Electric Hand Dryers

Private entrance to 1st floor open room that gives access to stairway to 2nd floor

NOW(OP)    NOW

Inside Stairs to 2nd floor

86'x37' unfinished room with windows +
mini blinds and with concrete floor
- All other floors on 1st floor to be Heavy Traffic
13'x18" Vinyl Tile per owners approval.

Stairs to 2nd floor from ware house

NOW(OP)    NOW(OP)    NOW(OP)

EW    EW    EW    EW    EW    EW    EW    EW    EW

NOW    NOW    NOW(OP)

EW = Exterior window 4'x4" (Qty-24)
Exterior window start 32" from floor, exit 80" from floor

NOW = Non opening window single Pane (Qty-29) w/ bottom starting 35" from floor

NOW (DP) 40"x72" Non opening window Double Pane (Qty 18) w/ Bottom Starting 35" from floor

Main Office
2nd Floor

N
E — W
S

37'

171'

40"x72"

Main Office 2nd Floor plan:

- 3'Aisle / 4' Aisle / Rest Room / Office — 20' / 3 EW's / 21'
- Rest Room / Office or File / Office / 3 EW's / 21'
- Aisle / Rest Room / Office / Office or File / 3 EW's / 21'
- Office or File / Office / 3 EW's / 21'
- Aisle / Office / 3 EW's / 21'
- Office or File / Sauna Tanning Showers / Toilet / 3 EW's / 21'
- Rest Room / Kitchen / Exercise Room / 3 EW's / 21'
- Aisle / Conference Room / 3 EW's / 21'

Windows labeled: NOW(DP), NOW(DP), NOW(DP), NOW, NOW, etc.

Stairway from 1st Floor to 2nd Floor

Kitchen w/counter cabinets, Double Sink, Garbage Disposal, Hook ups for Dishwasher, Refrigerator / Freezer, Stove,

Stairs to 2nd Floor from warehouse

4 Rest rooms to Have:
1 Toilet, 1 mirror
1 Lavoratory / 1 Electric Hand dryer
1 Vanity, 1 Shower stall
Racks for Towels

— All 2nd Floor floors to be 8"x8" Ceramic tile per owner's approval



CONTRACTOR'S LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS         )
                            )  KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____)

     BEFORE ME, the undersigned authority personally appeared _____ of FINSA DEVELOPMENT CORPORATION of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

     "PURSUANT to an Agreement made by and between Affiant and WALNUT GROVE, L.L.C. whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

     "For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are owed by Affiant or payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

     EXECUTED this _____ day of _____, 1999.


_____
AFFIANT


G-5

THE STATE OF TEXAS                    )
                                      )
COUNTY OF _____)

    BEFORE ME, the undersigned authority on this day personally appeared _____, and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


                       _____
                       NOTARY PUBLIC, STATE OF TEXAS

                       _____
                       (print notary name above)


MY COMMISSION EXPIRES:

G-6

CONTRACTOR'S PARTIAL LIEN WAIVER AFFIDAVIT

THE STATE OF TEXAS       )
                                )  KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF _____)

     BEFORE ME, the undersigned authority personally appeared _____ of FINSA DEVELOPMENT CORPORATION of _____ County, Texas, hereinafter referred to as "Affiant"), known to me to be a credible person, and after being by me duly sworn upon oath stated and affirmed that:

     "PURSUANT to an Agreement made by and between Affiant and WALNUT GROVE, L.L.C. whereby Affiant agreed to furnish labor, services and/or material for the construction of improvements upon that tract of real property described in Exhibit "A" attached hereto and made a part hereof for all purposes; and

     "For and in consideration of payment and receipt of $_____, Affiant has and does hereby waive, relinquish and release his or its liens, claims, rights and charges of every nature whatsoever which have arisen by virtue of any such labor, service and/or material having been performed and/or furnished by Affiant through the date of his or its latest request for payment, including any and all mechanic's or materialman's lien or liens claims afforded Affiant under the laws of the State of Texas. Affiant further agrees that as of the date hereof, Affiant has paid or has caused to be paid all bills, invoices, charges or other amounts due and payable which are owed by Affiant or payable by Affiant to others for labor, services and/or material furnished to or for the benefit of Affiant for construction of the aforementioned improvements, together with all applicable local, state or federal taxes or assessments payable by Affiant and that Affiant agrees that it shall defend, indemnify and hold harmless the GENERAL CONTRACTOR and OWNER of the aforementioned tract of real property and improvements, and such tract of real property and improvements from and against all such claims for any amount not so paid by Affiant."

     EXECUTED this _____ day of _____, 1999.


                      _____
                      AFFIANT

THE STATE OF TEXAS                    )
                                      )
COUNTY OF _____ )

     BEFORE ME, the undersigned authority on this day personally appeared _____, and after being duly sworn, stated that the statements hereinabove set forth are true and correct, that Affiant has the authority to make this Affidavit, and further acknowledged that Affiant executed the same for the purposes and consideration therein expressed.


                      _____
                      NOTARY PUBLIC, STATE OF TEXAS

                      _____
                      (print notary name above)


MY COMMISSION EXPIRES:

EXHIBIT H
## CHANGE ORDER TO THE DESIGN/BUILD AGREEMENT BETWEEN
## FINSA DEVELOPMENT CORPORATION AND WALNUT GROVE, L.L.C.
### DATED _____

Walnut Grove, L.L.C. (OWNER)         Finsa Development Corporation
1111 Sixth Street                    (CONTRACTOR)
Highland IL 62249                    973 South Minnesota
                                     Brownsville TX 78521

CHANGE ORDER #_____
CHANGE ORDER INITIATION DATE: _____
PROJECT: Los Indios Building for Walnut Grove
CONTRACT FOR: 125,000 Square Foot Building
CONTRACT DATE: _____

You are directed to make the following changes in this CONTRACT:

_____

_____

_____

_____

_____

NOTE: All terms and conditions of the DESIGN/BUILD AGREEMENT between OWNER and
      CONTRACTOR shall apply to this CHANGE ORDER.

THE TOTAL SUM OF THIS CHANGE ORDER: _____

Not valid until signed by the OWNER and CONTRACTOR. Signature of the CONTRACTOR
indicates his AGREEMENT herewith, including any adjustment in the CONTRACT SUM
or CONTRACT TIME.

The original CONTRACT SUM was:                          $_____
Net change by previously authorized CHANGE ORDERS:     $_____
The CONTRACT SUM prior to this CHANGE ORDER was:       $_____
The CONTRACT SUM will be increased by
    this CHANGE ORDER:                                 $_____
The new CONTRACT SUM including this
    CHANGE ORDER will be:                              $_____

Authorized by:

Walnut Grove, L.L.C. (OWNER)         Finsa Development Corporation
1111 Sixth Street                    (CONTRACTOR)
Highland IL 62249                    973 South Minnesota
                                     Brownsville TX 78521

By:_____          _____

Date: _____       Date: _____

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

RECEIVED
AUG 3 0 2001
LUCCO, BROWN & MUDGE

WALNUT GROVE L.L.C.,                )
an Illinois Limited Liability Company,   )
                                    )
    Plaintiff,                    )           Cause No. 01 L 1121
                                    )
vs.                                 )
                                    )
FINSA DEVELOPMENT CORPORATION,  )           **JURY TRIAL DEMANDED**
a Texas Corporation,                )
                                    )
    Defendant.                    )

## ANSWER & COUNTERCLAIM

### ANSWER

COMES NOW Defendant Finsa Development Corporation ("Finsa"), and for its answer states as follows:

### Count I

1.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 1.

2.    Admitted.

3.    Defendant is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 3.

4.    Defendant admits that on or about October 22, 1999, Defendant entered into a written contract with Plaintiff for the construction of a building in Los Indios, Texas, a copy of which is attached to Plaintiff's Complaint as Exhibit A. Except as expressly admitted herein, Defendant is without sufficient knowledge, information or belief as to truth of the remaining matters alleged in this paragraph of Plaintiff's Complaint.



EXHIBIT
C

5.    Defendant admits that Defendant entered into a written contract with Plaintiff for the construction of a building in Los Indios, Texas, a copy of which is attached to Plaintiff's Complaint as Exhibit A. Defendant further states that prior to entering into said contract, Plaintiff provided Defendant with documentation which indicated that the fire suppression system that would comply with the contract would utilize K-14 sprinkler heads at 75 pounds per square inch ("psi") of water pressure, that Plaintiff and its agents misled Defendant and withheld information from Defendant concerning the fire suppression system; and that after the contract was executed and Defendant had designed a system that complied with the contract and the fire code based the information furnished to Defendant, Plaintiff and its agents revised the requirements and demanded a system that did not comply with the fire code and which greatly exceeded the cost of the K-14 system. Except as expressly admitted herein, Defendant denies the allegations in this paragraph of Plaintiff's Complaint.

6.    Defendant is without knowledge or information sufficient to form a belief as to truth of the matters alleged in Paragraph 6 of Plaintiff's Complaint and, therefore, denies the same.

7.    Defendant admits that on October 22, 1999 Walnut Grove and Finsa entered into a contract titled "Design/Build Agreement Between Owner and Contractor." Defendant further admits that a partial copy of the same is attached as Exhibit A to Plaintiff's Complaint. Except as expressly admitted herein, Defendant denies the allegations in this paragraph of Plaintiff's Complaint.

8.    Defendant is without knowledge or information sufficient to form a belief as to truth of the matters alleged in Paragraph 8 of Plaintiff's Complaint.

9.    Denied.

2

10. Denied

11. Defendant states that the identified document contains the best evidence of its content. Except as expressly admitted herein, Defendant denies the allegations in this paragraph of Plaintiff's Complaint.

12. Denied.

13. Defendant states that the identified document contains the best evidence of its content. Except as expressly admitted herein, Defendant denies the allegations in this paragraph of Plaintiff's Complaint.

14. Denied.

15. Denied.

16. Defendant is without knowledge or information sufficient to form a belief as to truth of the matters alleged in Paragraph 16 of Plaintiff's Complaint and, therefore. denies the same.

17. Denied.

18. Denied.

## DEFENSES AND/OR AFFIRMATIVE DEFENSES TO COUNT I

COMES NOW Defendant and for its defenses and/or affirmative defenses to Count I, states as follows:

1. Plaintiff prevented Defendant from timely completion of the building in that:

   a. Plaintiff furnished false information to Defendant and withheld information relating to the requirements of the fire protection system;

3

b.  Plaintiff altered the specifications for the fire protection system just two months before the contract completion date, rendering timely completion impossible;

c.  Plaintiff's specifications required a fire protection system that was not approved by the National Fire Protection Association and/or the building code of Los Indios;

d.  Plaintiff's building requirements, as interpreted by Plaintiff after the execution of the contract, are contradictory in that they require compliance with the building code but also require a fire protection system that was not approved by the National Fire Protection Association or the building code of Los Indios;

e.  Plaintiff has continuously failed to approve reasonable change orders or respond to requests for information relating to the project, including the fire protection system; and

f.  Plaintiff failed to obtain timely permanent electrical power for the building and to make other decisions and selections necessary for the completion of the building.

2.    Plaintiff has materially breached the contract for the reasons set forth in paragraph 1.

3.    Plaintiff fraudulently induced the Defendant to enter into the contract in that Plaintiff provided Defendant with instructions for the design of the fire protection system which Plaintiff knew were improper, or in reckless disregard for the propriety of the instructions; Plaintiff knew and intended that Defendant would rely upon such instructions to bid the job and design the system; the fault in the instructions was due to the misclassification of the nature of Plaintiff's products, a subject on which Plaintiff and its agents had far superior knowledge to that of the Defendant; and, Defendant did not know that the instructions were faulty, but reasonably relied upon them to Defendant's detriment in bidding the job and designing the fire protection system.

4

4.   Plaintiff agreed that if Defendant would obtain a variance that would permit the use of the fire protection system proposed by Plaintiff, even though it was not approved by the National Fire Protection Association or the building code of Los Indios, Plaintiff would execute a change order with respect to the fire protection system that would increase Defendant's compensation under the contract by $100,000; however, after Defendant obtained a variance, the Plaintiff breached its promise and rejected the variance, refused to take action to comply with the conditions in the variance, and breached its agreement to enter into a change order so that the fire protection system and the building could be completed.

5.   Defendant is excused from the performance of the remaining portion of the contract in that it cannot do so without violating the law in that the fire protection system proposed by Plaintiff is not approved by the National Fire Protection Association or the building code of Los Indios, Texas.

6.   Plaintiff's claims for liquidated damages as a result of the alleged delay are in lieu of actual damages for delay and, therefore, all of Plaintiff's claims for damages for delay other than liquidated damages are precluded.

7.   The liquidated damage clause constitutes an unenforceable penalty.

8.   Plaintiff's claim fails to state a claim for attorney fees, and such claim should be stricken from Plaintiff's Complaint.

WHEREFORE, for the foregoing reasons, Defendant Finsa Development Corporation prays that this Court enter judgment in favor of Defendant and against Plaintiff on Count 1 of Plaintiff's Complaint, and award Defendant its costs and such other relief as this Court deems just.

## Count II

1-18.    Defendant realleges and adopts by reference its answers to paragraphs 1-18 of Count I of Plaintiff's Complaint, which paragraphs Plaintiff has realleged.

19.    Denied.

20.    Denied.

21.    Denied.

22.    Denied

23.    Denied.

## DEFENSES AND/OR AFFIRMATIVE DEFENSES TO COUNT II

COMES NOW Defendant and for its defenses and/or affirmative defenses to Count II, states as follows:

1.    Plaintiff prevented Defendant from timely completion of the building in that:

    a.    Plaintiff furnished false information to Defendant and withheld information relating to the requirements of the fire protection system;

    b.    Plaintiff altered the specifications for the fire protection system just two months before the contract completion date, rendering timely completion impossible;

    c.    Plaintiff's specifications required a fire protection system that was not approved by the National Fire Protection Association and/or the building code of Los Indios;

    d.    Plaintiff's building requirements, as interpreted by Plaintiff after the execution of the contract, are contradictory in that they require compliance with the building

code, but also require a fire protection system that was not approved by the National Fire Protection Association or the building code of Los Indios:

e.    Plaintiff has continuously failed to approve reasonable change orders or respond to requests for information relating to the project, including the fire protection system; and

f.    Plaintiff failed to obtain timely permanent electrical power for the building, and to make other decisions and selections necessary for the completion of the building.

2.    Plaintiff has materially breached the contract for the reasons set forth in Paragraph 1 above.

3.    Plaintiff fraudulently induced the Defendant to enter into the contract in that Plaintiff provided Defendant with instructions for the design of the fire protection system which Plaintiff knew were improper, or in reckless disregard for the propriety of the instructions; Plaintiff knew and intended that Defendant would rely upon such instructions to bid the job and design the system; the fault in the instructions was due to Plaintiff's misclassification of the nature of Plaintiff's products, a subject on which Plaintiff and its agents had far superior knowledge to that of the Defendant; and, Defendant did not know that the instructions were faulty, but reasonably relied upon them to Defendant's detriment in bidding the job and designing the fire protection system.

4.    Plaintiff stated that if Defendant would obtain a variance that would permit the use of the fire protection system proposed by Plaintiff, even though it was not approved by the National Fire Protection Association or the building code of Los Indios, Plaintiff would execute a change order with respect to the fire protection system that would increase Defendant's compensation under the contract by $100,000; however, after Defendant obtained a variance, the Plaintiff breached its promise and rejected the variance, refused

7

to take action to comply with the conditions in the variance, breached its agreement to enter into a change order so that the fire protection system and the building could be completed, and wrongfully prevented Defendant from completing the fire protection system.

5.      Defendant is excused from the performance of the remaining portion of the contract in that it cannot do so without violating the law in that the fire protection system proposed by Plaintiff is not approved by the National Fire Protection Association or the building code of Los Indios, Texas.

6.      Plaintiff's claims for liquidated damages as a result of the alleged delay are in lieu of actual damages for delay and, therefore, all of Plaintiff's claims for damages for delay other than liquidated damages are precluded.

7.      The liquidated damage clause constitutes an unenforceable penalty.

8.      Plaintiff's claim fails to state a claim for attorney fees, and such claim should be stricken from Plaintiff's Complaint.

WHEREFORE, Defendant Finsa Development Corporation prays that this Court enter judgment in favor of Defendant and against Plaintiff on Count II of Plaintiff's Complaint, and award Defendant its costs and such other relief as this Court deems just.

## COUNTERCLAIM

### Count I – Breach of Contract

COMES NOW Defendant Finsa Development Corporation ("Finsa") and for Count I of its counterclaim against Plaintiff states as follows:

1.      Finsa is a corporation organized and existing under the laws of the State of Texas.

8

2.   Walnut Grove L.L.C. ("Walnut Grove"), upon information and belief, is a limited
liability company organized under the laws of the State of Illinois.

3.   In 1999 Walnut Grove invited Finsa to bid on the construction of a warehouse that
Walnut Grove sought to build in Los Indios, Texas.

4.   Walnut Grove's specifications required that the warehouse was to have an ESFR
sprinkler system acceptable to Walnut Grover's insurer, Factory Mutual.

5.   In conjunction with the bidding process, Walnut Grove furnished Finsa with a May 26,
1999 letter from Factory Mutual, a true copy of which is attached hereto as Exhibit 1,
which states that Walnut Grove had supplied Factory Mutual with the building
specifications for the warehouse.

6.   Factory Mutual's letter states that the Early Suppression Fast Response ("ESFR")
sprinkler protection for the warehouse is acceptable. Factory Mutual also states in its
letter that the ESFR system should be a K-14 system designed for 12 sprinkler heads to
operate at 75 pounds per square inch ("psi") of water pressure.

7.   Finsa bid the job and entered into a contract with Walnut Grove (the "Contract") in
reliance upon the Factory Mutual letter of May 26, 1999 that Walnut Grove had furnished
to Finsa.

8.   In accordance with the Contract requirement that Finsa provide an ESFR sprinkler system
satisfactory to Factory Mutual, Finsa designed a K-14 system at 75 psi in accordance
with Factory Mutual's directions as set forth in its letter of May 26, 1999.

9.   After the building was constructed, and only two months before its original Contract
completion date, Factory Mutual concluded that Easter grass, one of the products Walnut
Grove intended to store in the warehouse, was an expanded plastic and, therefore, Factory

9

Mutual's original sp.. ..ication of a K-14 sprinkler system would not suffice. Instead,
Factory Mutual proposed a K-25 sprinkler system costing one hundred and forty
thousand dollars more than the K-14 system Finsa has proposed to provide.

10.   The K-25 sprinkler system proposed by Factory Mutual was not approved by the
National Fire Protection Association and/or the building code of Los Indios and,
therefore, was rejected repeatedly by the City of Los Indios.

11.   Although Finsa's agent changed the fire protection specifications and mandated a
different system than that based on the original specifications, Walnut Grove failed and
refused to execute a change order increasing the contract sum by the amount of the
increase in cost in the fire protection system; such failure and refusal by Walnut Grove
constitutes a breach of its obligations under its contract with Finsa.

12.   Although Finsa had been ahead of schedule in the construction of the warehouse, Finsa
was prevented by Walnut Grove from completing the building in a timely fashion in that:

    a.   Walnut Grove's agent and designee, Factory Mutual, changed the requirements
for the sprinkler system after the contract had been entered into and just two
months before the planned completion date;

    b.   Factory Mutual demanded a K-25 design that was not approved by the National
Fire Protection Association and/or the building code of Los Indios and, therefore,
could not lawfully be installed;

    c.   Factory Mutual did not even begin to perform testing needed to seek a variance
for the K-25 design it proposed until after the planned completion date;

    d.   Walnut Grove failed to obtain a required easement and agreement with the local
electrical utility to allow the placement of the transformer for the building and to

10

provide perm.....ent power until after the planned compietion date of the building; and

  e. Walnut Grove failed and refused to respond to various requests by Finsa for information, action or approval needed from Walnut Grove in order to complete the building in a timely fashion.

13. During the course of the contract, Finsa submitted six change orders to Walnut Grove, including change orders relating to the change in the sprinkler system; in breach of its contractual obligations, Walnut Grove unreasonably failed and refused to execute any change order submitted to it.

14. Walnut Grove agreed that if Finsa could obtain a variance from the City of Los Indios that would permit the use of the non-conforming K-25 sprinkler system, Walnut Grove would approve a change order for the sprinkler system which would increase Finsa's compensation by $100,000.00.

15. Although Finsa obtained the requested variance, Walnut Grove thereafter unreasonably refused to accept the variance and refused to grant the agreed upon change order, thereby materially breaching the contract and rendering it impossible for Finsa to complete the building.

16. Walnut Grove's unreasonable refusal to approve change orders and to give approvals and directions needed to complete the building constituted a material breach of contract.

17. As a direct result of Walnut Grove's breaches of contract, Finsa has suffered damages in the amount of $500,000.

18. Finsa is entitled to interest on all amounts due Finsa at the rate of 12% per annum, in accordance with Paragraph 6.C of the Contract.

WHEREFORE, FINSA prays that this Court enter judgment in favor of Finsa and against Walnut Grove on Count I of Finsa's counterclaim, and award damages to Finsa in the amount of $500,000, together with interest at the contract rate of 12% per annum, plus Finsa's costs and such other relief as this Court deems just.

### Count II – Fraudulent Misrepresentation

COMES NOW Finsa and for Count II of its counterclaim against Plaintiff, states as follows:

19.     Finsa is a corporation organized and existing under the laws of the State of Texas.

20.     Walnut Grove L.L.C. ("Walnut Grove"), upon information and belief, is a limited liability company organized under the laws of the State of Illinois.

21.     In 1999 Walnut Grove invited Finsa to bid on the construction of a warehouse that Walnut Grove sought to build in Los Indios, Texas.

22.     Walnut Grove's specifications provided that such warehouse was to have an ESFR sprinkler system acceptable to Walnut Grover's insurer, Factory Mutual.

23.     In conjunction with the bidding process, Walnut Grove furnished Finsa with a May 26, 1999 letter from Factory Mutual, a true copy of which is attached hereto as Exhibit 1, which stated that Walnut Grove had supplied Factory Mutual with the building specifications for the warehouse.

24.     Factory Mutual's letter states that the Early Suppression Fast Response ("ESFR") sprinkler protection for the warehouse is acceptable. Factory Mutual also states in its letter that the ESFR system should be a K-14 system designed for 12 sprinkler heads to operate at 75 psi.

25.    At the time Walnut Grove furnished Factory Mutual's letter to Finsa, Walnut Grove knew

that the materials Walnut Grove intended to store in the warehouse were expanded

plastics and that the representations made in Factory Mutual's letter were false, because

Factory Mutual was operating under the belief that the materials to be stored were

unexpanded plastics, which are a different, and less strict, fire classification under the fire

codes Walnut Grove relied upon in its Specifications in the Contract.

26.    Walnut Grove provided Finsa with the Factory Mutual letter knowing that the

information in the letter was false, or with reckless disregard for whether or not such

information was true.

27.    Walnut Grove knew and intended that Finsa would rely upon the Factory Mutual letter

and thereby bid a lower price for the work.

28.    Finsa did reasonably rely upon the Factory Mutual letter to bid the job; Finsa entered into

the Contract in reliance upon the Factory Mutual letter that Walnut Grove had

intentionally furnished to Finsa with erroneous information.

29.    Finsa designed a K-14 system at 75 psi in accordance with Factory Mutual's directions as

set forth in its letter of May 26, 1999.

30.    After the building was constructed, and only two months before the contract completion

date, Factory Mutual realized what Walnut Grove had known all along, that Easter grass,

one of the products Walnut Grove intended to store in the warehouse, was an expanded

plastic and, therefore, Factory Mutual's original specification of a K-14 sprinkler system

would not suffice.  Instead, Factory Mutual proposed a K-25 sprinkler system costing one

hundred and forty thousand dollars more than the K-14 system originally proposed.

31.    The K-25 sprinkler system proposed by Factory Mutual was not approved by the

National Fire Protection Association and/or the building code of Los Indios and,

therefore, was rejected ᵣ₌ₑₐₜₑₐₗᵧ by the city of Los Indios; as ᵣ ₌ₛᵤₗₜ, the sprinkler system could not be completed.

32. As a direct result of Walnut Grove's fraudulent conduct, Finsa has suffered actual damages in the amount of $500,000; in addition, the Contract, in Paragraph 6.C, provides interest of 12% per annum on all amounts owing and unpaid to Finsa.

33. Walnut Grove's intentional communication of false information with the intent that Finsa rely thereon to its detriment warrants the imposition of punitive damages, such that Walnut Grove is punished and deterred from such wrongful and egregious conduct in the future.

WHEREFORE, FINSA prays that this Court: enter judgment in favor of Finsa and against Walnut Grove on Count II of Finsa's counterclaim; award Finsa actual damages of $500,000, together with interest at 12% thereon, award punitive damages in an amount sufficient to punish Walnut Grove and deter its intentionally egregious conduct in the future; and, award Finsa its costs herein expended.

**JURY TRIAL DEMANDED**
**ON ALL COUNTS**

ARMSTRONG TEASDALE, LLP

Wilbur L. Tomlinson          #6206449
David G. Loseman            #6190860
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 612-2294 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was sent via first class mail, postage prepaid, on the ___29th___ day of August, 2001, to:  J. William Lucco, Lucco, Brown & Mudge Law Offices, 224 St. Louis Street, P.O. Box 539, Edwardsville, IL  62025.

FACTORY MUT

Factory Mutual Engineering Association
1222 Merit Drive
Suite 1800
Dallas, Texas 75251
Telephone: (972) 661-9202
Fax: (972) 661-1402 Engineering
Fax: (972) 661-9763 Adjustment

May 26, 1999

Mr. William F. Straeter
Executive Vice President
Highland Supply
Walnut Grove L.L.C.
1111 Sixth Street
Highland, IL 62249

RE:    Building Specifications
       Los Indios Facility
       Highland Supply
       Index 74676.95-01
       Account 09-07113

Dear Mr. Straeter:

Thank you for your submittal of building specifications describing construction of a new 125,000-sq. ft. warehouse at the above referenced location. The following are comments in regards to this submittal.

1.    The submittal indicates that Early Suppression Fast Response (ESFR) sprinkler protection will be provided throughout this facility. ESFR protection for this project is acceptable provided no construction features are present that would limit the installation of this protection. Care must be taken to ensure any potential obstructions are addressed as outlined in Factory Mutual's Data Sheet 2-2. Furthermore, design limitations offered in this data sheet should be strictly followed including maximum distance between the bottom of the smooth roof insulation and the sprinkler head. Any deviations from specifications listed on this data sheet would render the installation unacceptable. Close coordination between the installing sprinkler contractor, HVAC contractor, electrical contractor, and roof contractor should be made to ensure no obstructions to the ESFR sprinkler heads are present. Final drawings and calculations should be submitted to Factory Mutual for review prior to the installation. The ESFR installation checklist should also be included in the submittal.

2.    The submittal does not provided occupancy details and building heights to determine Early Suppression Fast Response (ESFR) design criteria. For a maximum storage height of 35 ft. and a maximum building height of 40 ft., the ESFR system should be designed for 12 heads at 75 psi including a 250-gpm hose stream allowance. This design would more than likely require the provision of a fire booster pump or fire pump and tank. A three-foot clearance between storage and ESFR sprinkler heads should be maintained at

Exhibit 1

all times. If this can not be obtained, then ESFR sprinklers should not be utilized in this installation.

3.  The specifications indicate that 6-in vinyl-faced fiberglass thermal insulation ceiling will be attached directly under the roof deck. The application of this ceiling material is satisfactory to Factory Mutual. However, care must be taken to ensure the maximum and minimum clearance distances of the ESFR sprinkler heads from the bottom of this insulation is not exceeded as outlined in our Operating Standard 2-2, "Installation Guidelines for Early Suppression Fast Response (ESFR) Sprinklers".

4.  Whether or not a fire water tank will be necessary in this project will depend on the hydraulic design of the system and the available public water supply. A fire water tank will not be needed only if the available public water supply can meet 100 % of the sprinkler demand, including a 250 gpm hose allowance, for the recommended 1 hour duration.

5.  Hydrants should be provided at this facility spaced roughly 300-ft (90 m) apart along the walls of buildings. For buildings over 300 ft (90 m) wide, provide hydrants on opposite sides of the building, unless long, blank masonry walls with few windows are present, but so long as there is no yard storage which requires hydrant protection. It will be satisfactory to locate the hydrants 25-ft. from the building. Depending on distance to building, available city hydrants on the street can be included as satisfactory protection.

6.  The specifications indicates that the roof will be a screwed down metal roof (Lap seam roof). The proposed roof structure should be designed to meet Factory Mutual 1-90 uplift resistance. The attachment of a lap seam roof would require several additional perimeters and corner fasteners to meet Factory Mutual's 1-90 requirements. However, this determination can not be made based upon the current submittal. Building eave and peak heights, panel widths and thickness, and type and manufacturer of the fasteners are needed to determine fastening patterns for this roof system. However, it must be made clear that the roof system should meet Factory Mutual's Class 1-90 systems. UL90 is not the same as FM 1-90. This distinction should be made clear in any specifications established for this project. UL90 should be avoided when ever possible. Most UL90 systems only achieve a FM 1-60 rating at best. The performance tests are different. Final roof specifications should be submitted for review prior to this installation. The submittal should include fastening patters as outlined above.

7.  The fire pump house should preferably be a detached building of non-combustible construction. When a detached building is not feasible, the pump room should be so located and constructed as to protect the pump unit and controls from falling floors or machinery, and from fire that might drive away the pump operator or damage the pump unit or controls. Access to the pump room should be provided from outside the building. An interior pump room should be provided with a 2-hr fire rated enclosure.

8.    If the local jurisdiction permits it and there is no risk of the collapsing the public main when the pump is in operation, a direct connection from the public main to the pump is preferred. Should local authorities require a low-pressure cutoff, Factory Mutual prefers the installation of an approved pilot controlled valve.

9.    Factory Mutual does not recommend the use of heat and smoke vents in the construction of an ESFR protected facility. These vents should be omitted if possible. If required, permanent heat and smoke vents should be arranged for manual operation. If local codes require that heat or smoke vents be arranged for automatic operation, use a standard response operating mechanism with a minimum operating temperature of 360°F (180°C).

10.   Skylights should be FMRC-Approved and should be applied and installed per the limits of the approval. They should be secured per the same rating as the rest of the roof (I-90).

11.   We look forward to reviewing the storage arrangement selected by Highland. Solid shelves should not be utilized in this project. If solid shelves are required, then ESFR should not be utilized for this project.  Also, ESFR sprinklers cannot protect uncartoned expanded plastics. If storage of these commodities is required, then alternative protection should be utilized.

12.   Sprinkler heads should be ESFR pendent 165°F nominal with a K factor of 14 gpm/psi. The minimum and maximum spacing between sprinkler heads or branch lines should be limited between 80 and 100 sq. ft. These limitations should not be exceeded.

13.   Factory Mutual does not recommend the use of draft curtains. Draft curtains can interfere with the proper distribution of sprinkler discharge. When their use is required by local codes, center them between sprinklers or sprinkler branch lines. If they are not centered, provide additional sprinklers so those sprinklers on either side of the draft curtain are no further from the curtain than one-half the allowable maximum sprinkler spacing. When draft curtains separate areas protected with ESFR sprinklers, no clear area under the draft curtains is required. When the ceilings over two areas are at the same elevations, or when the area with ESFR sprinklers has a higher roof/ceiling elevation, install a draft curtain between areas protected by ESFR sprinklers and areas protected by other types of sprinklers. ESFR sprinklers might operate unnecessarily and deplete water supplies if a fire occurs in an adjacent area protected by other sprinklers unless physical separation between the two areas is provided. Extend the draft curtain at least 2 ft (0.6 m) below the ceiling. Ensure the draft curtain is noncombustible and fits tightly against the underside of the roof. (Openings created by ribs in metal roof deck are not a concern, but openings created by channels between Z-purlins or other structural members are). Solid beams girders or other structural features, which meet the above criteria, will provide acceptable separation. Maintain a clear aisle of at least 4-ft centered under the draft curtain (2 ft. on each side of it).

14.   Provide permanent small hose lines (1 ½ in. [38 mm]) not exceeding 100 ft (30.5 m) in length, capable of reaching all storage areas to aid in firefighting and for mop-up operations.

I look forward to reviewing construction drawings, automatic sprinkler designs, and equipment list as indicated above.   Please send submittal to my attention at the following address: 18839 Redriver Trail, San Antonio, Texas 78259. Your interest in loss prevention matters is greatly appreciated.

Sincerely,

*Frank F. Liserio*

Frank F. Liserio. Jr.
Loss Prevention Consultant
Southwest Operations
San Antonio Resident

FFL/Plan 118112/6/ffl

| 1cc: | Protection/STLO/Steve Marek (E-mail)• |
| 1cc: | LE |
| 1cc: | FC |
| 1cc: | FFL (e-mail) |
| 1cc: | GPM (e-mail) |

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

**DOCKETED**

**FILED**

WALNUT GROVE, LLC )
_____ )
Plaintiff(s) )
)
DEC 19 2001
)
vs. )    No. 01-L-1121
)
FINSA DEVELOPMENT CORPORATION )
_____ )
Defendant(s) )

## ORDER

This matter was called for Case Management Conference pursuant to notice.
Following a discussion between the attorneys and the Court regarding case status,
discovery requirements and other matters pursuant to Supreme Court Rule 218, the Court
orders as follows:

1. The parties shall initiate written discovery pursuant to Supreme Court Rules
213(a) and 214 within thirty days of today's date. 1-18-02 ✓

2. Discovery and depositions of the parties ~~and the plaintiff's treating health care providers~~ shall be completed by _March 1, 2002_  3-1-02 ✓

3. Defendant shall serve Rule 213(g) interrogatories on plaintiff by
_Jan. 1, 2002_. 3-1-02 ✓

4. Plaintiff shall answer the Rule 213(g) interrogatories by _April 1, 2002_ 4-1-02 ✓

5. Plaintiff shall make retained opinion witnesses available for deposition by
_May 1, 2002_. 5-1-02 ✓

6. Plaintiff shall serve Rule 213(g) interrogatories on defendant by 4/15/02. 4-15-02 ✓
_May 1, 2002_.

7. Defendant shall answer the plaintiff's Rule 213(g) interrogatories ~~and shall identify any examiner pursuant to Supreme Court Rule 215~~ by _May 15, 2002_. 5-15-02 ✓

8. Defendant's retained opinion witnesses, if any, ~~and any Rule 215 examiner~~ shall be made available for deposition by _June 15, 2002_ 6-15-02 ✓

9. Any party may take depositions of non-retained opinion witnesses and non-party fact witnesses at any time as may be appropriate.

10. _____

_____

_____

This case is ordered set for: ( ) Jury Trial    ( ) Non-jury Trial
( ) Motion _____    (X) further Case Mgmt. Conf. _March 2002_ ✓
( ) _____

on _____, 200__, at _____
( ) Clerk to send copies of this Order to the attorneys.
( ) Copies hand delivered to the attorneys.

Date: _12/19/01_    _____
Judge

**EXHIBIT**

D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

**FINSA DEVELOPMENT CORPORATION** §
                                      §
    **Plaintiff,**                    §
                                        §
**VS.**                                     §        **CIVIL ACTION NO. _____**
                                        §
**WALNUT GROVE L.L.C.**          §
                                        §
    **Defendants.**                 §

## <u>DECLARATION OF J. WILLIAM LUCCO</u>

STATE OF ILLINOIS     §

COUNTY OF MADISON   §

    1.     My name is J. William Lucco.  I am over 18 years old and legally competent to make this affidavit.  I am an outside attorney engaged to represent Walnut Grove L.L.C. (hereinafter referred to as "Walnut Grove").  By virtue of this representation, I have personal knowledge about the matters set forth in this declaration.

    2.     Walnut Grove is a company organized under the laws of the State of Delaware.

    3.     In 1999 Walnut Grove contracted with plaintiff Finsa Development Corp. ("Finsa") to build a warehouse in Los Indios, Texas.  Finsa was the designer and builder of the project.  The parties entered into a written contract to govern their relations, entitled the  "Design/Build Agreement Between Owner and Contractor."  (hereinafter the "Agreement").  A true and correct copy of this Agreement is attached as Exhibit A.  Section 17(a) of the Agreement contained a choice

<div style="border:2px solid black; width:200px; text-align:center;">

**EXHIBIT**

_E_

</div>

of forum clause by which the parties agreed that any dispute would be brought for trial in the State Court of Illinois.   Section 17(a) also provided for application of Texas law.

4.      More than nine months ago, in July 2001, Walnut Grove filed a lawsuit against Finsa over this controversy in the State Court of Illinois in Madison County, Illinois in accordance with the forum selection clause of their Agreement. Exhibit B is a true and correct copy of that suit.  The style of that prior and pending case is *Walnut Grove, L.L.C. v. Finsa Development Corp.*, Cause No. 01 L 1121, in the Third Judicial Circuit Court for Madison County, Illinois.

5.      More than eight months ago, in August 2001, Finsa appeared in Illinois and answered the suit and is there defending it now.  More importantly, Finsa also asserted counterclaims against Walnut Grove in the Illinois suit for various relief, including the monies it claims it is owed under the Agreement for the work done.   A true and correct copy of the Answer and Counterclaim filed by Finsa in Illinois is attached as Exhibit C.  More than three months ago, the Illinois Court entered a scheduling order for discovery and trial of the Illinois suit.  See Exhibit D.

6.      Approximately nine months after appearing, answering and counterclaiming in the Illinois suit, Finsa filed a second suit over the same facility and contract in the 404th Judicial District State Court for Cameron County, Texas.  This second suit was recently removed to this federal district court.

7.      The prior and pending Illinois suit has been substantially developed.  The pleadings have been fully joined with counterclaims filed by Finsa. The Illinois state court has already entered a scheduling order in the Illinois suit.  See Exhibit D.  Substantial discovery has been taken and completed and is actively ongoing.  Thousands of pages of documents have been produced. Depositions have been scheduled and are about to commence in the Illinois suit.

-2-

8.     The second suit substantially overlaps and is entirely duplicative of the ongoing Illinois suit. The subject matter of this second suit arises from substantially, if not exactly, the same building, the same controversy, the same work, the same monies in issue and the same Agreement that is already in dispute in the Illinois suit. This second suit is, for all intents and purposes, a redundant and pointless suit which adds nothing to the resolution of the parties disputes being tried in the agreed forum of Illinois. Every claim asserted in the Texas suit arises out of the same subject matter, events and transactions already at issue in the Illinois suit. Every claim asserted in the Texas action has either already been asserted or could be asserted as a counterclaim in the Illinois suit.

9.     I declare under penalty of perjury that the foregoing statements are true and correct.

J. William Lucco